# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) ) | |
| | ) | Case No. |
| SOUTHFRESH AQUACULTURE, LLC, | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |

### MOTION OF THE DEBTOR FOR ENTRY OF INTERIM AND FINAL ORDERS: (I) AUTHORIZING THE DEBTOR TO (A) OBTAIN POSTPETITION FINANCING ON A SUPER-PRIORITY, SENIOR SECURED BASIS AND (B) USE CASH COLLATERAL, (II) GRANTING (A) LIENS AND SUPER-PRIORITY CLAIMS AND (B) ADEQUATE PROTECTION, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING AND (V) GRANTING RELATED RELIEF

SouthFresh Aquaculture, LLC, as debtor and debtor in possession in the above-captioned chapter 11 cases (the "Debtor"),[1] hereby moves this Court (this "Motion") for entry of an order in substantially the form attached hereto as **Exhibit A** (the "Interim DIP Order"), (i) authorizing the Debtor to (A) obtain postpetition financing on a senior secured, superpriority basis and (B) use Cash Collateral on the terms provided in this Motion; (ii) granting (A) liens (each, a "DIP Lien", and together, ("DIP Liens") and super-priority claims and (B) adequate protection; (iii) modifying the automatic stay to the extent necessary to grant the relief requested in this motion, (iv) scheduling a hearing to consider entry of a proposed final order (the "Final DIP Order" and, together with the Interim DIP Order(s), the "DIP Orders") authorizing the relief granted in the Interim DIP Order on permanent basis as described in this Motion, and (v) granting related relief. The Debtor respectfully states the following in support of this motion (the "Motion"):

---

[1] A detailed description of the Debtor and its business, and the facts and circumstances supporting this Motion and the Debtor's chapter 11 case (the "Bankruptcy Case"), is set forth in greater detail in the *Declaration of Justin Funk, Chief Executive Officer of SouthFresh Aquaculture, LLC, in Support of Chapter 11 Petition and First Day Motions* (the "First Day Declaration"), filed contemporaneously with the Debtor's voluntary petition for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), on January 28, 2019 (the "Petition Date"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the First Day Declaration or the Bankruptcy Code.

04724806.1

## Jurisdiction and Venue

1.      The United States Bankruptcy Court for the Northern District of Alabama (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the General Order of Reference from the United States District Court for the Northern District of Alabama, dated January 12, 1995. The Debtor confirms its consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief requested herein are sections 105(a), 362, 363, and 503(b) of the Bankruptcy Code and Bankruptcy Rule 6003.

## Background

4.      On the Petition Date, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is operating its business and managing its properties as Debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in this chapter 11 case, and no committee has been appointed or designated.

## Need for Working Capital

5.      At a high level, the Debtor's ordinary course operations can be separated into three general divisions: (1) catfish processing; (2) feed manufacturing; and (3) seafood reselling. For the catfish processing operation, Debtor purchases catfish from farmers, processes the catfish at the Processing Plant, and sells the processed catfish to customers.   For the feed manufacturing

04724806.1                              2

operation, Debtor purchases feed ingredients, manufactures the feed, and sells the manufactured feed to customers. For the seafood reselling operation, Debtor purchases seafood from a variety of sources, which it then resells to customers.

6.     For each of these operations, Debtor relies heavily on farmers, specialized vendors, ingredients suppliers, repairmen, transportation and shipping providers, and storage/ice providers, each of which provide the Debtor with the materials, supplies, and/or services necessary for the Debtor to operate its three divisions on a daily basis. Any disruption to the Debtor's supply network would have an immediate negative impact on the Debtor's business.

7.     The Debtor believes some of its vendors may be unfamiliar with the chapter 11 process and unwilling to do business on existing credit terms, assuming such parties will continue to supply the Debtor at all. Any loss of trade terms, leading to demands for cash in advance, cash on delivery, or otherwise, will negatively impact the Debtor's liquidity. Without immediate and reliable access to cash, the Debtor's ability to maintain and service its equipment and to purchase any additional equipment required to service its clients would also be jeopardized. The Debtor requires ready access to funding if it is to maintain a steady supply of materials and ensure reliable transportation of goods to the market, as well as protect its workers, customers, and overall business reputation.

8.     As set forth in the First Day Declaration, the Debtor made efforts to obtain critical post-petition financing on an unsecured basis, or a reasonably priced secured basis, without success. The Debtor approached existing credit providers who were unwilling to finance the Debtor's operations postpetition.

9.     The Debtor ultimately approached another existing prepetition lender, Alabama Farmer's Cooperative, Inc. ("AFC"). Although AFC is also the parent of the Debtor, the parties

have historically maintained an arm's-length lender/borrower relationship, pursuant to which AFC has loaned the Debtor approximately $12 million under standard loan documentation for both term loan and line of credit facilities. Although these prepetition facilities were entered into some years ago on an unsecured basis, they have not been repaid, and their repayment is now jeopardized by the Debtor's current cash constraints. Accordingly, although AFC has agreed to extend the Debtor credit post-petition as the debtor-in-possession lender (the "<u>DIP Lender</u>") pursuant to the Debtor-in-Possession Line of Credit and Security Agreement attached hereto as **Exhibit B**, it has required that such facility (the "<u>DIP Facility</u>") be fully secured and has increased the rate it charged for the existing loan facilities to account for the heightened credit risk.

## STATEMENT PURSUANT TO RULE 4001(b) AND (c)

10.     The Debtor submits this concise statement listing certain material terms of the DIP Facility and the Debtor's use of Cash Collateral (together, the "<u>DIP Financing</u>"). The Debtor believes that the following terms, which are required to be identified pursuant to Bankruptcy Rule 4001, are necessary and justified in the context and circumstances of this Bankruptcy Case.

(a)     <u>Cash Collateral</u>.  The DIP Lender will be the only party with an interest in Cash Collateral, and then only after entry of the Interim DIP Order.

(b)     <u>Use of Proceeds</u>. Proceeds of advances under the Line of Credit and any Cash Collateral may be used only for (i) working capital purposes of the Debtor from and after the Petition Date, (ii) current interest due to the DIP Lender pursuant to the terms of the Line of Credit Agreement and Note (with the Security Documents, as defined in the Line of Credit Agreement, and any other documentation or agreements into which the Debtor and Lender may enter to evidence and secure the postpetition financing, the "<u>DIP Documents</u>") and (iii) the Debtor's ordinary course operating expenses, in each case of clauses (i) through (iii) solely in accordance with the Budget[2] and the DIP Orders. Line of Credit Agreement at Section 2.

---

[2] To the extent the Debtor requires the issuance of letters of credit under the DIP Facility to support its operations in the ordinary course, the amount of such letters of credit will be deducted from the Debtor's overall availability under the Line of Credit Agreement, but will not constitute a cost or expense under or subject to the Budget unless or until any such letter of credit is drawn.

(c) <u>Borrowing</u>. The maximum principal amount available under the DIP Facility is $3,500,000. Line of Credit Agreement at Section 1. From the maximum principal amount, up to $750,000 may be used for DIP Lender to issue, or obtain the issuance for the benefit of the Debtor, letters of credit, which will result in a commensurate reduction in availability under the DIP Facility. Line of Credit Agreement at Section 2(B)(2); Letter of Credit Rider.

(d) <u>Liens and Superpriority Claim</u>. The liens and superpriority claims proposed to be granted to the DIP Lender pursuant to Bankruptcy Code Section 364(c) are described in detail in Recital D of the Line of Credit Agreement and in paragraph 9 of the proposed Interim DIP Order, and shall not include any lien or encumbrance in favor of the DIP Lender on any of the Debtor's Chapter 5 causes of action, but will permit a Carve-Out for certain administrative and professional fees of the Debtor as set forth in the Budget. Line of Credit Agreement at Section 2(B)(1). As adequate protection for the use of Cash Collateral, the Debtor proposes to provide continuing liens on newly-acquired or generated post-petition assets, a superpriority claim, and adequate protection payments, all as set forth in more detail in paragraph 11 of the proposed Interim DIP Order.

(e) <u>Conditions to Borrowing</u>. The conditions precedent to initial and subsequent advances under the DIP Facility include, among other items, the DIP Lender's receipt of customary closing documentation, an approved Budget, entry of the DIP Orders in a form acceptable to the DIP Lender providing the liens and other adequate protection required by the Line of Credit Agreement, and availability. Line of Credit Agreement at Section 9. Moreover, each advance is subject to the Debtor's compliance with certain Affirmative and Negative Covenants regarding the Debtor's operations, Line of Credit Agreement Sections 11 and 12, and on the absence of any Event of Default, Line of Credit Agreement at Section 13.

(f) <u>Pricing</u>. The DIP Facility contemplates a fixed Interest Rate of 7.0%, calculated over a 360-day year and payable monthly in arrears, subject to an increase of 2.0% upon the occurrence and continued existence of an Event of Default. Line of Credit Agreement at Section 4.

(g) <u>Term of Facility</u>. The DIP Facility has a Maturity Date of January 28, 2020. Line of Credit Agreement at Section 5.

(h) <u>Events of Default</u>. The DIP Facility and the Debtor's authority to use Cash Collateral are subject to certain Events of Default, including: (i) failure to pay any installment of principal or interest when due; (ii) failure to perform, keep or observe certain covenants, representations and warranties; (iii) unauthorized priming judgments or Liens; (iv) occurrence of a Material Adverse Effect; (v) any attempt to vacate or modify the DIP Orders in a manner adverse to the DIP Lender; (vi) entry of an order

amending, supplementing or modifying any DIP Orders in a manner adverse to the DIP Lender; (vii) reversal, vacation or stay of the effectiveness of any DIP Order; (viii) any violation of the terms of any DIP Order; (ix) dismissal of the Bankruptcy Case or conversion of the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code; (x) appointment of a Chapter 11 trustee or an examiner with expanded powers; (xi) any sale of all or substantially all assets that does not allow for payment in full of all Obligations unless consented to by Lender; (xii) the Debtor's filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order, granting any superpriority claim or Lien (except as contemplated herein) that is senior to or pari passu with the Lender's liens; or (xiii) any of the Liens or the DIP Superpriority Claims granted under the DIP Orders cease to be valid, perfected and enforceable in any respect. Line of Credit Agreement at Section 13; Interim DIP Order at paragraph 13.

### Basis for Relief

11.     As set forth in the First Day Declaration, the Debtor believes that the DIP Financing is the only financing available to the Debtor at this time. The Debtor has been unable to procure alternative financing (a) in the form of unsecured credit allowable under section 503(b)(l) of the Bankruptcy Code, or (b) solely as an administrative expense under section 364(a)-(b) of the Bankruptcy Code.

12.     In addition, the proposed DIP Financing will allow the Debtor to maintain much of its existing cash management system and avoid the operational complications that would be associated with setting up new bank accounts with a new lender. Therefore, for the reasons stated herein, the Debtor submits that it has satisfied the requirements to access post-petition financing on a superpriority, secured basis pursuant to section 364 of the Bankruptcy Code.

13.     Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business and (c) obtaining credit with specialized priority or with security. If a debtor in possession cannot obtain sufficient postpetition credit on an unsecured basis, section 364(c) of the

Bankruptcy Code permits a bankruptcy court to authorize a debtor to obtain credit or incur debt, repayment of which is (x) entitled to superpriority administrative expense status or (y) is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or both. 11 U.S.C. § 364(c).

14.     As discussed, the DIP Financing is secured by substantially all of the assets of the Debtor's estate through superpriority claims, security interests, and secured liens pursuant to section 364(c) and (d) of the Bankruptcy Code.

### A.     Financing under Section 364(c) of the Bankruptcy Code

15.     Section 364(c) of the Bankruptcy Code provides that if a debtor is unable to obtain unsecured credit allowable as an administrative expense, the court may authorize the debtor to obtain credit or incur debt (a) on a superpriority administrative basis, (b) secured by a lien on the debtor's unencumbered assets or (c) secured by a junior lien on the debtor's already encumbered assets. 11 U.S.C. § 364(c).

16.     Courts consider various factors in determining whether obtaining postpetition financing pursuant to section 364(c) is appropriate, including whether (i) a debtor is unable to obtain unsecured credit under section 364(b), (ii) the transaction is necessary to preserve the assets of the debtor's estate, and (iii) the terms of the transaction are fair, reasonable and adequate under the circumstances. *See In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312-13 (Bankr. D. Del. 2011) (noting these three factors in considering proposed postpetition financing) (citations omitted); *see also In re Farmland Indus., Inc.*, 294 B.R. 855, 879 (Bankr. W.D. Mo. 2003) (noting that courts look to various factors including whether "the proposed financing is an exercise of sound and reasonable business judgment").

### (i)     The Debtor could not obtain financing on an unsecured basis

17.     As set forth in the First Day Declaration, the Debtor has not been able to obtain postpetition financing of the type and magnitude required for this Chapter 11 Case on an unsecured basis. The Debtor attempted to identify potential postpetition lenders willing to provide funding to the Debtor on more advantageous terms but was not successful. Accordingly, the DIP Financing is the Debtor's only viable financing option with terms comparable to those offered by the DIP Loan Agreement, and the liens granted to secure the DIP Financing are an essential part of the protections provided to the DIP Lender thereunder.

(ii)     **The DIP Financing is necessary to preserve assets of the Debtor's estates and is in the best interests of creditors**

18.     The Debtor's decision to accept the terms of the DIP Financing is the culmination of a search to procure financing available under the difficult circumstances in which the Debtor finds itself. Borrowing under the terms of the DIP Facility is the best option available to the Debtor and entry of the DIP Orders is in the best interests of the Debtor, its estate, and all stakeholders.

19.     The DIP Financing will provide immediate access to capital to pay vendors and employees, ensure prudent available cash flow for a business of the Debtor's size, and stabilize operations. The proceeds from the DIP Financing will be used to satisfy working capital requirements and to fund restructuring costs not payable from the cash generated by post-petition operations.

20.     Failure to obtain the DIP Financing on an interim basis (the "Interim DIP Financing") and final basis would gravely harm the Debtor and its stakeholders. Without access to the DIP Facility, the Debtor could potentially be forced to cease operations and liquidate its business piecemeal to the detriment of all parties in interest. *See In re Farmland*, 294 B.R. at 885

(approving postpetition financing that "gives the Debtor sufficient time to market and sell several of their major assets so as to pay down the debt to the DIP Lenders and then reorganize around their remaining core assets. Without the continued financing, the Debtor would likely be forced into a Chapter 7 or 11 liquidation, to the detriment of all creditors").

### (iii) The terms of the DIP Financing are fair and reasonable under the circumstances

21. In determining whether the terms of postpetition financing are fair and reasonable, courts consider the relative circumstances of both the debtor and the potential lender. *In re Farmland*, 294 B.R. at 886-89; *see also Unsecured Creditors' Comm. Mobil Oil Corp.* v. *First Nat'l Bank & Trust Co.* (*In re Ellingsen MacLean Oil Co., Inc.*), 65 B.R. 358, 364-65 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization). Judged from that perspective, the terms of the DIP Financing are eminently fair and reasonable. The DIP Financing ensures that the Debtor will have the liquidity it needs to operate its business during the Chapter 11 Case, thus permitting the Debtor the opportunity to restructure or to sell its assets, in its reasonable business judgment. After thorough analysis by the Debtor and its advisors, the Debtor has concluded that the terms of the DIP Financing, including its costs, are reasonable and appropriate under the circumstances, and better than any other terms the Debtor was offered.

22. The DIP Financing subjects the security interests and administrative expense claims granted to the DIP Lender to the Carve-Out for certain administrative and professional fees, including (a) the Debtor's quarterly fees, (b) fees of the Clerk of the Court, (c) reasonable fees and expenses incurred by professionals retained by the Debtor, subject to compliance with the Budget and allowance of such fees by the Court, where required. Carve-outs for professional

Case 19-70152-JHH11   Doc 12   Filed 01/28/19   Entered 01/28/19 17:44:52   Desc Main
Document   Page 9 of 93

fees have been found to be reasonable and necessary to ensure that debtor's estates are adequately assisted by counsel and other professionals. *See In re Ames*, 115 B.R. at 38.

23.     The DIP Lender has agreed to forego the collection of fees and charges commonly associated with obtaining post-petition financing. Courts recognize that lender fees often are the only way to obtain financing, and routinely approve them, *see, e.g., Resolution Trust Corp.* v. *Official Unsecured Creditors' Comm. (In re Defender Drug Stores, Inc.)*, 145 B.R. 312, 31619 (B.A.P. 9th Cir. 1992), but the proposed DIP Financing is of even greater benefit to the estate, and is the only post-petition credit facility the Debtor was offered without a fee.

### (iv)    The interests of any prepetition secured parties are adequately protected

24.     The interests of any prepetition secured parties are adequately protected because the DIP Financing is secured by a first priority lien only on the Debtor's currently unencumbered assets and expressly provides that any DIP Lien on an asset encumbered as of the Petition Date is only taken on a junior and subordinate basis.

### B.     Adequate Protection under Section 361 of the Bankruptcy Code

25.     Adequate protection is decided on a case-by-case basis and can be provided in various forms, including granting of replacement liens and administrative claims. *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[T]he determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case."); *see also In re Realty Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted), *rev'd on other grounds*, 89

Case 19-70152-JHH11     Doc 12     Filed 01/28/19     Entered 01/28/19 17:44:52     Desc Main
                              Document     Page 10 of 93

B.R. 336 (S.D.N.Y. 1988). "A finding of adequate protection should be premised on facts, or on projections grounded on a firm evidentiary basis." *In re Mosello*, 195 B.R. 277, 292 (Bankr. S.D.N.Y. 1996).

26. The DIP Lender is adequate protected against any post-petition diminution in the value of its collateral resulting from the Debtor's use of the DIP Lender's cash collateral by the Debtor's grant of a DIP Lien on all post-petition assets, which provides ongoing replacement value for the DIP Lien as cash is generated by future operations. Additionally, the Debtor has agreed to pay the DIP Lender monthly interest on any outstanding advances under the DIP Facility at a reasonable commercial fixed rate of seven percent (7%).

27. Accordingly, the Debtor believe that the adequate protection proposed herein and in the DIP Orders is fair and reasonable and is sufficient to satisfy the requirements of section 363(c) of the Bankruptcy Code.

28. Under these circumstances, the Debtor's decision to enter into the DIP Financing is a reasonable exercise of its business judgment, and the DIP Orders accordingly should be entered. *See, e.g., In re Ames*, 115 B.R. at 38 (noting that courts permit debtors to "exercise their basic business judgment" when obtaining debtor-in-possession financing under section 364 of the Bankruptcy Code); *Trans World Airlines, Inc.* v. *Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because the facility "reflect[ed] sound and prudent business judgment"); *see also In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("[D]iscretion to act with regard to business planning activities is at the heart of the Debtors' power.") (citation omitted).

**C. The DIP Financing Was Negotiated In Good Faith and Should Be Afforded the Protection of Section 364(e) of the Bankruptcy Code**

Case 19-70152-JHH11   Doc 12   Filed 01/28/19   Entered 01/28/19 17:44:52   Desc Main
Document      Page 11 of 93

29.     Pursuant to section 364(e) of the Bankruptcy Code, any reversal or modification on appeal of an authorization to obtain credit or incur debt or a grant of priority or a lien under section 364 of the Bankruptcy Code shall not affect the validity of that debt incurred or priority or lien granted as long as the entity that extended credit "extended such credit in good faith." *See* 11 U.S.C. § 364(e).

30.     Courts generally hold that "good faith" in the context of postpetition financing means, consistent with the Uniform Commercial Code, honesty in fact in the conduct or transaction concerned. *See Unsecured Creditors' Comm.* v. *First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 834 F.2d 599, 605 (6th Cir. 1987) (citing U.C.C. § 1-201(19)). A lender's predictable desire to ensure that it is repaid, including through the holding of collateral, and to make money on interest are understandable and acceptable motivations for a post-petition lender in negotiating a deal.  Moreover, existing prepetition creditors have a particular interest in ensuring that a debtor has sufficient capital to continue to operate in a prudent fashion under the protection of the Bankruptcy Code, in an effort to maximize the value of the debtor's assets and improve its own odds of receiving some recovery in the proceedings.  These reasonable business decisions do not suggest in any way that a post-petition lender is not acting in good faith, and the extension of credit after a petition is filed inures to the benefit of all creditors by facilitating the debtor's efforts to restructure its operations to a higher level of profitability.

31.     The terms of the DIP Financing were negotiated at arm's length and reflect the only option available to the Debtor in light of its financial circumstances.

32.     All of the advances under the DIP Facility will be extended by the DIP Lender in good faith (as such term is used in section 364(e) of the Bankruptcy Code). Moreover, the DIP Financing has been extended by the DIP Lender in express reliance upon the protections offered

Case 19-70152-JHH11    Doc 12    Filed 01/28/19    Entered 01/28/19 17:44:52    Desc Main
Document      Page 12 of 93

by section 364(e) of the Bankruptcy Code, and the DIP Lender should be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim DIP Order or any provision thereof is vacated, reversed, or modified on appeal or otherwise.

**D.  Approval of the Interim DIP Financing on an Expedited Basis is Necessary to Prevent Immediate and Irreparable Harm**

33.     Bankruptcy Rules 4001(b)(2) and 4001(c)(2) govern the procedures for obtaining authorization to use cash collateral and to obtain postpetition financing. They provide, in relevant part:

> The court may commence a final hearing on a motion for authorization to use cash collateral no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a preliminary hearing before such 14 day period expires, but the court may authorize the use of only that amount of cash collateral as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(b)(2). And:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than fourteen days after service of the motion. If the motion so requests, the court may conduct a hearing before such fourteen-day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c)(2).

34.     Generally, courts find "immediate and irreparable harm" exists where loss of the business threatens the ability to reorganize. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990). Approval of postpetition financing on an interim basis under Rule 4001(c)(2) is left to the discretion of the court as informed by the facts of each case. *See In re Pan Am Corp.*, No. 91-8319, 1992 WL 154200, at *6 (S.D.N.Y. June 18, 1992). There is no limit to the amount of funding that the court can approve on an interim basis. *Id.* After the fourteen-

day period, the request for financing is not limited to those amounts necessary to prevent the destruction of the Debtor's business, and the debtor is entitled to borrow those amounts that it believes are prudent to the operation of its business. *Ames Dept. Stores*, 115 B.R. at 36.

35.     Immediate and irreparable harm would result if the relief requested herein is not granted on an interim basis. As described in the First Day Declaration, the Debtor needs to obtain immediate access to liquidity under the DIP Financing in order to, among other things, continue the operation of its business, maintain business relationships with vendors and customers, make payroll, and satisfy other working capital and operational needs.

36.     Without immediate financing, the Debtor will likely face a substantial, if not devastating, loss of vendors and customers who may shift to competing businesses offering similar services, as well as the loss of significant numbers of employees who cannot labor without the certainty that their efforts will be timely rewarded with the earned wages and benefits. A slowdown or backlog in the processing of fish due to a lack of workers or operating funds could lead to catastrophic losses or liability for the Debtor. Funding these expenditures through the Interim DIP Financing is necessary to the Debtor's ability to preserve and maintain its going-concern value and goodwill for the benefit of all parties in interest.

37.     The crucial importance of a Debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized by courts in similar circumstances. *See, e.g.*, *In re Mid-State Raceway, Inc.*, 323 B.R. 40 (Bankr. N.D.N.Y. 2005). Federal Rule of Bankruptcy Procedure 4001(c)(2) expressly authorizes a court to grant such relief on an interim basis upon an expedited hearing pending final approval of a requested financing arrangement, as needed to prevent immediate and irreparable harm to the debtor's estate.

38.     Accordingly, the Debtor believes that, under the circumstances, entry of the Interim DIP Order is necessary to prevent immediate and irreparable harm to its estates and therefore is warranted under the requirements of Bankruptcy Rules 4001(b)(2) and 4001(c)(2).

**E.     Modification of the Automatic Stay Provided under Section 362 of the Bankruptcy Code is Appropriate under the Circumstances**

39.     The Interim DIP Order provides that the automatic stay imposed under section 362 of the Bankruptcy Code is modified to the extent necessary to permit the relief granted therein. Stay modification provisions of this sort are ordinary and usual features of debtor-in-possession financing facilities and are reasonable under the present circumstances. Accordingly, the Court should modify the automatic stay to the extent contemplated under the DIP Financing and the proposed DIP Orders.

## Request for Final Hearing

40.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtor requests that the Court set a date, no sooner than fourteen days after the date of this Motion and no later than thirty days after the entry of the Interim DIP Order, to hold a hearing to consider entry of the Final DIP Order and the permanent approval of the relief requested in this Motion. The Debtor also requests authority to serve a copy of the signed Interim DIP Order, which fixes the time and date for the filing of any objections to entry of the Final DIP Order, by first class mail upon the notice parties listed below, and further requests that the Court deem service thereof sufficient notice of the hearing on the Final DIP Order under Bankruptcy Rule 4001(c)(2).

## Bankruptcy Rule 6003 is Satisfied

41.     The Debtor have demonstrated that they will suffer "immediate and irreparable harm" if the Interim DIP Order is not entered and the Debtor are not provided immediate access to

the Interim DIP Financing. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (finding that "immediate and irreparable harm" exists where loss of the business threatens ability to reorganize). Accordingly, assuming that Bankruptcy Rule 6003 is applicable to the relief requested, the Debtor respectfully submits that it has satisfied the Rule.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

42.     Given the nature of the relief requested herein, the Debtor respectfully requests a waiver of (a) the notice requirements under Bankruptcy Rule 6004(a) and (b) the fourteen-day stay under Bankruptcy Rule 6004(h), if applicable. As set forth above, approval of the DIP Financing, including the Interim DIP Financing, is essential to prevent irreparable damage to the Debtor's operations and the value of its assets as a going concern. Accordingly, the Debtor submits that ample cause exists to justify a waiver of the requirements under Bankruptcy Rule 6004(a) and fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent they apply.

## No Prior Request

43.     The Debtor has not previously sought the relief requested herein from this or any other court.

## Notice

44.     The Debtor will provide notice of this Motion to: (a) the Office of the Bankruptcy Administrator for the Northern District of Alabama; (b) the holders of the 20 largest unsecured claims against the Debtor; (c) counsel to the proposed DIP Lender; (d) the International Chemical Workers Union Council of the United Food and Commercial Workers Union and Its Local 1038C; (e) the United States Attorney's Office for the Northern District of Alabama; (f) the Internal Revenue Service; (g) the United States Environmental Protection Agency; (h) the Alabama Department of Environmental Management; (i) the United States Department of Agriculture; (j) the United States Food and Drug Administration; (k) the Alabama Department of

Agriculture & Industries – Weights and Measures Division; (l) the office of the Attorney General for the State of Alabama; (m) the Critical Vendors; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of page intentionally blank]*

WHEREFORE, the Debtor respectfully requests that the Court enter the Order, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

/s/ J. Leland Murphree
J. Leland Murphree
Jayna P. Lamar
Ryan D. Thompson
Evan N. Parrott
Wes Bulgarella

*Proposed Counsel to the Debtor*

**OF COUNSEL:**

**MAYNARD, COOPER & GALE, P.C.**
1901 Sixth Avenue North,
2400 Regions/Harbert Plaza
Birmingham, AL 35203
(205) 254-1000
lmurphree@maynardcooper.com
jlamar@maynardcooper.com
rthompson@maynardcooper.com
eparrott@maynardcooper.com
wbulgarella@maynardcooper.com

**Exhibit A**

**Proposed Order**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

|  |  |  |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. |
| SOUTHFRESH AQUACULTURE, LLC, | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |

## INTERIM ORDER (I) AUTHORIZING THE DEBTOR TO (A) OBTAIN POSTPETITION FINANCING ON A SUPER-PRIORITY, SENIOR SECURED BASIS AND (B) USE CASH COLLATERAL, (II) GRANTING (A) LIENS AND SUPER-PRIORITY CLAIMS AND (B) ADEQUATE PROTECTION, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING AND (V) GRANTING RELATED RELIEF

Upon the motion (the "Motion"),[1] of the above-captioned debtor and debtor in possession (the "Debtor"), for entry of an order (this "Order"), (i) Authorizing the Debtor to (A) Obtain Postpetition Financing on a Super-Priority, Senior Secured Basis and (B) Use Cash Collateral, (II) Granting (A) Liens and Super-Priority Claims and (B) Adequate Protection, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing and (V) Granting Related Relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the General Order of Reference from the United States District Court for the Northern District of Alabama, dated January 12, 1995; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

04724832.1

the relief requested therein at a hearing before this Court (the "Hearing"); and it appearing to the Court that granting the interim relief requested in the Motion is fair and reasonable and in the best interests of the Debtor, its estate, and its creditors and equity holders and is essential for the continued operation of the Debtor's business and necessary to avoid immediate and irreparable harm to the Debtor's estate; and it further appearing that the Debtors are unable to obtain unsecured credit for money borrowed allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code; and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, the Court makes the following FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.    Findings Regarding the Postpetition Financing.

    (i)    *Request for Postpetition Financing.* The Debtor seeks authority on an interim basis to access and use the liquidity provided under the DIP Facility, and the resulting cash collateral of the DIP Lender, to: (i) finance ongoing debtor-in-possession working capital purposes, as provided for in the Budget, and other general corporate purposes; and (ii) finance transaction fees, costs and expenses related to the DIP Facility and this proceeding, to the extent permitted under the DIP Documents and as provided for in the Budget. The Debtor also seeks authority to use the credit available under the DIP Facility to obtain letters of credit needed to fulfill the requirements of certain key vendors, including certain sellers of fish and other seafood who must deliver their goods for government inspection prior to release of the product to the Debtor, but who refuse to do so without the payment protection provided by letters of credit.

    (ii)    *Need for Postpetition Financing and Use of Cash Collateral.* The Debtor's need for postpetition financing, and to use the resulting cash collateral of the DIP Lender, as provided for in

Case 19-70152-JHH11    Doc 12    Filed 01/28/19    Entered 01/28/19 17:44:52    Desc Main
Document    Page 21 of 93

the Motion is necessary to enable the Debtor to continue operations and to administer and preserve the value of its estate. The ability of the Debtor to finance its operations, to maintain business relationships with its vendors, suppliers, and customers, to pay its employees, and otherwise to finance its operations requires the availability of working capital from the DIP Facility and the use of cash collateral. Without the ability to access the DIP Facility or cash collateral, the Debtor, its estate, and its creditors, and the possibility for a successful reorganization, would suffer immediate and irreparable harm. The Debtor does not have sufficient available sources of working capital and financing to operate its businesses or maintain its properties in the ordinary course of business for the anticipated duration of this proceeding without the DIP Facility and authorized use of cash collateral.

(iii)     *No Credit Available on More Favorable Terms*. Given its current financial condition, financing arrangements, and capital structure, the Debtor is unable to obtain financing from sources other than the DIP Lender on terms more favorable than the DIP Facility and DIP Documents. The Debtor has been unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtor has also been unable to obtain credit (a) having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, or (b) secured solely by a junior lien on property of the Debtor and its estate that is subject to a prepetition lien. Financing on a postpetition basis is not otherwise available without granting the DIP Lender (a) a perfected, first priority security interest in and liens on all of the Debtor's existing and after-acquired unencumbered assets (other than any causes of action based on Chapter 5 of the Bankruptcy Code and subject to the Carve-Out), (b) a perfected, junior security interest in and lien on any of the Debtor's existing assets that may be subject to a valid and unavoidable prepetition  lien, and (c) a superpriority claim, all as set forth in this Interim DIP Order.

04724832.1

3

*(iv)      Adequacy of the Budget.* As set forth in the DIP Documents and the Motion, the Debtor has prepared and delivered to the DIP Lender a budget, a copy of which is annexed hereto as Exhibit 1 (as it may be modified, amended, restated or supplemented with the consent of the DIP Lender in its sole discretion, the "<u>Budget</u>").[2] The Budget has been prepared and thoroughly reviewed by the Debtor, its management, and its advisors, and the Debtor, its management, and its advisors believe the Budget and the estimate of administrative expenses due or accruing during the period covered by the Budget were developed using reasonable assumptions, and based on those assumptions the Debtor believes there should be sufficient available assets to pay all administrative expenses due or accruing during the period covered by the Budget.

B.      <u>Findings Regarding Good Faith</u>.

(i)      *Willingness to Provide Financing.* The DIP Lender has demonstrated a willingness to provide financing to the Debtor subject to: (a) the entry by this Court of this Interim DIP Order; (b) approval by this Court of the terms and conditions of the DIP Facility and the DIP Documents; and (c) entry of findings by this Court that such financing is essential to the Debtor's estate, that the DIP Lender is extending credit to the Debtor pursuant to the DIP Documents in good faith, and that the DIP Lender's claims, superpriority claims, security interests, and liens and other protections granted pursuant to this Interim DIP Order and the DIP Documents will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument, or reconsideration of this Interim DIP Order, or any other order.

(ii)      *Business Judgment and Good Faith Pursuant to Section 364(e).* The terms and conditions of this Interim DIP Order, the DIP Facility, and the DIP Documents are fair, reasonable,

---

[2] For the avoidance of doubt, the Budget is one of the DIP Documents.

and the best available to the Debtor under the circumstances, reflect the Debtor's exercise of prudent and sound business judgment consistent with its fiduciary duties, and is supported by reasonably equivalent value and consideration. The DIP Documents and the use of the DIP Lender's resulting cash collateral were negotiated in good faith and at arms' length between the Debtor and the DIP Lender, each being represented by its own counsel. The DIP Lender expressly declined to request or take any security interest in the Debtor's Chapter 5 causes of action, which shall remain unencumbered, and agreed to the Carve-Out and a reasonable Budget to facilitate the Debtor's operations under chapter 11. The use of credit to be extended under the DIP Facility and of the DIP Lender's resulting cash collateral shall be deemed to have been so allowed, advanced, made, used, and extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code, and the DIP Lender is therefore entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Interim DIP Order.

C.     Notice. Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtor, whether by facsimile, email, overnight courier, or hand delivery, to certain parties in interest, including: (a) the Office of the Bankruptcy Administrator for the Northern District of Alabama; (b) the holders of the 20 largest unsecured claims against the Debtor; (c) counsel to the proposed DIP Lender; (d) the International Chemical Workers Union Council of the United Food and Commercial Workers Union and Its Local 1038C; (e) the United States Attorney's Office for the Northern District of Alabama; (f) the Internal Revenue Service; (g) the United States Environmental Protection Agency; (h) the Alabama Department of Environmental Management; (i) the United States Department of Agriculture; (j) the United States Food and Drug Administration; (k) the Alabama Department of Agriculture & Industries – Weights and Measures Division; (l) the office

Case 19-70152-JHH11    Doc 12    Filed 01/28/19    Entered 01/28/19 17:44:52    Desc Main
Document      Page 24 of 93

of the Attorney General for the State of Alabama; (m) the Critical Vendors[3]; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"). The parties have made reasonable efforts to afford the best notice possible under the circumstances and such notice is good and sufficient to permit the relief set forth in this Interim DIP Order.

Accordingly, based upon the foregoing findings and conclusions, the Motion, and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED and DECREED** that:

1. The Motion is GRANTED.

2. The Interim DIP Financing is authorized and approved, the DIP Documents are authorized and approved on an interim basis, and the use of Cash Collateral on an interim basis is authorized, subject to the terms and conditions set forth in this Interim DIP Order and the DIP Documents (including the Budget).

3. Any objections to the Interim DIP Financing and/or entry of this Interim DIP Order, to the extent not withdrawn or resolved, are hereby overruled.

4. During the period that this Interim DIP Order is effective, and subject to the terms and conditions set forth in the DIP Documents, the DIP Facility, and this Interim DIP Order, and to prevent immediate and irreparable harm to the Debtor's estates, the Debtor is hereby authorized to access the Interim DIP Financing pursuant to the terms herein and the terms of the DIP Documents.

5. The DIP Documents are hereby approved for the Interim DIP Financing, including the Budget annexed hereto as Exhibit 1. Any modification to, or amendment or update of the Budget shall be in form and substance acceptable to and approved in writing by the DIP Lender in its sole discretion. The Debtor is expressly and immediately authorized and empowered to execute and

---

[3] As identified in Debtor's Motion for Entry of Order (I) Authorizing the Payment of Critical Vendor Claims, and (II) Granting Related Relief filed contemporaneously with the Motion.

deliver the DIP Documents, including all instruments and documents that may be necessary or required for the performance by the Debtor under the DIP Facility and the creation and perfection of the DIP Liens provided for by this Interim DIP Order and the DIP Documents, and to incur liabilities and make payments thereunder or therefrom as part of the Interim DIP Financing without need to obtain further Court approval, and otherwise operate pursuant to and in accordance with the Interim DIP Financing, including the Budget, until the final hearing on the Motion. The DIP Documents evidence valid and binding obligations of the Debtor, which shall be enforceable against the Debtor, its estate, and its creditors in accordance with the terms and conditions of the DIP Documents and this Interim DIP Order.

6.      All postpetition collections and proceeds, whether from ordinary course collections, asset sales, insurance recoveries, condemnations, or otherwise, will be deposited and governed by this Interim DIP Order and the DIP Documents as Cash Collateral of the DIP Lender, unless expressly subject to the prepetition security interest of another creditor.

7.      All of the Borrower's obligations described in the DIP Documents shall represent valid and binding obligations of the Debtor, enforceable against the Debtor and its estate in accordance with the terms of the DIP Documents. The proceeds of the DIP Facility shall be used in accordance with the DIP Documents, including the Budget as applicable (subject to any Permitted Variances therefrom as may be permitted under the Line of Credit Agreement): (a) for the payment of fees, expenses and costs incurred in connection with the Chapter 11 Cases; (b) to obtain letters of credit as required for ordinary purchases and operations, which shall reduce availability under the DIP Facility but not be an expense covered by the Budget unless or until such letters of credit are drawn, and (c) for working capital, capital expenditures, and other general corporate purposes of the Debtor. Notwithstanding entry of the Interim DIP Order or Final DIP

Case 19-70152-JHH11    Doc 12    Filed 01/28/19    Entered 01/28/19 17:44:52    Desc Main
Document        Page 26 of 93

Order, however, the DIP Lender shall have no obligation to make any loan or advance under the DIP Facility unless all of the conditions precedent to the making of such extension of credit under the Line of Credit Agreement has been satisfied in full or waived by the DIP Lender in its sole discretion.

8.        Upon entry of this Interim DIP Order, the DIP Documents and this Interim DIP Order shall constitute and evidence the validity and binding effect of the Debtor's obligations under the Interim DIP Financing, the DIP Documents, and this Interim DIP Order (the "DIP Obligations"), which DIP Obligations shall be enforceable against the Debtor, its estate, and any successors thereto, including, any trustee appointed in this case, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of this Chapter 11 Case, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases"). Upon entry of this Interim DIP Order, the DIP Obligations will include all loans and any other indebtedness or obligations, contingent or absolute, which may from time to time be owing by the Debtor to the DIP Lender under the DIP Documents or this Interim DIP Order, including all principal, accrued interest, costs, fees, expenses, and other amounts owed under the DIP Documents for the period prior to the Final Hearing on the Motion (the "Interim Period"), and upon entry of a Final DIP Order, the DIP Obligations will also include all loans and any other indebtedness or obligations, contingent or absolute, which may from time to time thereafter be owing by the Debtor to the DIP Lender under the DIP Documents or the Final DIP Order. The DIP Obligations shall be due and payable as provided for herein and in the DIP Documents.

9.        As more fully set forth in the DIP Documents and the Motion, as security for the full and timely payment of the DIP Obligations, the DIP Lender is hereby granted:

Case 19-70152-JHH11    Doc 12    Filed 01/28/19    Entered 01/28/19 17:44:52    Desc Main
Document      Page 27 of 93

(a)(i)   pursuant to Section 364(c)(2) of the Bankruptcy Code, but subject to the Carve-Out, an unavoidable  first priority lien on and security interest in all unencumbered assets of the Debtor (now existing or hereafter acquired, including all proceeds thereof) other than any claims or causes of action which the Debtor may be entitled to assert by reason of any avoidance or other power vested in or on behalf of the Debtor or the estate of the Debtor under chapter 5 of the Bankruptcy Code; and

(i)   pursuant to Section 364(c)(3) of the Bankruptcy Code, junior liens on and security interests in any encumbered assets of the Debtor which are subject to any validly perfected, unavoidable security interest or lien in existence on the Petition Date or that is perfected subsequent thereto as permitted by Section 546(b) of the Bankruptcy Code (including, without limitation, the Permitted Encumbrances, as defined in the Line of Credit Agreement).

(b)   The liens and security interests identified in subparagraph (a), above, are referred to herein as the "DIP Liens" and the collateral to which such DIP Liens attach, the "DIP Collateral."

(c)   Except as otherwise agreed by the DIP Lender or ordered by this Court in accordance with the Bankruptcy Code, the DIP Liens shall not be made subject to or *pani passu* with any lien or security interest by any court order heretofore or hereafter entered in the Bankruptcy Case and shall be valid and enforceable against any trustee appointed in the Bankruptcy Case, upon any Successor Case(s), and/or upon the dismissal of the Bankruptcy Case. The DIP Liens shall not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code.

(d)   This Interim DIP Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens without the necessity of filing or recording any financing

statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy_law) the DIP Liens in the priorities granted herein. Notwithstanding the foregoing, the DIP Lender is authorized to file, as it in its sole discretion deems necessary or desirable, such financing statements, mortgages, notices of lien, or other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens.

(e)     The Debtor is authorized to execute and promptly deliver to the DIP Lender all such financing statements, mortgages, notices, and other documents as the DIP Lender may reasonably request. The DIP Lender, in its sole discretion, may file a photocopy of this Interim DIP Order as a financing statement with any filing or recording office or with probate court or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instruments.

(f)     Until the indefeasible payment in full of all DIP Obligations and the termination of the DIP Lender's obligation to extend credit under the DIP Facility, the Debtor shall adequately insure the DIP Collateral.  Upon entry of this Interim DIP Order, the DIP Lender shall be, and shall be deemed to be, without any further action or notice, named as an additional insured and loss payee, as applicable, on each insurance policy maintained by the Debtor which in any way relates to the DIP Collateral. Notwithstanding the foregoing, the Debtor is authorized to take all necessary actions to cause the DIP Lender to be named as an additional insured and loss payee, as

Case 19-70152-JHH11    Doc 12    Filed 01/28/19    Entered 01/28/19 17:44:52    Desc Main
Document      Page 29 of 93

applicable, on each insurance policy maintained by the Debtor which in any way relates to the DIP Collateral.

(g)     Until such time as the DIP Obligations have been paid in full in accordance with the terms of the DIP Documents, all proceeds of DIP Collateral in which the DIP Lender holds a first priority DIP Lien shall either (i) be remitted or caused to be remitted to the DIP Lender for application against the DIP Obligations in accordance with the terms of the DIP Documents and this Interim DIP Order, or (ii) maintained by the Debtor as Cash Collateral of the DIP Lender subject to the provisions and restrictions of the Budget and other DIP Documents.

(h)     The DIP Lender shall have the unqualified right to credit bid up to the full amount of the DIP Obligations in any sale of the DIP Collateral (or any part thereof) without the need for further Court order authorizing the same, and whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

10.     In addition to the DIP Liens, subject and subordinate to the Carve-Out and in accordance with sections 364(c)(1), 503 and 507 of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims (the "DIP Superpriority Claims") with priority over any and all administrative expenses of the Debtor, whether heretofore or hereafter incurred, of the kind specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 364, 365, 503(b), 507(a), 507(b), 726, 1113, 1114 or any other provisions of the Bankruptcy Code under which administrative expense priority may be obtained or granted.

11.     Subject to the terms and conditions set forth in, and in accordance with, this Interim DIP Order, the DIP Facility, and the DIP Documents, including the Budget, the Debtor is

authorized to use Cash Collateral. Upon the occurrence of a Termination Event (as defined herein), the Debtor's consensual use of Cash Collateral shall automatically terminate. As adequate protection for any diminution in the value of the DIP Collateral caused by the Debtor's use of Cash Collateral, the DIP Lender shall (i) hold, to the extent such Cash Collateral is used, a continuing DIP Lien on DIP Collateral, including Cash Collateral, acquired or generated by the Debtor after entry of this Interim DIP Order, and (ii) receive monthly payments of interest in accordance with the Line of Credit Agreement and Note.

12. The term "Event of Default" shall have the same meaning under this Interim DIP Order as such term has under the DIP Documents, including Section 13 of the Line of Credit Agreement.

13. Upon the occurrence of an Event of Default, all DIP Obligations shall become due and payable in accordance with the DIP Documents. Additionally, the DIP Lender may file a notice of such Event of Default (a "Default Notice") on the docket of the Bankruptcy Case. Unless otherwise ordered by the Court in accordance with the terms hereof, as of 12:00 midnight prevailing Central time on the 5th business day after the date the DIP Lender files a Default Notice (such period, the "Default Notice Period"), the automatic stay under section 362 of the Bankruptcy Code will be automatically lifted without further order of this Court to allow the DIP Lender to take any and all actions permitted by law, as if no case were pending under the Bankruptcy Code. The Debtor may file a response to the Notice of Default during the Default Notice Period and may seek an expedited hearing to contest the existence of an Event of Default or the propriety of any termination of the automatic stay as a result of such alleged Event of Default, but the Debtor's access to advances under the DIP Facility and the Debtor's use of Cash Collateral shall be suspended or stayed during the Default Notice Period and until such time as the Court conducts

the expedited hearing regarding the Default Notice. In the event the automatic stay is lifted in accordance with this paragraph, either automatically or after a hearing before this Court, the Debtor shall be permanently prohibited from (a) using Cash Collateral, including accounts receivable, inventory, and the proceeds thereof, of the Debtor in which the DIP Lender has an interest, unless the DIP Lender receives adequate protection of its interest in the Cash Collateral pursuant to an order of this Court and in accordance with its rights under the Bankruptcy Code, or (b) obtaining credit or incurring indebtedness secured by a lien or security interest that is equal or senior to a DIP Lien or which is entitled to priority administrative status which is equal or superior to that granted to the DIP Lender hereunder, as the case may be, until all DIP Obligations are indefeasibly paid in full. Nothing herein shall be construed to limit or otherwise restrict the availability of the rights and remedies provided for in the DIP Loan Agreement.

14.     The Debtor's right to use the DIP Facility and Cash Collateral shall terminate immediately upon the earliest of (i) forty-five (45) days after the Petition Date unless the Final DIP Order, in a form acceptable to the DIP Lender, has been entered by this Court as of such date, (ii) expiration of the Default Notice Period and lifting of the automatic stay in accordance with paragraph 13, above; (iii) conversion of the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, and (iv) the Maturity Date (as defined in the Line of Credit Agreement).

15.     The failure of the DIP Lender to file a Default Notice or seek relief or otherwise exercise its rights and remedies under this Interim DIP Order, the DIP Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Lender.

16.     The automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby modified to permit (a) the Debtor to grant the DIP Liens and the DIP Superpriority Claims, and to

Case 19-70152-JHH11    Doc 12    Filed 01/28/19    Entered 01/28/19 17:44:52    Desc Main
Document      Page 32 of 93

perform such acts as the DIP Lender may request in its sole discretion to assure the perfection and priority of the DIP Liens, (b) the Debtor to incur all liabilities and obligations to the DIP Lender as contemplated under the DIP Documents, (c) the Debtor to pay all amounts referred to, required under, in accordance with, and subject to this Interim DIP Order and the DIP Documents, (d) the DIP Lender to enforce its rights and remedies under the DIP Documents and this Interim DIP Order and, if and when entered, the Final DIP Order, and to apply payments or proceeds received from the Debtor pursue to the DIP Documents or the Interim DIP Order or Final DIP Order without further leave of this Court; and (e) as may be further required to implement fully the terms of this Interim DIP Order and any subsequent Final DIP Order.

17.    Except as explicitly provided for herein, this Interim DIP Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary. Nothing in this Interim DIP Order vests or confers on any person standing or authority to pursue any cause of action, claim, defense, or other right belonging to the Debtor or its estate.

18.    In determining to make extensions of credit under the DIP Facility, permitting the use of Cash Collateral, taking the DIP Liens, or exercising any rights or remedies as and when permitted pursuant to this Interim DIP Order (or any Final DIP Order), or the DIP Documents, the DIP Lender shall not be deemed to be in control of the operations of the Debtor, or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtor (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability, Act, 29 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal or state statute). Furthermore, nothing in this Interim DIP Order or the DIP Documents shall in any way be construed or interpreted to impose or allow the

imposition upon the DIP Lender of any liability for any claims arising from the prepetition or postpetition activities of the Debtor.

19.     The entry of this Interim DIP Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the DIP Lender's right to seek any other or supplemental relief in respect of the Debtor; (b) any of the rights of the DIP Lender under the Bankruptcy Code or under applicable non-bankruptcy law, including the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code or (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans of reorganization; or (c) any other rights, claims, or privileges (whether legal, equitable or otherwise) of the DIP Lender.

20.     Immediately upon entry by the Court, the terms and provisions of this Interim DIP Order shall become valid and binding upon and inure to the benefit of the Debtor, the DIP Lender, all creditors of the Debtor, and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in the Bankruptcy Case, any Successor Case, or upon dismissal of any of this Bankruptcy Case.

21.     The provisions of this Interim DIP Order and any actions taken pursuant hereto or rights granted hereunder shall survive entry of any order which may be entered (i) confirming any plan of reorganization in this Bankruptcy Case, (ii) converting this Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, (iii) dismissing this Bankruptcy Case or any Successor Case, or (iv) pursuant to which this Court abstains from hearing this Bankruptcy Case or a Successor Case.

22.     The DIP Lender has acted in good faith in connection with this Interim DIP Financing and Interim DIP Order, and its reliance on this Interim DIP Order is in good faith. Based on the findings set forth in this Interim DIP Order and the record made during the Interim Hearing,

Case 19-70152-JHH11    Doc 12    Filed 01/28/19    Entered 01/28/19 17:44:52    Desc Main
Document     Page 34 of 93

and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim DIP Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court, the DIP Lender is entitled to fullest extent to the protections provided in section 364(e) of the Bankruptcy Code. Any such modification, amendment, or vacatur shall not affect the validity and enforceability of any payments hereunder of DIP Obligations, advances made hereunder, or lien, claim or priority authorized or created hereby, including the DIP Liens. Any liens or claims granted to the DIP Lender arising prior to the effective date of any such modification, amendment, or vacatur of this Interim DIP Order shall be governed in all respects by the original provisions of this Interim DIP Order, including entitlement to all rights, remedies, privileges, and benefits granted herein.

23. To the extent of any conflict between or among the Motion, the DIP Documents, and this Interim DIP Order, the terms and provisions of this Interim DIP Order shall govern.

24. Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Interim DIP Order.

25. The Final Hearing to consider entry of the Final DIP Order and final approval of the DIP Financing is scheduled for January 30, 2019, at 10:00 a.m. (Central time) before the Honorable Jennifer Henderson, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Northern District of Alabama, Western Division, 2005 University Blvd, Tuscaloosa, Alabama 35401. Objections to the entry of the proposed Final Order shall be in writing and filed with the Clerk of the Court no later than _____ __, 2019, at 4:00 p.m. (prevailing Eastern time), with copies served upon on counsel for the Debtor, counsel for the DIP Lender, and the Notice Parties by _____.

Case 19-70152-JHH11    Doc 12    Filed 01/28/19    Entered 01/28/19 17:44:52    Desc Main
Document    Page 35 of 93

26.     This Interim DIP Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.

27.     The Court has retained and will retain jurisdiction to interpret, implement, and enforce this Interim DIP Order according to its terms.

Dated: _____

_____
UNITED STATES BANKRUPTCY JUDGE

EXHIBIT 1

(Budget)

Exhibit 1
SouthFresh Aquaculture, LLC
13-Week Budget

# SouthFresh Aquaculture, LLC
## 13 Week Cash Flow Forecast
### January 28, 2019

| | 2/3/2019 | 2/10/2019 | 2/17/2019 | 2/24/2019 | 3/3/2019 | 3/10/2019 | 3/17/2019 | 3/24/2019 | 3/31/2019 | 4/7/2019 | 4/14/2019 | 4/21/2019 | 4/28/2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Receipts from Customers | 318,559 | 340,965 | 434,842 | 574,198 | 455,280 | 360,207 | 882,030 | 803,593 | 737,440 | 542,969 | 866,280 | 781,234 | 950,406 |
| Cash Payments to Supplies | (246,663) | (359,441) | (373,885) | (260,405) | (365,603) | (317,820) | (291,084) | (304,843) | (310,481) | (360,044) | (252,609) | (268,522) | (303,283) |
| Administrative Fees | 45 | (11) | 95 | 287 | (12) | (619) | 705 | 99 | (11) | 568 | (4) | 330 | 310 |
| Allowances | 885 | 239 | 3,673 | 303 | 282 | 1,561 | 287 | | 287 | 686 | | 473 | 463 |
| Automobile | 1,224 | 1,142 | 1,219 | 841 | 402 | 812 | 1,696 | 78 | 190 | 1,260 | 261 | 756 | 243 |
| Bank Fees | | 2,111 | (3) | 125 | 511 | 2,066 | 162 | 215 | 757 | 2,149 | (15) | 77 | 540 |
| Brokerage & Commissions | 15,813 | 3,134 | 35,280 | 20,375 | | 22,117 | 17,875 | (581) | 10,500 | 19,251 | 15,750 | 14,289 | 2,057 |
| Comdata Charges | 1,077 | 3,579 | | | | | | 21,263 | 7,902 | 1,043 | 10,964 | 84 | 51,901 |
| Contract Labor | | (12,039) | 44,486 | 612 | | 250 | 43 | | | 200 | | 500 | 1,000 |
| Contributions | 245 | 377 | | | 249 | (127) | | (581) | 6,196 | 1,534 | | 701 | 2,315 |
| Deviations | 1,086 | 506 | 1,004 | 1,124 | 807 | | 393 | 1,728 | 14 | 465 | (57) | 964 | 1,892 |
| Dues & Subscriptions | 1,943 | 955 | 1,954 | 1,922 | 1,553 | 1,913 | 1,919 | 1,223 | 1,849 | 3,870 | (83) | 1,891 | 1,776 |
| Employee Benefits - 401(k) | | | | | 2,954 | | | 1,988 | | | | | 1,475 |
| Employee Benefits - Other | 532 | 151 | 1,792 | 157 | 647 | 261 | 1,355 | 372 | 873 | 387 | 1,034 | 941 | 311 |
| Entertainment | 892 | 1,670 | 723 | 988 | 289 | 415 | 858 | 340 | 1,577 | 767 | 430 | 965 | 1,032 |
| Express Mail & Postage | | | 6,234 | 10 | 4,594 | | | 3,596 | | 3 | | 1,658 | |
| Fines & Penalties | 780 | | | 150 | 268 | | 300 | | | 1,070 | | 1,500 | 2,400 |
| Flyers | 1,287 | | 81 | 12,990 | | 2,000 | 1,287 | 54 | 1,400 | 783 | 155 | 3,445 | 3,885 |
| Food Shows & Booths | 6,697 | 116 | 862 | (5,628) | 36,288 | 52,417 | 1,627 | 12,742 | 26,021 | 46,892 | 155 | 1,839 | 13,714 |
| Freight | 59,378 | 29,694 | 929 | 796 | 694 | 694 | 7,544 | 11,139 | 806 | 997 | (1,572) | 16,255 | 8,375 |
| Fuel, Gas & Oil | 708 | 2,302 | 837 | 2,029 | 413 | 4,386 | 2,010 | 479 | 275 | 2,520 | 397 | 13,404 | 1,764 |
| Hauling/Seining Expenses | 2,757 | | | | | | 275 | 823 | 1,701 | | 770 | 3,001 | 438 |
| Inspection | 436 | 10,359 | | 624 | | 269 | (4,764) | (5,839) | 182 | | 570 | 200 | 3,885 |
| Insurance | 299 | 3,679 | 283 | 256 | 630 | | 855 | 770 | 11,541 | 1,082 | 432 | (5,224) | (6,073) |
| KPI | 6,068 | 4,653 | 2,236 | 50 | 13,158 | 2,867 | 527 | 7,406 | | 11,235 | 4,162 | 770 | 792 |
| Legal & Accounting Expense | | 10,387 | 5,728 | | | 3,627 | 932 | 55 | | (3,700) | | 2,299 | 15,842 |
| Local Program | 1,377 | (137) | 888 | 4 | 51 | 381 | 5,861 | 308 | | 178 | 83 | (3,693) | 54 |
| Lumper | | | | | | 1,609 | | | | | | 1,007 | |
| Marketing Program | 23,706 | 5,757 | 39,355 | 20,826 | 14,899 | 7,655 | 19,387 | 16,752 | 28,005 | 23,477 | 16,366 | 14,973 | 23,853 |
| Marketing, Promotions & Ads. | 12,501 | 13,867 | 13,361 | 13,127 | 12,312 | 12,302 | 12,092 | 12,586 | 11,511 | 17,780 | 5,035 | 11,553 | 10,629 |
| Miscellaneous | 2,615 | 142 | 142 | | 506 | 110 | 1,074 | | 290 | 509 | 333 | 393 | 252 |
| Moving Expense | 8,300 | 53,770 | 50,646 | 8,031 | 4,387 | 56,387 | 48,100 | 3,381 | 16,288 | 59,147 | 12,397 | 51,180 | 3,049 |
| Packaging | 88,874 | 18,001 | 60,343 | 31,656 | 29,315 | 14,285 | 70,017 | 21,661 | 48,297 | 69,843 | 31,161 | 24,839 | 29,784 |
| Payroll Taxes | 108 | 24 | 378 | 485 | 1,291 | 212 | 120 | 15 | 2,285 | 927 | 234 | | 188 |
| Pest Control | 143,566 | 147,608 | 163,727 | 168,035 | 157,500 | 140,687 | 198,942 | 168,738 | 137,668 | 239,968 | 89,804 | 142,458 | 163,626 |
| Lease Payments | 318 | 1,490 | 1,391 | 1,771 | 249 | 3,467 | 471 | 949 | 1,110 | 803 | | 4,307 | 451 |
| Repairs & Maintenance | 10,294 | 1,340 | 29,131 | 10,994 | 10,293 | 9,502 | (4,263) | 33,769 | 19,243 | 14,485 | 13,921 | (11,142) | 14,527 |
| Safety | 13,178 | 6,062 | 16,005 | 13,973 | 20,231 | 9,086 | 14,931 | 12,831 | 16,882 | 14,288 | 14,568 | 23,562 | 25,679 |
| Salaries & Wages | 12,115 | 17,289 | 1,518 | 1,385 | | 6,099 | (316) | 2,227 | | 6,757 | | 657 | 174 |
| Samples | 2,698 | 685 | 3,095 | 4,549 | 1,425 | 1,089 | (1,597) | 995 | 2,870 | 2,331 | 1,599 | 825 | 1,194 |
| Sanitation & Waste Disposal | 466 | 2,376 | 290 | 1,439 | | 1,044 | 281 | 2,523 | 366 | 8,106 | 209 | 133 | 688 |
| Supplies | | | | | | | | 1,019 | | | | 550 | |
| Taxes, Licenses & Permits | 5,743 | 6,345 | 3,105 | 6,797 | 9,410 | 3,400 | 6,307 | 14,266 | 8,164 | 3,912 | 3,220 | 4,565 | 7,001 |
| Telephone, Fax & Internet | 2,532 | (2,383) | 9,073 | 790 | 1,432 | 964 | 5,345 | 2,001 | 1,288 | 691 | 3,296 | 7,543 | 728 |
| Testing | 758 | 361 | 1,698 | 725 | 690 | 689 | 1,987 | 1,007 | 1,244 | 1,379 | 573 | 458 | 335 |
| Training and Education | | | | | | | | | | | | | |
| Transportation Expense | 25,683 | 16,884 | 11,579 | 41,646 | 42,076 | (14,002) | 45,790 | 14,154 | 46,231 | 28,255 | 9,522 | 39,207 | 34,791 |
| Travel | | | | | | | | | | | | | |
| Uniforms | | | | | | | | | | | | | |
| Utilities | | | | | | | | | | | | | |
| Emergency Contingency | 200,000 | 200,000 | 200,000 | 200,000 | 100,000 | 100,000 | 100,000 | 100,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 |
| Operating Expenses | (641,170) | (568,828) | (742,566) | (576,898) | (471,466) | (477,238) | (548,723) | (473,607) | (456,826) | (661,770) | (288,992) | (420,684) | (469,292) |

Exhibit 1
SouthFresh Aquaculture, LLC
13-Week Budget

# SouthFresh Aquaculture, LLC
## 13 Week Cash Flow Forecast
### January 28, 2019

| | 2/3/2019 | 2/10/2019 | 2/17/2019 | 2/24/2019 | 3/3/2019 | 3/10/2019 | 3/17/2019 | 3/24/2019 | 3/31/2019 | 4/7/2019 | 4/14/2019 | 4/21/2019 | 4/28/2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BA Fees | | | | | | | | | | 81,447 | 85,000.00 | | |
| MCG Legal Expenses* | | | | | | | 40,000 | | | | 10,000 | | |
| M&M Legal Expenses | | | | | | | 10,000 | | | | | | |
| Committee Legal Expenses | | | | | | | | | 5,000 | | | | 5,000 |
| Utilities Deposit | | | 55,000 | | | | | | | | | | |
| Critical Vendors | 1,007,757 | | | | | | | | | | | | |
| Interest Expense | | | | | 11,500 | | | | | 18,200 | | | |
| | | | | | | | | | | | | | |
| Non Operating Expenses | (1,007,757) | - | (55,000) | - | (11,500) | - | (50,000) | - | (5,000) | (99,647) | (95,000) | - | (5,000) |
| | | | | | | | | | | | | | |
| Weekly Cash In(out)flow | (1,577,232) | (587,304) | (736,609) | (263,106) | (393,290) | (434,851) | (7,776) | 25,143 | (34,869) | (578,492) | 229,680 | 92,028 | 172,831 |
| | | | | | | | | | | | | | |
| Beginning Cash Balance | 1,500,000 | | | | | | | | | | | | |
| Cash Flow Prior to Financing | (1,577,232) | (587,304) | (736,609) | (263,106) | (393,290) | (434,851) | (7,776) | 25,143 | (34,869) | (578,492) | 229,680 | 92,028 | 172,831 |
| DIP Financing | 77,232 | 587,304 | 736,609 | 263,106 | 393,290 | 434,851 | 7,776 | (25,143) | 34,869 | 578,492 | (229,680) | (92,028) | (172,831) |
| Ending Cash Balance | - | | - | | - | | - | | - | | - | | - |
| | | | | | | | | | | | | | |
| DIP Starting Balance | 3,500,000 | 3,422,768.13 | 2,835,464.56 | 2,098,855.18 | 1,835,749.45 | 1,442,459.50 | 1,007,608.30 | 999,831.92 | 1,024,974.63 | 990,105.57 | 411,613.87 | 641,293.66 | 733,321.30 |
| Drawdown | 77,232 | 587,304 | 736,609 | 263,106 | 393,290 | 434,851 | 7,776 | (25,143) | 34,869 | 578,492 | (229,680) | (92,028) | (172,831) |
| DIP Ending Balance | 3,422,768 | 2,835,465 | 2,098,855 | 1,835,749 | 1,442,460 | 1,007,608 | 999,832 | 1,024,975 | 990,106 | 411,614 | 641,294 | 733,321 | 906,153 |

*After application of approximate $100k retainer

## Exhibit B

**Debtor-in-Possession Line of Credit and Security Agreement**

04724806.1

20

# DEBTOR-IN-POSSESSION LINE OF CREDIT AND SECURITY AGREEMENT

**THIS DEBTOR-IN-POSSESSION LINE OF CREDIT AND SECURITY AGREEMENT** ("this Agreement") is made and entered into effective as of the 28th day of January, 2019, by and between **ALABAMA FARMERS COOPERATIVE, INC.**, an Alabama agricultural cooperative association (hereinafter referred to as "Lender"), and **SOUTHFRESH AQUACULTURE, LLC**, an Alabama limited liability company as debtor and debtor-in-possession in a case pending under chapter 11 of the Bankruptcy Code (hereinafter referred to as the "Borrower").

## RECITALS

A.      The Borrower and the Lender have previously entered into that SouthFresh Aquaculture, LLC Line of Credit Agreement dated August 1, 2017 (as amended from time to time and in effect as of the Petition Date, the "Existing Loan Agreement").

B.      On January 28, 2019 (the "Petition Date"), the Borrower filed a voluntary petition for relief (the "Bankruptcy Case") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§101, *et seq.* (as amended from time to time, the "Bankruptcy Code") with the United States Bankruptcy Court for the Northern District of Alabama, Western Division (the "Bankruptcy Court"). The Borrower is continuing in the possession of its assets and continuing to operate its business and manage its properties as debtor and debtor-in-possession under Sections 1107(a) and 1108 of the Bankruptcy Code.

C.      The Borrower has requested that Lender make available to the Borrower, from and after the date of entry of the Interim Order (as defined herein) (the "Interim Order Date"), a secured, super-priority debtor-in-possession credit facility.

D.      To provide security for the repayment of all Obligations (as defined herein) of the Borrower hereunder and under the Note and Security Documents (each as defined herein), the Borrower will provide to Lender the following (as more fully described herein):

(i)      pursuant to Section 364(c)(1) of the Bankruptcy Code and the Orders (as defined herein), as applicable, a DIP Superpriority Claim in the Bankruptcy Case (without the need to file a proof of claim) for all of the Obligations with priority over any and all administrative expense claims and unsecured claims of any entity against the Borrower or its estate, including any claims specified in or ordered pursuant to Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b) (except as set forth in the Orders), 546(c), 546(d), 726 (to the extent permitted by law), 1113, and 1114 or any other provisions of the Bankruptcy Code, which shall at all times be senior to the rights of the Borrower and its estate, and any successor trustee or other estate representative, subject only to the Carve-Out (as defined herein);

(ii)     pursuant to Section 364(c)(2) of the Bankruptcy Code and the Orders, as applicable, an automatically perfected, valid, enforceable, unavoidable, and first-priority security interest in and lien on all real and personal property assets of the Borrower of any kind other than the proceeds of any causes of action held by the Borrower under Chapter 5 of the Bankruptcy Code (collectively, and as more specifically described on Exhibit A hereto, the "Collateral"),

Case 19-70152-JHH11    Doc 12    Filed 01/28/19    Entered 01/28/19 17:44:52    Desc Main
Document      Page 42 of 93

whether now existing or hereafter acquired, that were not subject to a valid, perfected, and non-avoidable lien in existence on the Petition Date, to secure the Obligations, which first-priority liens and security interests shall be perfected without necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements or other agreements or documents, subject only to the Carve-Out, and excluding; and

(iii)     pursuant to Section 364(c)(3) of the Bankruptcy Code and the Orders, an automatically valid, enforceable, unavoidable and perfected security interest in and lien on the Collateral to secure the Obligations that shall be junior in priority and subject to (a) any unavoidable valid and perfected lien on the Collateral in existence on the Petition Date, including liens for taxes, assessments and other governmental charges or levies not yet due or liens for taxes, assessments and other governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves (in the good faith judgment of the management of the Borrower) have been established in accordance with GAAP, (b) unavoidable valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code, and (c) the Carve-Out.

**IN CONSIDERATION** of the mutual covenants and undertakings herein contained and incorporating the Recitals set forth above, the Borrower and Lender hereby agrees as follows:

**SECTION 1. The Line.** On the terms and conditions set forth in this Agreement, and subject to entry, and the terms, of the Orders, Lender agrees to make available to the Borrower during the period commencing on January 28, 2019, and ending on the Maturity Date (as defined herein), a line of credit (including letters of credit arranged by Lender and issued by Regions Bank for the benefit of the Borrower) in the maximum principal amount of **THREE MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($3,500,000.00)** (hereinafter referred to as the "Line").

**SECTION 2. Purpose.**

(A)     **Purpose.**   The purpose of the Line is to help finance the costs of operation of the Borrower during the Bankruptcy Case, and the Borrower agrees to utilize the proceeds of the Line for this purpose.

(B)     **Special Covenants.**

(1)     The Borrower agrees to adhere to the rolling 13-week operating budget attached hereto as Exhibit B (as it may be updated and amended, the "Budget"), and Lender agrees to fund, or carve out from its security interest in the Borrower's cash flow from operations or the proceeds of the Collateral, sufficient funds to pay certain administrative and professional fees of the Borrower, subject to the limitations on amount and type of such expenses as set forth in the Budget (the "Carve-Out").

(2)     Subject to and in accordance with the terms and conditions contained herein and in the Letter of Credit Rider attached hereto, and assuming availability, the Borrower shall have the right to request, and Lender agrees to cause the issuance of, up to $750,000 in letters of credit for the account of the Borrower.

**SECTION 3. Availability.** Advances under the Line will be made available on any day on which Lender is open for business upon the telephonic or written request of an authorized officer of the Borrower. Requests for advances must be received by Lender no later than 12:00 o'clock noon, Central Time, on the day the advance is desired. Unless otherwise agreed, all advances will be made available by wire transfer of immediately available funds to such account or accounts as the Borrower may authorize from time to time on forms supplied by Lender. In making advances on telephonic request, Lender shall be entitled to rely on (and shall incur no liability to the Borrower in acting upon) any request made by a person identifying himself or herself as one of the persons authorized by the Borrower to request advances hereunder.

**SECTION 4. Interest.**

(A)     **Applicable Interest Rate.** Advances made hereunder shall bear interest at a fixed rate per annum equal at all times to seven percent (7.0%) (the "Interest Rate").

(B)     **Payment of Interest.** The Borrower shall make monthly payments of interest commencing March 1, 2019, and continuing on the same day of each month thereafter. Interest which is not paid by the 20th day of the month in which it falls due shall constitute an Event of Default under Section 13 hereof.

(C)     **Payment and Calculation.** Interest shall be payable monthly in arrears and shall be calculated on the actual number of days each advance is outstanding on the basis of a year consisting of 360 days. In calculating interest, the date each advance is made shall be included and the date each advance is repaid shall be excluded.

(D)     **Default Rate.** If the Borrower fails to make any payment required to be made under the terms of the Note or this Agreement (including on or after the Maturity Date, whether by reason of acceleration or otherwise) or the Orders, then, at the option of Lender in each instance, such payment shall bear interest from the date due to the date such amount is paid in full at a rate of two percent (2.0%) per annum (calculated on a 360-day basis) in excess of the Interest Rate (the "Default Interest Rate"). The Default Interest Rate shall be applicable irrespective of whether the unpaid principal balance of the Note is accelerated, foreclosure proceedings are commenced with respect to the Security Documents or any other rights or remedies of Lender under any of this Agreement or the Orders are exercised. At and after the Maturity Date, the Default Interest Rate shall apply to the entire unpaid principal balance then due and payable under this Note, and to the extent permitted by law, to any accrued and unpaid interest thereon and other fees, charges and costs payable under this Agreement, the Note or the Security Documents. All interest provided for in this subsection owed prior to the Maturity Date shall be payable on demand.

**SECTION 5. Repayment and Maturity.** The unpaid principal balance and all accrued but unpaid interest on the advances shall be due and payable on or before January 28, 2020, or on such earlier date as provided in an order of the Bankruptcy Court or upon Lender's acceleration of the Note after an Event of Default (the "Maturity Date").

**SECTION 6. Note.** The Borrower's obligation to repay the advances, and the interest accruing thereon, shall be evidenced by a line of credit note substantially in the form attached as Exhibit C hereto (the "Note"), which the Borrower shall execute contemporaneously herewith.

**SECTION 7. Manner and Time of Payment.** The Borrower shall make each payment under this Agreement and under the Note either by wire transfer of immediately available funds or by check. Wire transfers shall be made to such bank and into such account as Lender shall designate (upon request made to Lender) for advance to and credit of ALABAMA FARMERS COOPERATIVE, INC., with sufficient information to identify the source and application of such funds. The Borrower shall give Lender telephonic notice no later than 10:00 a.m., Central Time, of its intent to pay by wire transfer. Wire transfers received after 2:00 p.m., Central Time, shall be credited on the next business day. Checks shall be mailed or delivered to Lender at P.O. Box 2227, 121 Somerville Road, N.E., Decatur, Alabama 35609-2227 (or to such other address as Lender may designate by notice). Credit for payment by check will not be given until the next business day after receipt of the check or the actual receipt of immediately available funds, whichever is later.

**SECTION 8. Security.** As security for each and every obligation, agreement, and covenant of the Borrower to Lender hereunder and under the Note, including, without limitation, the payment of the full amount owed hereunder or thereunder when due, and the full performance of all obligations of the Borrower hereunder and under the Orders, the Borrower hereby assigns and pledges to Lender, and grants to Lender a security interest in and lien on, all of the Borrower's right, title and interest in and to the Collateral, including the proceeds thereof and as more particularly described on Exhibit A. The Borrower shall, upon Lender's request, execute a mortgage in favor of Lender in a form acceptable to Lender describing all real property Collateral, and such other deeds of trust, security agreements, financing statements, continuation statements, assignments, certificates, and other documents and instruments with respect to the Collateral pursuant to the UCC and applicable law and otherwise as may be necessary or reasonably requested by Lender to perfect or from time to time to publish notice of, or continue or renew the security interests granted hereby, in each case in form reasonably satisfactory to Lender (collectively, the "Security Documents"). The Borrower will pay the reasonable costs of filing Security Documents in all public offices where filing is necessary or reasonably requested by Lender and will pay any and all recording, transfer or filing taxes that may be due in connection with any such filing. The Borrower grants Lender the right, at any time and at Lender's option, and at the Borrower's expense, to file any or all Security Documents pursuant to the UCC and applicable law and otherwise as Lender reasonably may deem necessary or desirable or as directed under the Orders.

**SECTION 9. Conditions Precedent.** Lender's obligation to make advances hereunder is subject to the following conditions precedent:

(A)     **Due execution.** That Lender receives duly executed copies of this Agreement and all instruments and documents contemplated hereby, including the Note and Mortgage.

(B)     **Approvals.** That Lender receives evidence satisfactory to it that all consents and approvals which are necessary for, or required as a condition of, the validity and enforceability of this Agreement and all documents and instruments contemplated hereby, have been obtained and are in full force and effect, including without limitation (i) an order or judgment of the Bankruptcy Court entered on the docket of the Bankruptcy Court with respect to the Bankruptcy Case substantially in the form of Exhibit D hereto and otherwise acceptable to the Borrower and Lender approving and ratifying this Agreement, the Note and the Security Documents, and (a) authorizing the incurrence by the Borrower of interim secured indebtedness in accordance with this Agreement, (b)

approving the Borrower's grant of security interests in or liens on the Collateral as set forth in this Agreement and the Security Documents, and (c) authorizing the Borrower's payment to Lender of all Obligations as and when due, which order shall not have been vacated, reversed, modified, amended or stayed (the "Interim Order"), and (ii) thereafter, an order or judgment of the Bankruptcy Court entered on the docket of the Bankruptcy Court with respect to the Bankruptcy Case substantially in the form of the Interim Order, with only such modifications as are satisfactory in form and substance to the Borrower and Lender, which order shall have not been vacated, reversed, modified, amended or stayed (the "Final Order"; with the Interim Order, the "Orders").

**(C)**     **Event of Default.** That no Event of Default (as defined in Section 13 hereof, in the Note, or in the Orders) or event which with the passage of time or the giving of notice or both would become an Event of Default hereunder or thereunder, exists.

**(D)**     **Budget.** That the Borrower propose, and Lender approve, the Budget as initially proposed and as updated periodically during the Bankruptcy Case, and that the Borrower comply with the Budget, subject to variations of no more than five percent (5%) in the amount of any line item expenditure in a week, or disbursements that exceed, in the aggregate, one hundred ten present (110%) of the weekly budgeted amount, unless approved by Lender in writing ("Permitted Variances"); provided, that to the extent the Borrower uses less than the full amount allotted in any given week for a particular line item, the Borrower can choose to roll any unused budgeted amount for such line item to the following week in the Budget.

**(E)**     **Availability.** That sufficient availability remains under the line of credit to fund the requested advance.

**SECTION 10. Representations and Warranties.** To induce Lender to extend credit hereunder, and recognizing that Lender is relying hereon, the Borrower represents and warrants as follows:

**(A)**     **Warranties.** As of the date hereof, all representations, warranties, and information provided to Lender are true and correct.

**(B)**     **Conflicting Agreements.** Neither this Agreement nor any instrument or document contemplated hereby conflicts with any agreement to which the Borrower is a party or with any provision of the Borrower's operating agreement or articles of organization.

**(C)**     **Binding Agreement.** This Agreement and all instruments and documents contemplated hereby will, when delivered and approved by the Orders, constitute legal, valid, and binding obligations of the Borrower, enforceable in accordance with their terms.

**SECTION 11. Affirmative Covenants.** Unless otherwise agreed to in writing by Lender, while this Agreement is in effect, whether or not any indebtedness is outstanding hereunder, and acknowledging the Borrower's initiation and the pendency of the Bankruptcy Case, the Borrower agrees to:

**(A)**     **Eligibility.** Maintain its status as an entity eligible to borrow from Lender.

**(B)**     **Existence.** Preserve and keep in full force and effect its existence and good standing in the jurisdiction of its formation, its qualification to transact business in all places required

by law, and all licenses, certificates, permits, authorizations, approvals, and the like which are material to the conduct of its business or required by law.

**(C)** **Insurance.** Maintain insurance with insurance companies or associations acceptable to Lender in such amounts and covering such risks as are usually carried by companies engaged in the same or similar business and similarly situated, and make such increases in the type or amount of coverage as Lender may reasonably request. All such policies insuring any collateral provided for herein, shall provide for loss payable clauses or endorsements in form and content acceptable to Lender. At the request of Lender, all policies (or such other proof of compliance with this Section as may be satisfactory) shall be delivered to Lender.

**(D)** **Property Maintenance.** Maintain all of its property that is necessary to or useful in the proper conduct of its business, including all Collateral, in good working condition, ordinary wear and tear excepted.

**(E)** **Books and Records.** Keep adequate records and books of account in which complete entries will be made in accordance with generally accepted accounting principles ("GAAP") consistently applied.

**(F)** **Inspection.** Permit Lender or its agents, during normal business hours or at such other times as the parties may agree, to examine the Borrower's properties, books, and records, and to discuss the Borrower's affairs, finances, and accounts with its respective officers, directors, employees, and independent certified public accountants.

**(G)** **Reports and Notices.** Furnish to Lender:

    **(1)** **Annual Financial Statement.** As soon as available, but in no event later than 120 days after the end of any fiscal year of the Borrower occurring during the term hereof, annual financial statements of the Borrower prepared in accordance with GAAP consistently applied. Such financial statements shall: (i) be audited by independent certified public accountants selected by the Borrower and acceptable to Lender; (ii) be accompanied by a report of such accountants containing an opinion acceptable to Lender; (iii) be prepared in a reasonable detail and in comparative form; and (iv) include a balance sheet, a statement of income, a statement of retained earnings, a statement of cash flows, and all notes and schedules relating thereto. Lender may waive this requirement for any fiscal year in its sole discretion.

    **(2)** **Management Letters.** Promptly upon receipt thereof, a copy of any management letters submitted to the Borrower by its independent certified public accountant.

    **(3)** **Monthly Financial Statements.** As soon as available, but in no event more than 30 days after each month end, a balance sheet, a statement of income for such month and for the period year to date, an accounts receivable aging report, and such other monthly statements as Lender may specifically request, all prepared in reasonable detail in accordance with GAAP consistently applied.

Case 19-70152-JHH11    Doc 12    Filed 01/28/19    Entered 01/28/19 17:44:52    Desc Main
Document    Page 47 of 93

(4) **Monthly Operating Reports.** Simultaneously with the filing thereof, a copy of all Monthly Operating Reports submitted in the Bankruptcy Case.

(5) **Notice of Default.** Promptly after becoming aware thereof, notice of the occurrence of an "Event of Default" (as defined in Section 13 hereof) or of any event which, with the giving of notice or the passage of time or both, would become an Event of Default hereunder.

(6) **Notice of Non-Environmental Litigation.** Promptly after the commencement thereof, notice of the commencement of all actions, suits, or proceedings before any court, arbitrator, or governmental department, commission, board, bureau, agency, or instrumentality affecting the Borrower which, if determined adversely to the Borrower, could have a material adverse effect on the financial condition, properties, profits, or operations of the Borrower.

(7) **Notice of Environmental Litigation.** Promptly after receipt thereof, notice of the receipt of all pleadings, orders, complaints, indictments, or any other communication alleging a condition concerning any Collateral that may require the Borrower to undertake or to contribute to a cleanup or other response under environmental laws, or which seeks penalties, damages, injunctive relief, or criminal sanctions related to alleged violations of such laws, or which claims personal injury or property damage to any person as a result of environmental factors or conditions.

(8) **Other Information.** Such other information regarding the condition or operations, financial or otherwise, of the Borrower as Lender may, from time to time, reasonably request, including, but not limited to, copies of all pleadings, notices, and communications referred to in subsections G(5) and G(6) above.

(H) **Debtor-in-Possession Obligations.** Comply in all material respects and in a timely manner with its obligations and responsibilities as debtor-in-possession under the Bankruptcy Code, the Bankruptcy Rules, the Orders, and any other order of the Bankruptcy Court.

(I) **Adequate Protection Payments.** Make adequate protection payments payable in cash on the dates and to the extent required by the Orders.

(J) **First Day Orders.** Cause all proposed "first day orders" submitted to the Bankruptcy Court to be in accordance with and as permitted by the terms of this Agreement in all respects.

**SECTION 12. Negative Covenants.** Unless otherwise agreed to in writing by Lender, while this Agreement is in effect, whether or not any indebtedness is outstanding hereunder, the Borrower will not:

(A) **Borrowings.** Create incur, assume, or allow to exist, directly or indirectly, any indebtedness or liability for borrowed money or for the deferred purchase price of property or services, except for accounts payable to trade creditors and current operating liabilities (other than for borrowed money) incurred in the ordinary course of the Borrower's business.

**(B)**     **Liens.** Create, incur, assume, or allow to exist any mortgage, deed of trust, pledge, lien (including the lien of an attachment, judgment, or execution), security interest, or other encumbrance of any kind upon any Collateral that is senior to, or pari passu with the security interest of Lender in the Collateral, unless expressly authorized by Lender in writing. The foregoing restrictions shall not apply to: (i) liens in favor of Lender; (ii) liens for taxes, assessments, or governmental charges; (iii) liens, pledges and deposits under workers' compensation, unemployment insurance, and social security laws; (iv) liens, deposits and pledges to secure the performance of bids, tenders, contracts (other than contracts for the payment of money), and like obligations arising in the ordinary course of the Borrower's business as conducted on the date hereof; and (v) liens imposed by law in favor of mechanics, materialmen, warehousemen, and like persons that secure obligations that are not past due.

**(C)**     **Transfer of Assets.** Sell, transfer, lease, or otherwise dispose of any Collateral, except in the ordinary course of the Borrower's business.

**(D)**     **Loans.** Lend or advance money, credit, or property to any person or entity, except for trade credit extended in the ordinary course of the Borrower's business.

**(E)**     **Contingent Liabilities.** Assume, guarantee, become liable as a surety, endorse, contingently agree to purchase, or otherwise become liable upon the obligation of any person or entity, except by the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of the Borrower's business.

**(F)**     **Change in Business.** Engage in any business activities or operations substantially different from or unrelated to the Borrower's present business activities or operations.

**(G)**     **Distributions.** Declare or pay any distributions of its earnings, surplus, or assets to any holder of any interest.

**(H)**     **Retirement of Indebtedness.** Prepay or retire early, directly or indirectly, any loans or other funded indebtedness permitted hereunder owing to any other person or entity which is subordinated in right of payment to the Borrower's indebtedness hereunder.

**(I)**     **Compliance with Budget.** Except as otherwise provided herein, directly or indirectly (i) use any cash or the proceeds of the Line in a manner or for a purpose other than those consistent with this Agreement, the Orders and the Budget (and Permitted Variances related thereto), (ii) permit a disbursement causing any variance other than Permitted Variances without the prior written consent of Lenders or (iii) make any payment (as adequate protection or otherwise), or application for authority to pay, on account of any claim or indebtedness arising prior to the Petition Date other than payments authorized by the Bankruptcy Court.

**(J)**     **Bankruptcy Related Negative Covenants.** The Borrower will not seek or consent to and will cooperate with Lender to object to any motion or request for relief seeking any of the following:

        (1)     Any modification, stay, vacation or amendment to the Orders to which the Lender has not consented in writing;

(2)     A priority claim or administrative expense or unsecured claim against the Borrower (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Lender in respect of the Obligations, except with respect to the Carve Out, statutory liens and charges not capable of being subordinated by the entry of the Orders;

(3)     Any order which authorizes the payment of any indebtedness of Borrower (other than the Obligations, indebtedness reflected in the Budget, and other indebtedness approved by Lender) incurred prior to the Petition Date or the grant of "adequate protection" (whether payment in cash or transfer of property) with respect to any such indebtedness which is secured by a lien (other than as expressly set forth in the Orders or the Budget); or

(4)     Any order which authorizes the Borrower to take any action that is prohibited by the terms of this Agreement or to refrain from taking any action that is required to be taken by the terms of this Agreement.

**SECTION 13. Events of Default.**   Each of the following shall constitute an "Event of Default" hereunder:

**(A)**    **Payment Default.**   Failure by the Borrower to make any payment required to be made hereunder when due, including on or after the Maturity Date.

**(B)**    **Representations and Warranties.**   Any representation or warranty made by the Borrower herein or in any agreement, certificate or document related hereto or furnished in connection herewith or submitted in the Bankruptcy Case, shall prove to have been false or misleading in any material respect on or as of the date made.

**(C)**    **Certain Affirmative Covenants.**   Failure by the Borrower to perform or comply with any covenant set forth in Section 11 hereof (other than Section 11(G)(4), (5) and (6)), and such failure continues for fifteen (15) days after written notice thereof shall have been delivered by Lender to the Borrower.

**(D)**    **Other Covenants and Agreements.**   The Borrower should fail to perform or comply with any other covenant or agreement contained herein, including any covenant excluded under subsection (C) above.

**(E)**    **Other Indebtedness.**   The Borrower should fail to pay when due any indebtedness permitted hereunder to any other person or entity for borrowed money or any other event occurs which, under any agreement or instrument relating to such indebtedness, has the effect of accelerating or permitting the acceleration of such indebtedness, whether or not such indebtedness is actually accelerated or the right to accelerate is conditioned on the giving of notice, the passage of time or otherwise.

**(F)**    **Judgments.**   A judgment, decree, or order for the payment of money shall be rendered against the Borrower and either: (i) enforcement proceedings shall have been commenced; or (ii) such judgment, decree, or order shall continue unsatisfied and in

0472268 6.3
Case 19-70152-JHH11   Doc 12   Filed 01/28/19   Entered 01/28/19 17:44:52   Desc Main
Document     Page 50 of 93

effect for a period of 20 consecutive days without being vacated, discharged, satisfied, or stayed pending appeal.

**(G)** **Liens.** The Borrower shall grant, or the Bankruptcy Court shall approve the placement of, any lien or encumbrance on any of the Collateral on a basis that is senior to, or is pari passu with, Lender's lien on such asset, unless Lender consents in advance in writing, excluding the Carve-Out.

**(H)** **Certain Events in Bankruptcy Case**. Any of the following shall occur in the Bankruptcy Case: (i) any attempt by the Borrower to vacate or modify the Orders in a manner adverse to Lender; (ii) entry of an order amending, supplementing or modifying either of the Orders in a manner adverse to Lender; (iii) reversal, vacation or stay of the effectiveness of either of the Orders; (iv) any violation by the Borrower of the terms of either of the Orders; (v) dismissal of the Bankruptcy Case or conversion of the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code; (vi) appointment of a Chapter 11 trustee or an examiner with expanded powers in the Bankruptcy Case; (vii) any sale of all or substantially all Collateral that does not allow for payment in full of all Obligations unless consented to by Lender; (viii) the Borrower's filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order, granting any superpriority claim or Lien that is senior to or pari passu with the Lender's liens; (ix) any of the liens or the superpriority claims granted to Lender under the Orders cease to be valid, perfected or enforceable in any respect; or (x) the Borrower fails to satisfy its adequate protection obligations to the Borrower under the Orders.

**SECTION 14. Suspension of Line During Grace Period.** During the continuance of any event that, with the passage of time or the giving of notice or both would become an Event of Default hereunder, Lender may, without notice to the Borrower, suspend the unused portion of the Line (including letters of credit).

**SECTION 15. Remedies upon Default.** Upon the occurrence of and during the continuance of each and every Event of Default, and except as such rights may be modified or expanded by the Orders:

**(A)** **Termination.** Lender may, without notice to the Borrower, suspend the unused portion of the Line and, upon notice to the Borrower, may terminate the Line and declare the entire unpaid balance of the Note, all accrued interest thereon, and all other amounts payable under this Agreement, to be immediately due and payable. Upon such a declaration, the unpaid principal balance of the Note and all such other amounts shall become immediately due and payable, without protest, presentment, demand, or further notice of any kind, all of which are hereby expressly waived by the Borrower.

**(B)** **Enforcement.** Subject to the terms of the Orders, Lender may proceed to protect, exercise, and enforce such rights and remedies as may be provided by agreement or under law. Each and every one of such rights and remedies shall be cumulative and may be exercised from time to time, and no failure on the part of Lender to exercise, and no delay in exercising, any right or remedy shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy preclude any other or future exercise thereof, or the exercise of any other right. Without limiting the foregoing, Lender may hold and/or set off and apply against the Borrower's indebtedness any and all cash, accounts, securities, or other property in Lender's possession or under its control.

04722686.3
Case 19-70152-JHH11    Doc 12    Filed 01/28/19    Entered 01/28/19 17:44:52    Desc Main
Document    Page 51 of 93

**SECTION 16. Complete Agreement, Amendments.** This Agreement and all documents and instruments contemplated hereby are intended by the parties to be a complete and final expression of their agreement. No amendment, modification, or waiver of any provision hereof or thereof, nor any consent to any departure of the Borrower herefrom or therefrom, shall be effective unless approved by Lender and contained in a writing signed by or on behalf of Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

**SECTION 17. Applicable Law.** This Agreement and the Note shall be governed by and construed in accordance with the federal law of the United States and the laws of the State of Alabama, without reference to choice of law doctrine.

**SECTION 18. Notices.** All notices hereunder shall be in writing and shall be deemed to be duly given upon delivery, if personally delivered or sent by telegram or facsimile transmission, or three (3) days after mailing if sent by express, certified or registered mail, to the parties at the following addresses (or such other address for a party as shall be specified by like notice):

| | |
|---|---|
| If to Lender, as follows: | Mr. Alfred E. Cheatham, Jr.<br>Executive Vice President<br>Alabama Farmers Cooperative, Inc.<br>121 Somerville Road NE<br>P.O. Box 2227<br>Decatur, AL 35609-2227<br>Fax Number: (256) 560-2691 |
| With a copy to: | Lawrence C. Weaver, Esq.<br>Wilmer & Lee, P.A.<br>P.O. Box 1429<br>Decatur, Alabama 35602<br>Fax number: (256) 350-1124 |
| If to the Borrower, as follows: | Mr. James M. Lamb<br>President<br>SouthFresh Aquaculture, LLC<br>1792 N. McFarland Boulevard<br>Tuscaloosa, Alabama 35406<br>Fax Number: (256) 308-5628 |
| With a copy to: | Jayna Lamar, Esq.<br>Maynard, Cooper & Gale, P.C.<br>1901 Sixth Avenue North, Suite 2400<br>Birmingham, Alabama 35203-2618<br>Fax Number: (205) 254-1999 |

**SECTION 19. Costs and Expenses.** To the extent allowed by law, the Borrower agrees to pay to Lender, on demand, all out-of-pocket costs and expenses incurred by Lender (including the reasonable fees and expenses of counsel retained by Lender) in connection with the perfection,

maintenance, and release of any Collateral provided for hereunder and the preservation and enforcement of the rights of Lender hereunder, under the Note, and any Security Documents.

**SECTION 20. Effectiveness and Severability.** This Agreement shall continue in effect until all indebtedness and obligations of the Borrower hereunder and under all instruments and documents contemplated hereby shall have been repaid. Any provision of this Agreement or any instrument or document contemplated hereby which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or thereof.

**SECTION 21. Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of the Borrower and Lender, and their respective successors and assigns, except that the Borrower may not assign or transfer its rights or obligations hereunder without the prior written consent of Lender.

[Signatures on following page]

Case 19-70152-JHH11    Doc 12    Filed 01/28/19    Entered 01/28/19 17:44:52    Desc Main
Document    Page 53 of 93

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed by their duly authorized officers as of the date shown above.

**SOUTHFRESH AQUACULTURE, LLC**, an Alabama limited liability company as debtor-in-possession

By:_____
    Its: _____

Attest:_____
       Its:_____

**ALABAMA FARMERS COOPERATIVE, INC.**, an Alabama agricultural cooperative association

By:_____
    Its:_____

Attest:_____
       Its:_____

# LETTER OF CREDIT RIDER

This LETTER OF CREDIT RIDER ("this Rider") forms a part of the Debtor-in-Possession Line of Credit and Security Agreement dated January 28, 2019 (as at any time amended, restated, supplemented or otherwise modified, the "Line of Credit Agreement"), between **SOUTHFRESH AQUACULTURE, LLC**, an Alabama limited liability company as debtor and debtor-in-possession in a case pending under chapter 11 of the Bankruptcy Code (the "Borrower"), and **ALABAMA FARMERS COOPERATIVE, INC.**, an Alabama agricultural cooperative association ("Lender"). Capitalized terms used in this Rider, unless otherwise defined herein, shall have the meanings ascribed to them in the Line of Credit Agreement.

(a)     Subject to the terms and conditions of the Line of Credit Agreement, Lender, in reliance upon the agreements set forth therein and herein, agrees to cause to be issued, at the request of the Borrower, Letters of Credit for the account of the Borrower on the terms and conditions hereinafter set forth; provided, that (i) each Letter of Credit shall expire on the earlier of (A) the stated expiry date of such Letter of Credit (or in the case of any renewal or extension thereof, the expiry date of any such renewal or extension) and (B) the date that is five (5) business days prior to the Maturity Date; and (ii) the Borrower may not request any Letter of Credit, if, after giving effect to such issuance (A) the aggregate LC Exposure would exceed the LC Commitment or (B) the aggregate amount of outstanding advances under the Line plus the LC Exposure would exceed $3,500,000.

(b)     To request the issuance of a Letter of Credit (or any amendment, renewal or extension of an outstanding Letter of Credit), the Borrower shall give Lender irrevocable written notice at least seven (7) business days prior to the requested date of such issuance specifying the date (which shall be a business day) such Letter of Credit is to be issued (or amended, extended or renewed, as the case may be), the expiration date of such Letter of Credit (which shall be at least seven (7) business days prior to the Maturity Date), the amount of such Letter of Credit, the name and address of the beneficiary thereof and such other information as shall be necessary to prepare, amend, renew or extend such Letter of Credit. The issuance of such Letter of Credit (or any amendment which increases the amount of such Letter of Credit) will be subject to the further conditions that such Letter of Credit shall be in such form and contain such terms as the applicable issuer of such Letter of Credit shall approve and that the Borrower shall have executed and delivered any additional applications, agreements and instruments relating to such Letter of Credit as the applicable issuer of such Letter of Credit shall reasonably require; provided, that in the event of any conflict between such applications, agreements or instruments and this Rider, the terms of this Rider shall control.

(c)     The Lender shall examine all documents purporting to represent a demand for payment under a Letter of Credit promptly following its receipt thereof. The Lender shall notify the Borrower of such demand for payment and whether the issuer of the Letter of Credit has made or will make a LC Disbursement thereunder; provided, that any failure to give or delay in giving such notice shall not relieve the Borrower of its obligation to reimburse Lender with respect its reimbursement of such LC Disbursement. The Borrower shall be irrevocably and unconditionally obligated to reimburse Lender for any LC Disbursements paid by Lender in respect of such drawing, without presentment, demand or other formalities of any kind. Unless

04724212.2

the Borrower shall have notified Lender prior to 10:00 a.m. (Central time) on the business day immediately prior to the date on which such drawing is honored that the Borrower intends to reimburse Lender for the amount of such drawing in funds other than from the proceeds of advances under the Line, the Borrower shall be deemed to have timely given notice of a request for an advance under the Line to Lender on the date on which such drawing is honored in the exact amount due to Lender. The proceeds of such borrowing shall be applied to reimburse Lender for its payment of such LC Disbursement.

        (d)      The Borrower's obligation to reimburse LC Disbursements hereunder shall be absolute, unconditional and irrevocable and shall be performed strictly in accordance with the terms of the Line of Credit Agreement (including this Rider) under all circumstances whatsoever and irrespective of any of the following circumstances:

        (i)      any lack of validity or enforceability of, or the termination of, any Letter of Credit or this Rider;

        (ii)      the existence of any claim, set-off, defense or other right which the Borrower may have at any time against a beneficiary or any transferee of any Letter of Credit (or any persons or entities for whom any such beneficiary or transferee may be acting), Lender or any other person, whether in connection with this Rider or the Letter of Credit or any document related hereto or thereto or any unrelated transaction;

        (iii)      any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect;

        (iv)      payment by Lender or the applicable issuer under a Letter of Credit against presentation of a draft or other document to Lender or the applicable issuer that does not comply with the terms of such Letter of Credit;

        (v)      any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Rider, constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrower's obligations hereunder; or

        (vi)      the existence of an Event of Default.

Neither Lender nor the applicable issuer of any Letter of Credit shall have any liability or responsibility to the Borrower by reason of or in connection with the issuance or transfer of a Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to above), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to a Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of Lender or the applicable issuer; provided, that the foregoing shall not be construed to excuse Lender or the applicable issuer, as applicable, from liability to the Borrower to the extent of any actual direct damages (as opposed to special, indirect (including claims for lost profits or other consequential damages), or punitive damages, claims in respect of which are hereby waived by

Case 19-70152-JHH11   Doc 12   Filed 01/28/19   Entered 01/28/19 17:44:52   Desc Main
Document    Page 56 of 93

the Borrower to the extent permitted by applicable law) suffered by the Borrower that are caused by Lender's or the applicable issuer's, as applicable, failure to exercise due care when determining whether drafts or other documents presented under a Letter of Credit comply with the terms thereof. The parties hereto expressly agree, that in the absence of gross negligence or willful misconduct on the part of Lender or the applicable issuer, as applicable (as finally determined by a court of competent jurisdiction), Lender or the applicable issuer, as applicable, shall be deemed to have exercised due care in each such determination. In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented that appear on their face to be in substantial compliance with the terms of a Letter of Credit, Lender or the applicable issuer may, in its discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

As used in this Rider, the following terms are defined as follows:

(a) "**LC Commitment**" means that portion of the Line that may be used by the Borrower for the issuance of Letters of Credit in an aggregate face amount not to exceed $750,000.

(b) "**LC Disbursement**" means a payment made by Lender pursuant to or in connection with a Letter of Credit.

(c) "**LC Exposure**" means the sum of (i) the aggregate undrawn amount of Letters of Credit outstanding at any time, plus (ii) the aggregate amount of all LC Disbursements that have not been reimbursed by or on behalf of the Borrower at any time.

(d) "**Letters of Credit**" means any letter of credit issued pursuant to the Line of Credit Agreement by Lender or by another issuer at Lender's request for the account of the Borrower pursuant to the LC Commitment.

Case 19-70152-JHH11    Doc 12    Filed 01/28/19    Entered 01/28/19 17:44:52    Desc Main
Document      Page 57 of 93

Exhibit A

(Description of Collateral)

## EXHIBIT A

As security for the obligations under this Agreement and the Note, the Borrower hereby grants to Lender security title to and a continuing security interest in, and assigns, transfers, conveys, pledges and sets over to Lender all of the Borrower's right, title and interest in, to and under all assets of the Borrower of every kind, nature and description, wherever located, including the Borrower's real property described on Schedules 1 and 2 attached hereto and the following property of the Borrower, whether now owned or hereafter acquired by the Borrower, and whether now existing or hereafter incurred, created, arising or entered into (collectively, the "Collateral"):

(a)     all Equipment, Inventory and other tangible property, and any and all accessions and additions thereto, any substitutions and replacements therefor, and all attachments and improvements placed upon or used in connection therewith, or any part thereof;

(b)     all Accounts and contracts;

(c)     all rights as an unpaid vendor or lienor, including stoppage in transit, replevin, detinue and reclamation;

(d)     any other property now or hereafter held by Lender or by others for Lender's account;

(e)     [Reserved];

(f)     all Chattel Paper;

(g)     all Documents;

(h)     all General Intangibles;

(i)     all Instruments;

(j)     all claims in any pending litigation and/or claims for any insurance proceeds relating to the Collateral;

(k)     all permits and licenses and the proceeds thereof, to the extent now or hereafter permitted by applicable law;

(l)     all leases and use agreements of personal property entered into by the Borrower as lessor with other persons as lessees, and all rights under such leases and agreements, including the right to receive and collect all rentals and other moneys (including security deposits) at any time payable under such leases and agreements, whether paid or accruing before or after the filing of any petition by or against the Borrower under the federal Bankruptcy Code;

(m)     all leases and use agreements of personal property entered into by the Borrower as lessee with other persons as lessor, and all rights, titles and interests thereunder, including the leasehold interest of the Borrower in such property and all options to purchase such property or to extend any such lease or agreement;

(n)     all copyrights, patents and trademarks;

04726124.1

(o)     all moneys, all Deposit Accounts and other reserve accounts in which such moneys may at any time be invested and all certificates, instruments and documents from time to time representing or evidencing any such moneys;

(p)     all Goods and personal property, whether tangible or intangible, now owned or hereafter acquired or in which the Borrower now has or hereafter acquires any rights and wherever located;

(q)     all insurance policies related to the foregoing;

(r)     all Investment Property;

(s)     all Supporting Obligations;

(t)     all Commercial Tort Claims;

(u)     all Letter of Credit Rights;

(v)     all Payment Intangibles;

(w)     all Software relating to any of the foregoing; and

(x)     all rights, interest, dividends, and Proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, royalties, issues, profits and products of each of the foregoing and all books, documents, files, ledgers and records in whatever media (whether on computer or otherwise) whether recorded or stored relating to each of the foregoing, and all equipment and general intangibles necessary or beneficial to retain, access or process the information contained in those books and records.

No submission by the Borrower to Lender of a schedule or other particular identification of Collateral shall be necessary to vest in Lender the liens contemplated by this Agreement in each and every item of Collateral now existing or hereafter acquired, incurred, created, arising or entered into, but rather such liens shall vest in Lender immediately upon the acquisition, creation, incurring or arising of, or entering into, any such item of Collateral, without the necessity for any other or further action by the Borrower or by Lender.  The Borrower shall take such steps and observe such formalities as Lender may request from time to time to create and maintain in favor of Lender the liens contemplated by this Agreement in all of the Collateral, whether now owned or hereafter acquired by the Borrower, and whether now existing or hereafter incurred, created, arising or entered into.

Case 19-70152-JHH11    Doc 12    Filed 01/28/19    Entered 01/28/19 17:44:52    Desc Main
Document    Page 60 of 93

# SCHEDULE 1

## LEGAL DESCRIPTION

All of that real property lying and being in Marengo County, Alabama more particularly described as follows:

Beginning at the intersection of the North right-of-way line of Southern Railway and the East margin of Mariah Street extended North to the Tombigbee River; thence Northerly along the East boundary line of said Mariah Street extended to the low water line of the South bank of the Tombigbee River; thence following the meanders of said low water line in an Easterly direction to the centerline of a ravine or slough, generally known as the "Second Slough"; thence in a Southerly direction along the meanders of said centerline of said slough to a point where said centerline intersects the Northern boundary of the right-of-way of Southern Railway; thence along the Northern boundary line of the right-of-way of Southern Railway in the Westerly direction to the point of beginning; lying, being and situated in Section 23, Township 18 North, Range 2 East in the city of Demopolis, Marengo County, Alabama; being and intended to be the entire tract above generally described and owned by C.A. Merryman, his heirs, Merryman Cooperage Company, Greif Brothers Cooperage Corporation, a Delaware corporation, J.R. Raible Company, Allen Cooperage Company, or any successor or partially or wholly owned subsidiary of the said businesses, located in said Section 23, Township 18, North, Range 2 East, in Demopolis, Marengo County, Alabama.

04726124.1

## SCHEDULE 2

### LEGAL DESCRIPTION

All of that real property lying and being in Greene County, Alabama more particularly described as follows:

NORTHWEST QUARTER OF SECTION 10, TOWNSHIP 21 NORTH, RANGE 2 EAST AND THE EAST RIGHT-OF-WAY MARGIN OF CHOCTAW ROAD, SAID POINT BEING THE POINT OF COMMENCEMENT; THENCE RUN N05°30'01"W ALONG SAID EAST RIGHT-OF-WAY MARGIN FOR A DISTANCE OF 1080.09 FEET TO A POINT, SAID POINT BEING THE POINT OF BEGINNING; THENCE CONTINUE N05°30101"W ALONG SAID EAST RIGHT-OF-WAY MARGIN FOR A DISTANCE OF 1269.91 FEET TO THE INTERSECTION OF SAID EAST RIGHT-OF-WAY MARGIN OF SAID CHOCTAW ROAD WITH THE EASTERLY RIGHT-OF-WAY MARGIN OF U. S. HIGHWAY NO. 43; THENCE RUN N18°00'32"E ALONG THE EASTERLY RIGHT-OF-WAY MARGIN OF SAID U. S. HIGHWAY NO. 43 FOR A DISTANCE OF 840.00 FEET TO THE SOUTH RIGHT-OF-WAY MARGIN OF A PROPOSED STREET; THENCE RUN S71°59'28"E ALONG SAID SOUTH RIGHT-OF-WAY MARGIN FOR A DISTANCE OF 550.00 FEET; THENCE RUN S63°59'28"E FOR A DISTANCE OF 730.46 FEET; THENCE RUN S20°57'51"E FOR A DISTANCE OF 743.10 FEET; THENCE RUN S10°50'01"E FOR A DISTANCE OF 393.77 FEET; THENCE RUN S17°08'28"W FOR A DISTANCE OF 284.83 FEET; THENCE RUN S82°03'03"W FOR A DISTANCE OF 1588.72 FEET TO THE POINT OF BEGINNING. SAID PARCEL LYING IN THE NORTHWEST QUARTER OF SECTION 10 AND THE SOUTHWEST QUARTER OF SECTION 3 ALL IN TOWNSHIP 21 NORTH, RANGE 2 EAST, GREENE COUNTY, ALABAMA AND CONTAINING 62.01 ACRES MORE OR LESS.

SAID PARCEL SUBJECT TO AN EXISTING SANITARY SEWER EASEMENT RESERVED BY THE CITY OF EUTAW.

04726124.1

Exhibit B

(Budget)

Exhibit 8
SouthFresh Aquaculture, LLC
13-Week Budget

# SouthFresh Aquaculture, LLC
## 13 Week Cash Flow Forecast
### January 28, 2019

| | 2/3/2019 | 2/10/2019 | 2/17/2019 | 2/24/2019 | 3/3/2019 | 3/10/2019 | 3/17/2019 | 3/24/2019 | 3/31/2019 | 4/7/2019 | 4/14/2019 | 4/21/2019 | 4/28/2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Receipts from Customers | 318,559 | 340,965 | 434,842 | 574,198 | 455,280 | 360,207 | 882,030 | 803,593 | 737,440 | 542,969 | 866,280 | 781,234 | 950,406 |
| Cash Payments to Supplies | (246,863) | (359,441) | (373,885) | (260,405) | (365,603) | (317,820) | (291,084) | (304,843) | (310,482) | (360,044) | (252,609) | (268,522) | (303,283) |
| Administrative Fees | 45 | (11) | 95 | 287 | - | (619) | 705 | 99 | 287 | 568 | (4) | 320 | 310 |
| Allowances | - | 239 | 3,473 | - | 303 | 282 | 1,561 | 78 | 190 | 686 | 473 | 473 | 463 |
| Automobile | 885 | 1,142 | 1,219 | 841 | 402 | 812 | 1,696 | 215 | 757 | 1,260 | 756 | 756 | 243 |
| Bank Fees | 1,224 | 2,111 | (3) | 125 | 511 | 2,066 | 162 | (581) | 10,500 | 2,149 | (15) | 77 | 540 |
| Brokerage & Commissions | - | 15,813 | 35,280 | 20,375 | - | 22,117 | 17,875 | 21,263 | - | 19,251 | 15,750 | 14,289 | - |
| Comdata Charges | 1,077 | 3,134 | 3,579 | 612 | - | - | - | - | 7,902 | 1,043 | 10,964 | 84 | 51,901 |
| Contract Labor | - | (12,039) | 44,486 | - | - | 43 | (581) | - | 200 | 200 | - | 500 | 1,000 |
| Contributions | - | - | - | - | 250 | - | - | - | - | - | - | 701 | 2,515 |
| Deductions | 245 | 377 | 6,676 | - | 807 | - | - | 1,738 | 6,196 | 1,534 | (57) | 964 | 1,892 |
| Dues & Subscriptions | 1,066 | 506 | 1,004 | 1,124 | 1,553 | (127) | 393 | 1,223 | 14 | 465 | (83) | 14 | 1,776 |
| Employee Benefits - 401(k) | 1,943 | 955 | 1,954 | 1,922 | 2,954 | 1,913 | 1,919 | 1,988 | 1,849 | 3,870 | 1,891 | 1,891 | 1,475 |
| Employee Benefits - Other | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Entertainment | 532 | 151 | 1,792 | 157 | 647 | 261 | 1,355 | 372 | 873 | 387 | 1,034 | 941 | 311 |
| Express Mail & Postage | 892 | 1,670 | 723 | 988 | 289 | 415 | 858 | 340 | 1,577 | 767 | 430 | 965 | 1,032 |
| Fines & Penalties | - | - | - | 10 | 4,594 | - | - | - | - | 3 | - | 1,658 | - |
| Flyers | - | - | - | 150 | - | - | 300 | 300 | 3 | - | 155 | 1,500 | 2,400 |
| Food Shows & Booths | 780 | - | 126 | 2,100 | 268 | 2,000 | - | - | - | 1,070 | 783 | 3,445 | 1,819 |
| Freight | 6,697 | 10,359 | 5,424 | 6,921 | - | 26,382 | 1,287 | - | 1,070 | 22,302 | 5,015 | 16,255 | 8,375 |
| Fuel, Gas & Oil | 2,757 | 3,679 | 6,545 | 2,845 | 4,220 | 2,973 | 1,627 | - | 783 | 4,053 | 4,879 | 13,404 | 1,764 |
| Hauling/Seining Expenses | 436 | 1,513 | 1,233 | 460 | 872 | 574 | 7,544 | - | 2,520 | 1,942 | 385 | 3,001 | 438 |
| Inspection | - | - | - | 12,990 | - | - | 2,010 | 479 | - | - | - | 200 | 3,885 |
| Insurance | 1,287 | 29,694 | (2,833) | (5,628) | 36,288 | 52,417 | 275 | 3,596 | 26,021 | 46,892 | (1,572) | (5,224) | (6,073) |
| KPI | 59,378 | 929 | 862 | 796 | 750 | 694 | (4,764) | (5,839) | 806 | 997 | 397 | 770 | 792 |
| Legal & Accounting Expense | 708 | 2,302 | 837 | 2,029 | 413 | 4,386 | 855 | 770 | 275 | 2,520 | - | 570 | 13,714 |
| Local Program | - | - | - | - | - | - | 527 | 855 | 1,701 | - | - | - | - |
| Lumper | 299 | 1,925 | 408 | 624 | 630 | 269 | - | 527 | 182 | 1,082 | 4,162 | 432 | 878 |
| Marketing Program | 6,068 | 4,653 | 2,236 | 256 | 13,158 | 2,867 | 853 | 1,067 | 11,541 | 11,235 | - | 2,299 | 15,842 |
| Marketing, Promotions & Ads | - | - | - | 50 | - | 3,627 | 932 | 5,861 | - | - | - | (3,693) | - |
| Miscellaneous | 1,377 | 10,387 | 5,728 | - | 4 | 51 | (9,950) | 308 | 178 | 178 | 83 | 1,007 | 54 |
| Moving Expense | - | (137) | 888 | - | - | - | 381 | - | - | - | - | - | - |
| Packaging | 23,706 | 5,757 | 39,355 | 20,826 | 14,899 | 7,655 | 19,387 | 16,752 | 28,005 | 23,477 | 16,366 | 14,973 | 23,853 |
| Payroll Taxes | 12,501 | 13,867 | 13,361 | 13,127 | 12,312 | 12,202 | 12,092 | 12,586 | 11,511 | 17,780 | 5,005 | 11,513 | 10,029 |
| Pest Control | 2,615 | 142 | - | 637 | 506 | 1,110 | 1,074 | 393 | 290 | 509 | 333 | 393 | 252 |
| Lease Payments | 8,300 | 53,770 | 50,646 | 8,031 | 4,387 | 56,387 | 48,100 | 3,381 | 16,288 | 59,147 | 12,397 | 51,180 | 3,049 |
| Repairs & Maintenance | 88,874 | 18,001 | 60,343 | 31,656 | 29,315 | 14,285 | 70,017 | 21,661 | 48,297 | 69,843 | 31,161 | 24,839 | 29,784 |
| Safety | 108 | 24 | 378 | 485 | 1,291 | 212 | 120 | 15 | 2,285 | 927 | 234 | 133 | 188 |
| Salaries & Wages | 143,546 | 147,608 | 163,727 | 168,035 | 157,500 | 140,687 | 198,942 | 168,738 | 137,668 | 239,968 | 89,804 | 142,458 | 163,626 |
| Samples | 318 | 1,490 | 1,391 | 1,771 | 249 | 3,467 | 471 | 949 | 1,110 | 803 | 4,307 | 4,307 | 451 |
| Sanitation & Waste Disposal | 10,294 | 1,340 | 29,131 | 10,994 | 10,293 | 9,902 | 14,931 | 33,769 | 19,243 | 14,485 | 13,921 | (11,142) | 14,527 |
| Supplies | 13,178 | 6,062 | 16,005 | 13,973 | 20,231 | 9,086 | (4,263) | 12,811 | 16,882 | 14,288 | 14,568 | 23,562 | 25,679 |
| Taxes, Licenses & Permits | 12,115 | 17,289 | 1,518 | 1,385 | - | 6,099 | 14,931 | 2,227 | 1,244 | 6,757 | 657 | 657 | 174 |
| Telephone, Fax & Internet | 2,698 | 685 | 3,095 | 4,549 | 1,425 | 1,089 | 2,227 | 995 | 2,870 | 2,331 | 1,599 | 825 | 1,194 |
| Testing | 466 | 2,376 | 290 | 1,439 | - | 1,044 | 995 | 2,523 | 366 | 8,106 | 209 | 133 | 688 |
| Training and Education | - | - | - | - | - | - | (1,316) | 1,019 | - | - | - | 550 | - |
| Transportation Expense | 5,743 | 6,345 | 3,105 | 6,797 | 9,410 | 3,400 | 281 | 6,307 | 8,164 | 3,912 | 3,220 | 4,565 | 7,001 |
| Travel | 2,532 | (2,383) | 9,073 | 790 | 1,432 | 964 | 6,307 | 2,001 | 1,288 | 691 | 3,296 | 7,543 | 728 |
| Uniforms | 738 | 361 | 1,098 | 725 | 690 | 689 | 5,345 | 1,987 | 1,244 | 1,379 | 573 | 458 | 335 |
| Utilities | 25,683 | 16,884 | 11,579 | 41,646 | 42,076 | (14,002) | 1,987 | 14,154 | 46,231 | 28,255 | 9,522 | 39,207 | 34,791 |
| Emergency Contingency | 200,000 | 200,000 | 200,000 | 200,000 | 100,000 | 100,000 | 100,000 | 45,790 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 |
| Operating Expenses | (641,170) | (568,428) | (742,566) | (576,898) | (471,466) | (477,238) | (548,723) | (473,607) | (456,826) | (661,770) | (288,992) | (420,684) | (469,292) |

Exhibit 8
SouthFresh Aquaculture, LLC
13-Week Budget

## SouthFresh Aquaculture, LLC
### 13 Week Cash Flow Forecast
### January 28, 2019

| | 2/3/2019 | 2/10/2019 | 2/17/2019 | 2/24/2019 | 3/3/2019 | 3/10/2019 | 3/17/2019 | 3/24/2019 | 3/31/2019 | 4/7/2019 | 4/14/2019 | 4/21/2019 | 4/28/2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BA Fees | | | | | | | | | | 81,447 | | | |
| MCG Legal Expenses* | | | | | | | 40,000 | | | | 85,600.00 | | |
| M&M Legal Expenses | | | | | | | 10,000 | | | | 10,000 | | |
| Committee Legal Expenses | | | | | | | | | 5,000 | | | | |
| Utilities Deposit | | | 55,000 | | | | | | | | | | 5,000 |
| Critical Vendors | 1,007,757 | | | | | | | | | | | | |
| Interest Expense | | | | | 11,500 | | | | | 18,200 | | | |
| | | | | | | | | | | | | | |
| **Non Operating Expenses** | (1,007,757) | - | (55,000) | - | (11,500) | - | (50,000) | - | (5,000) | (99,647) | (95,000) | - | (5,000) |
| | | | | | | | | | | | | | |
| **Weekly Cash In(out)flow** | (1,577,232) | (587,304) | (736,609) | (263,106) | (393,290) | (434,851) | (7,776) | 25,143 | (34,869) | (578,492) | 229,680 | 92,028 | 172,831 |
| | | | | | | | | | | | | | |
| **Beginning Cash Balance** | 1,500,000 | | | | | | | | | | | | |
| Cash Flow Prior to Financing | (1,577,232) | (587,304) | (736,609) | (263,106) | (393,290) | (434,851) | (7,776) | 25,143 | (34,869) | (578,492) | 229,680 | 92,028 | 172,831 |
| DIP Financing | 77,232 | 587,304 | 736,609 | 263,106 | 393,290 | 434,851 | 7,776 | (25,143) | 34,869 | 578,492 | (229,680) | (92,028) | (172,831) |
| **Ending Cash Balance** | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | | |
| **DIP Starting Balance** | 3,500,000 | 3,422,768.13 | 2,835,464.56 | 2,098,855.18 | 1,835,749.45 | 1,442,459.50 | 1,007,608.30 | 999,831.92 | 1,024,974.63 | 990,105.57 | 411,613.87 | 641,293.66 | 733,321.30 |
| Drawdown | 77,232 | 587,304 | 736,609 | 263,106 | 393,290 | 434,851 | 7,776 | (25,143) | 34,869 | 578,492 | (229,680) | (92,028) | (172,831) |
| **DIP Ending Balance** | 3,422,768 | 2,835,465 | 2,098,855 | 1,835,749 | 1,442,460 | 1,007,608 | 999,832 | 1,024,975 | 990,106 | 411,614 | 641,294 | 733,321 | 906,153 |

*After application of approximate $100k retainer

Exhibit C

(Line of Credit Note)

$3,500,000.00                    **Decatur, Alabama**                    January 28, 2019

## LINE OF CREDIT NOTE

*FOR VALUE RECEIVED*, **SOUTHFRESH AQUACULTURE, LLC**, an Alabama limited liability company as debtor and debtor-in-possession in a case pending under chapter 11 of the Bankruptcy Code ("Borrower"), promises to pay to the order of **ALABAMA FARMERS COOPERATIVE, INC.**, an Alabama agricultural cooperative association ("Lender" or, together with any other holder of this Note, "Holder"), at the office of Lender at 121 Somerville Road, NE, Decatur, Alabama 35601 (P.O. Box 2227, 35609), or at such other place as the Holder may designate, the principal sum of Three Million Five Hundred Thousand and No/100 Dollars ($3,500,000.00) or so much thereof as may be advanced and outstanding hereunder, in legal tender of the United States of America in immediately available funds, at the place payment is due.

This Note is the note referred to in, and is entitled to the security of, each of the following documents (individually a "Loan Document" and collectively, "Loan Documents"), if any:

(a)     the Debtor-in-Possession Line of Credit and Security Agreement of even date herewith executed by Lender and the Borrower ("Line of Credit Agreement"); and

(b)     One or more security agreements encumbering all of the Borrower's personal property and mortgages or deeds of trust encumbering certain real property of the Borrower located in multiple locations across the United States as described in such instruments as the same are executed and delivered to Lender by the Borrower from time-to-time pursuant to the terms of the Line of Credit Agreement.

Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Line of Credit Agreement.

Advances made hereunder shall bear interest at the Interest Rate or Default Interest Rate, as applicable, until repaid. Interest shall be computed on the basis of a 360-day year and shall be paid monthly.

The Borrower promises to make payments in accordance with the following provisions:

(a)     The Borrower shall make monthly payments of interest commencing March 1, 2019, and continuing on the same day of each month thereafter. Interest which is not paid by the 20th day of the month in which it falls due shall constitute an Event of Default.

(b)     On the Maturity Date, any and all amounts due under this Note including, but not limited to, any outstanding principal and accrued but unpaid interest, shall be immediately due and payable by the Borrower.

In relation to any payment made by the Borrower to Lender, each such payment shall be applied first to accrued but unpaid interest, next to any late charges and other charges then due and owing under this Note, and then in reduction of the principal sum.

If any payment of principal or interest on this Note shall become due on a Saturday, Sunday or any day on which Holder of this Note is legally closed to business, then such payment shall be made on the next succeeding business day, and interest shall continue to accrue on the entire unpaid balance of the principal

04723056.4                                         1

sum of this Note until such payment is received by Holder. Any payment received by Lender after 2:00 p.m. (Central time) on a business day (or at any time on a day that is not a business day) shall be deemed made by the Borrower and received by Lender on the following business day.

The indebtedness evidenced hereby may be prepaid in whole or in part without premium or penalty at anytime. Amounts so prepaid will be applied as prescribed herein and amounts prepaid may not be re-borrowed.

All advances and payments under the terms of this Note shall be evidenced by and consistent with accounting journal entries to be maintained by the Holder. The records of advances and payments shall be provided to the Borrower monthly and shall be deemed determinative of the balance due unless disputed by the Borrower within fifteen (15) days after delivery by Lender.

Without in any way limiting the generality of the foregoing, the occurrence of any one or more of the following events shall constitute an Event of Default under this Note:

(a) If the Borrower fails to pay when due any principal or interest under this Note, or any other sum provided for herein;

(b) If the Borrower defaults in the performance or observance of any other covenant, condition or agreement under this Note and such default continues unremedied for as much as twenty (20) days after written notice thereof is given to the Borrower;

(c) If any other "Event of Default" shall occur under any the Line of Credit Agreement or any Security Documents (after giving effect to any applicable notice, grace and cure periods provided for therein); or

(d) If any "Event of Default" shall occur under one of the Orders.

If any one or more of the foregoing Events of Default shall occur, then the entire unpaid principal balance of this Note, together with accrued but unpaid interest thereon, at the option of the Holder of this Note (but without requirement of notice to or demand on any other party), shall be and become due and payable immediately, and the Holder of this Note may proceed to exercise any remedy available to it at law or in equity to collect all amounts owed to Lender.

Time is of the essence with respect to the payment of every payment of principal and of interest hereunder and the performance of every other covenant made by the Borrower under this Note, the Loan Documents and under any other agreement which secures the payment of this Note.

The Borrower hereby waives demand, presentment, dishonor, notice of dishonor and any other requirement necessary to hold the Borrower obligated hereon. The Borrower hereby agrees that the obligations evidenced by this Note may, from time to time, in whole or in part, be released or modified without notice to, or reservation of rights against, the Borrower, and that any collateral now or hereafter held for the obligations of the Borrower under this Note may hereafter be released, compromised, or exchanged, and that Holder may fail to perfect its lien or security interest in such collateral or may permit the perfection of its lien or security interest in such collateral to lapse, all without in any way affecting or releasing the liability of the Borrower under this Note.

The Borrower agrees to pay all intangibles taxes, documentary stamp taxes, recording fees or taxes and other taxes and fees due to any governmental authority in connection with the execution and delivery of this Note, any Loan Documents or any other agreement which provides collateral for this Note.

Case 19-70152-JHH11    Doc 12    Filed 01/28/19    Entered 01/28/19 17:44:52    Desc Main
Document      Page 68 of 93

As additional collateral for the payment of this Note, the Borrower transfers, assigns, pledges, and sets over to Holder, and grants Holder a continuing lien upon and security interest in all deposits and credits which the Borrower may now or hereafter have with Holder. Holder is hereby authorized, at any time or times after the occurrence of an Event of Default and without prior notice, to apply such deposits and credits, in whole or in part and in such order as Holder may elect, to the payment of, or as a reserve against, the obligations of the Borrower under this Note.

The Borrower agrees to pay to Holder, in addition to the other amounts payable under this Note, all costs and expenses, including without limitation, court costs and reasonable attorneys' fees, incurred by the Holder of this Note in collecting, securing or attempting to collect or secure this Note after the occurrence of an Event of Default (without giving effect to any grace, notice or cure period).

Holder shall not by any act, delay, omission or otherwise be deemed to have waived any of its rights or remedies under the Note, any Loan Document or under any agreement which provides collateral for this Note, or under applicable law. Holder may accept late payments and/or partial payments under this Note without waiving or otherwise impairing its right to require strict conformance to the terms hereof. All rights and remedies of Holder under this Note, under any such agreement providing collateral for this Note, and under applicable law shall be cumulative and may be exercised successively or concurrently. Any provision of this Note which shall be deemed to be unenforceable or invalid under any such law shall be ineffective to the extent of such unenforceability or invalidity without affecting the enforceability or validity of any other provision hereof.

Notwithstanding any provision contained in this Note or any Loan Document to the contrary, the parties intend that no provision of this Note or the Loan Documents be interpreted, construed, applied or enforced so as to permit or require the payment or collection of interest, whether before or after maturity of this Note, in excess of the maximum rate permitted by the law applicable to this transaction ("Maximum Permitted Rate"). If, however, any such provision is so interpreted, construed, applied or enforced, then the parties intend: (i) that such provision automatically shall be reformed *nunc pro tunc* so as to require payment only of interest at the Maximum Permitted Rate, and (ii) if Holder of this Note has received interest payments in excess of such Maximum Permitted Rate, that the amount of such excess be credited *nunc pro tunc* in reduction of the principal amount of this obligation, together with interest at such Maximum Permitted Rate.

This Note was negotiated, executed and delivered and is to be performed in Morgan County, Alabama, and the parties agree that this Note will be construed in accordance with the laws of the United States and the internal laws of the State of Alabama. All actions with respect to this Note may be instituted in the Bankruptcy Court Circuit Court of the State of Alabama for so long as the Case is pending or in the Circuit Court sitting in Morgan County, Alabama, or the United States District Court for the Northern District of Alabama sitting in Huntsville, Alabama, as Lender might elect from time to time, and by execution and delivery of this Note, the Borrower irrevocably and unconditionally submits to the jurisdiction (both subject matter and personal) of each such court and irrevocably and unconditionally waives: any objection the undersigned might now or hereafter have to the venue in any such court; and any claim that any action or proceeding brought in any such court has been brought in an inconvenient forum.

**THE BORROWER HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING OUT OF OR IN ANY WAY PERTAINING OR RELATING TO THIS NOTE, THE LOAN DOCUMENTS, OR ANY OTHER INSTRUMENT OR DOCUMENT EXECUTED OR DELIVERED IN CONNECTION WITH THIS NOTE, OR (B) IN ANY WAY CONNECTED WITH OR PERTAINING OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF THE PARTIES HERETO WITH RESPECT TO THIS NOTE, THE LOAN DOCUMENTS, OR ANY OTHER**

INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR IN CONNECTION WITH THE TRANSACTIONS RELATED HERETO OR CONTEMPLATED HEREBY OR THE EXERCISE OF EITHER PARTY'S RIGHTS AND REMEDIES HEREUNDER, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. THE BORROWER AGREES THAT LENDER MAY FILE A COPY OF THIS NOTE WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED FOR AGREEMENT BETWEEN THE PARTIES IRREVOCABLY TO WAIVE TRIAL BY JURY, AND THAT ANY DISPUTE OR CONTROVERSY OF ANY KIND WHATSOEVER BETWEEN THEM SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

[Signatures on following page]

**IN WITNESS WHEREOF**, the undersigned has caused this Note to be executed by its duly authorized officer thereunto on the date first above written with the intention that this Note shall constitute a sealed instrument.

ATTEST:

**SOUTHFRESH AQUACULTURE, LLC,**
an Alabama limited liability company, as debtor and debtor-in-possession

By:_____

  Its:_____

By:_____

  Its:_____

[SEAL]

Federal Tax ID Number of Borrower:
**\*\*-\*\*\*7245**

Exhibit D

(Form of Proposed Interim Order)

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

|  |  |  |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. |
| SOUTHFRESH AQUACULTURE, LLC, | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |

## INTERIM ORDER (I) AUTHORIZING THE DEBTOR TO (A) OBTAIN POSTPETITION FINANCING ON A SUPER-PRIORITY, SENIOR SECURED BASIS AND (B) USE CASH COLLATERAL, (II) GRANTING (A) LIENS AND SUPER-PRIORITY CLAIMS AND (B) ADEQUATE PROTECTION, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING AND (V) GRANTING RELATED RELIEF

Upon the motion (the "Motion"),[1] of the above-captioned debtor and debtor in possession (the "Debtor"), for entry of an order (this "Order"), (i) Authorizing the Debtor to (A) Obtain Postpetition Financing on a Super-Priority, Senior Secured Basis and (B) Use Cash Collateral, (II) Granting (A) Liens and Super-Priority Claims and (B) Adequate Protection, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing and (V) Granting Related Relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the General Order of Reference from the United States District Court for the Northern District of Alabama, dated January 12, 1995; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

04724832.1

the relief requested therein at a hearing before this Court (the "<u>Hearing</u>"); and it appearing to the Court that granting the interim relief requested in the Motion is fair and reasonable and in the best interests of the Debtor, its estate, and its creditors and equity holders and is essential for the continued operation of the Debtor's business and necessary to avoid immediate and irreparable harm to the Debtor's estate; and it further appearing that the Debtors are unable to obtain unsecured credit for money borrowed allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code; and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, the Court makes the following FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.    <u>Findings Regarding the Postpetition Financing</u>.

      (i)    *Request for Postpetition Financing*. The Debtor seeks authority on an interim basis to access and use the liquidity provided under the DIP Facility, and the resulting cash collateral of the DIP Lender, to: (i) finance ongoing debtor-in-possession working capital purposes, as provided for in the Budget, and other general corporate purposes; and (ii) finance transaction fees, costs and expenses related to the DIP Facility and this proceeding, to the extent permitted under the DIP Documents and as provided for in the Budget. The Debtor also seeks authority to use the credit available under the DIP Facility to obtain letters of credit needed to fulfill the requirements of certain key vendors, including certain sellers of fish and other seafood who must deliver their goods for government inspection prior to release of the product to the Debtor, but who refuse to do so without the payment protection provided by letters of credit.

      (ii)    *Need for Postpetition Financing and Use of Cash Collateral*. The Debtor's need for postpetition financing, and to use the resulting cash collateral of the DIP Lender, as provided for in

the Motion is necessary to enable the Debtor to continue operations and to administer and preserve the value of its estate. The ability of the Debtor to finance its operations, to maintain business relationships with its vendors, suppliers, and customers, to pay its employees, and otherwise to finance its operations requires the availability of working capital from the DIP Facility and the use of cash collateral. Without the ability to access the DIP Facility or cash collateral, the Debtor, its estate, and its creditors, and the possibility for a successful reorganization, would suffer immediate and irreparable harm. The Debtor does not have sufficient available sources of working capital and financing to operate its businesses or maintain its properties in the ordinary course of business for the anticipated duration of this proceeding without the DIP Facility and authorized use of cash collateral.

(iii) *No Credit Available on More Favorable Terms.* Given its current financial condition, financing arrangements, and capital structure, the Debtor is unable to obtain financing from sources other than the DIP Lender on terms more favorable than the DIP Facility and DIP Documents. The Debtor has been unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtor has also been unable to obtain credit (a) having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, or (b) secured solely by a junior lien on property of the Debtor and its estate that is subject to a prepetition lien. Financing on a postpetition basis is not otherwise available without granting the DIP Lender (a) a perfected, first priority security interest in and liens on all of the Debtor's existing and after-acquired unencumbered assets (other than any causes of action based on Chapter 5 of the Bankruptcy Code and subject to the Carve-Out), (b) a perfected, junior security interest in and lien on any of the Debtor's existing assets that may be subject to a valid and unavoidable prepetition lien, and (c) a superpriority claim, all as set forth in this Interim DIP Order.

Case 19-70152-JHH11    Doc 12    Filed 01/28/19    Entered 01/28/19 17:44:52    Desc Main
Document      Page 75 of 93

*(iv)* *Adequacy of the Budget*. As set forth in the DIP Documents and the Motion, the Debtor has prepared and delivered to the DIP Lender a budget, a copy of which is annexed hereto as Exhibit 1 (as it may be modified, amended, restated or supplemented with the consent of the DIP Lender in its sole discretion, the "Budget").[2] The Budget has been prepared and thoroughly reviewed by the Debtor, its management, and its advisors, and the Debtor, its management, and its advisors believe the Budget and the estimate of administrative expenses due or accruing during the period covered by the Budget were developed using reasonable assumptions, and based on those assumptions the Debtor believes there should be sufficient available assets to pay all administrative expenses due or accruing during the period covered by the Budget.

B.  Findings Regarding Good Faith.

(i)  *Willingness to Provide Financing*. The DIP Lender has demonstrated a willingness to provide financing to the Debtor subject to: (a) the entry by this Court of this Interim DIP Order; (b) approval by this Court of the terms and conditions of the DIP Facility and the DIP Documents; and (c) entry of findings by this Court that such financing is essential to the Debtor's estate, that the DIP Lender is extending credit to the Debtor pursuant to the DIP Documents in good faith, and that the DIP Lender's claims, superpriority claims, security interests, and liens and other protections granted pursuant to this Interim DIP Order and the DIP Documents will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument, or reconsideration of this Interim DIP Order, or any other order.

(ii)  *Business Judgment and Good Faith Pursuant to Section 364(e)*. The terms and conditions of this Interim DIP Order, the DIP Facility, and the DIP Documents are fair, reasonable,

---

[2] For the avoidance of doubt, the Budget is one of the DIP Documents.

04724832.1                                    4

and the best available to the Debtor under the circumstances, reflect the Debtor's exercise of prudent and sound business judgment consistent with its fiduciary duties, and is supported by reasonably equivalent value and consideration. The DIP Documents and the use of the DIP Lender's resulting cash collateral were negotiated in good faith and at arms' length between the Debtor and the DIP Lender, each being represented by its own counsel. The DIP Lender expressly declined to request or take any security interest in the Debtor's Chapter 5 causes of action, which shall remain unencumbered, and agreed to the Carve-Out and a reasonable Budget to facilitate the Debtor's operations under chapter 11. The use of credit to be extended under the DIP Facility and of the DIP Lender's resulting cash collateral shall be deemed to have been so allowed, advanced, made, used, and extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code, and the DIP Lender is therefore entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Interim DIP Order.

C.     <u>Notice.</u> Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtor, whether by facsimile, email, overnight courier, or hand delivery, to certain parties in interest, including: (a) the Office of the Bankruptcy Administrator for the Northern District of Alabama; (b) the holders of the 20 largest unsecured claims against the Debtor; (c) counsel to the proposed DIP Lender; (d) the International Chemical Workers Union Council of the United Food and Commercial Workers Union and Its Local 1038C; (e) the United States Attorney's Office for the Northern District of Alabama; (f) the Internal Revenue Service; (g) the United States Environmental Protection Agency; (h) the Alabama Department of Environmental Management; (i) the United States Department of Agriculture; (j) the United States Food and Drug Administration; (k) the Alabama Department of Agriculture & Industries – Weights and Measures Division; (l) the office

of the Attorney General for the State of Alabama; (m) the Critical Vendors[3]; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"). The parties have made reasonable efforts to afford the best notice possible under the circumstances and such notice is good and sufficient to permit the relief set forth in this Interim DIP Order.

Accordingly, based upon the foregoing findings and conclusions, the Motion, and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED and DECREED** that:

1.      The Motion is GRANTED.

2.      The Interim DIP Financing is authorized and approved, the DIP Documents are authorized and approved on an interim basis, and the use of Cash Collateral on an interim basis is authorized, subject to the terms and conditions set forth in this Interim DIP Order and the DIP Documents (including the Budget).

3.      Any objections to the Interim DIP Financing and/or entry of this Interim DIP Order, to the extent not withdrawn or resolved, are hereby overruled.

4.      During the period that this Interim DIP Order is effective, and subject to the terms and conditions set forth in the DIP Documents, the DIP Facility, and this Interim DIP Order, and to prevent immediate and irreparable harm to the Debtor's estates, the Debtor is hereby authorized to access the Interim DIP Financing pursuant to the terms herein and the terms of the DIP Documents.

5.      The DIP Documents are hereby approved for the Interim DIP Financing, including the Budget annexed hereto as Exhibit 1. Any modification to, or amendment or update of the Budget shall be in form and substance acceptable to and approved in writing by the DIP Lender in its sole discretion. The Debtor is expressly and immediately authorized and empowered to execute and

---

[3] As identified in Debtor's Motion for Entry of Order (I) Authorizing the Payment of Critical Vendor Claims, and (II) Granting Related Relief filed contemporaneously with the Motion.

04724832.1                                        6

deliver the DIP Documents, including all instruments and documents that may be necessary or required for the performance by the Debtor under the DIP Facility and the creation and perfection of the DIP Liens provided for by this Interim DIP Order and the DIP Documents, and to incur liabilities and make payments thereunder or therefrom as part of the Interim DIP Financing without need to obtain further Court approval, and otherwise operate pursuant to and in accordance with the Interim DIP Financing, including the Budget, until the final hearing on the Motion. The DIP Documents evidence valid and binding obligations of the Debtor, which shall be enforceable against the Debtor, its estate, and its creditors in accordance with the terms and conditions of the DIP Documents and this Interim DIP Order.

6. All postpetition collections and proceeds, whether from ordinary course collections, asset sales, insurance recoveries, condemnations, or otherwise, will be deposited and governed by this Interim DIP Order and the DIP Documents as Cash Collateral of the DIP Lender, unless expressly subject to the prepetition security interest of another creditor.

7. All of the Borrower's obligations described in the DIP Documents shall represent valid and binding obligations of the Debtor, enforceable against the Debtor and its estate in accordance with the terms of the DIP Documents. The proceeds of the DIP Facility shall be used in accordance with the DIP Documents, including the Budget as applicable (subject to any Permitted Variances therefrom as may be permitted under the Line of Credit Agreement): (a) for the payment of fees, expenses and costs incurred in connection with the Chapter 11 Cases; (b) to obtain letters of credit as required for ordinary purchases and operations, which shall reduce availability under the DIP Facility but not be an expense covered by the Budget unless or until such letters of credit are drawn, and (c) for working capital, capital expenditures, and other general corporate purposes of the Debtor. Notwithstanding entry of the Interim DIP Order or Final DIP

Order, however, the DIP Lender shall have no obligation to make any loan or advance under the DIP Facility unless all of the conditions precedent to the making of such extension of credit under the Line of Credit Agreement has been satisfied in full or waived by the DIP Lender in its sole discretion.

8.     Upon entry of this Interim DIP Order, the DIP Documents and this Interim DIP Order shall constitute and evidence the validity and binding effect of the Debtor's obligations under the Interim DIP Financing, the DIP Documents, and this Interim DIP Order (the "DIP Obligations"), which DIP Obligations shall be enforceable against the Debtor, its estate, and any successors thereto, including, any trustee appointed in this case, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of this Chapter 11 Case, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases"). Upon entry of this Interim DIP Order, the DIP Obligations will include all loans and any other indebtedness or obligations, contingent or absolute, which may from time to time be owing by the Debtor to the DIP Lender under the DIP Documents or this Interim DIP Order, including all principal, accrued interest, costs, fees, expenses, and other amounts owed under the DIP Documents for the period prior to the Final Hearing on the Motion (the "Interim Period"), and upon entry of a Final DIP Order, the DIP Obligations will also include all loans and any other indebtedness or obligations, contingent or absolute, which may from time to time thereafter be owing by the Debtor to the DIP Lender under the DIP Documents or the Final DIP Order. The DIP Obligations shall be due and payable as provided for herein and in the DIP Documents.

9.     As more fully set forth in the DIP Documents and the Motion, as security for the full and timely payment of the DIP Obligations, the DIP Lender is hereby granted:

Case 19-70152-JHH11   Doc 12   Filed 01/28/19   Entered 01/28/19 17:44:52   Desc Main
Document   Page 80 of 93

(a)(i)    pursuant to Section 364(c)(2) of the Bankruptcy Code, but subject to the Carve-Out, an unavoidable first priority lien on and security interest in all unencumbered assets of the Debtor (now existing or hereafter acquired, including all proceeds thereof) other than any claims or causes of action which the Debtor may be entitled to assert by reason of any avoidance or other power vested in or on behalf of the Debtor or the estate of the Debtor under chapter 5 of the Bankruptcy Code; and

(i)    pursuant to Section 364(c)(3) of the Bankruptcy Code, junior liens on and security interests in any encumbered assets of the Debtor which are subject to any validly perfected, unavoidable security interest or lien in existence on the Petition Date or that is perfected subsequent thereto as permitted by Section 546(b) of the Bankruptcy Code (including, without limitation, the Permitted Encumbrances, as defined in the Line of Credit Agreement).

(b)    The liens and security interests identified in subparagraph (a), above, are referred to herein as the "DIP Liens" and the collateral to which such DIP Liens attach, the "DIP Collateral."

(c)    Except as otherwise agreed by the DIP Lender or ordered by this Court in accordance with the Bankruptcy Code, the DIP Liens shall not be made subject to or *pani passu* with any lien or security interest by any court order heretofore or hereafter entered in the Bankruptcy Case and shall be valid and enforceable against any trustee appointed in the Bankruptcy Case, upon any Successor Case(s), and/or upon the dismissal of the Bankruptcy Case. The DIP Liens shall not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code.

(d)    This Interim DIP Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens without the necessity of filing or recording any financing

statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens in the priorities granted herein. Notwithstanding the foregoing, the DIP Lender is authorized to file, as it in its sole discretion deems necessary or desirable, such financing statements, mortgages, notices of lien, or other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens.

(e)     The Debtor is authorized to execute and promptly deliver to the DIP Lender all such financing statements, mortgages, notices, and other documents as the DIP Lender may reasonably request. The DIP Lender, in its sole discretion, may file a photocopy of this Interim DIP Order as a financing statement with any filing or recording office or with probate court or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instruments.

(f)     Until the indefeasible payment in full of all DIP Obligations and the termination of the DIP Lender's obligation to extend credit under the DIP Facility, the Debtor shall adequately insure the DIP Collateral.  Upon entry of this Interim DIP Order, the DIP Lender shall be, and shall be deemed to be, without any further action or notice, named as an additional insured and loss payee, as applicable, on each insurance policy maintained by the Debtor which in any way relates to the DIP Collateral. Notwithstanding the foregoing, the Debtor is authorized to take all necessary actions to cause the DIP Lender to be named as an additional insured and loss payee, as

applicable, on each insurance policy maintained by the Debtor which in any way relates to the DIP Collateral.

(g)     Until such time as the DIP Obligations have been paid in full in accordance with the terms of the DIP Documents, all proceeds of DIP Collateral in which the DIP Lender holds a first priority DIP Lien shall either (i) be remitted or caused to be remitted to the DIP Lender for application against the DIP Obligations in accordance with the terms of the DIP Documents and this Interim DIP Order, or (ii) maintained by the Debtor as Cash Collateral of the DIP Lender subject to the provisions and restrictions of the Budget and other DIP Documents.

(h)     The DIP Lender shall have the unqualified right to credit bid up to the full amount of the DIP Obligations in any sale of the DIP Collateral (or any part thereof) without the need for further Court order authorizing the same, and whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

10.     In addition to the DIP Liens, subject and subordinate to the Carve-Out and in accordance with sections 364(c)(1), 503 and 507 of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims (the "DIP Superpriority Claims") with priority over any and all administrative expenses of the Debtor, whether heretofore or hereafter incurred, of the kind specified in, or ordered pursuant to, sections105, 326, 328, 330, 331, 364, 365, 503(b), 507(a), 507(b), 726, 1113, 1114 or any other provisions of the Bankruptcy Code under which administrative expense priority may be obtained or granted.

11.     Subject to the terms and conditions set forth in, and in accordance with, this Interim DIP Order, the DIP Facility, and the DIP Documents, including the Budget, the Debtor is

authorized to use Cash Collateral. Upon the occurrence of a Termination Event (as defined herein), the Debtor's consensual use of Cash Collateral shall automatically terminate. As adequate protection for any diminution in the value of the DIP Collateral caused by the Debtor's use of Cash Collateral, the DIP Lender shall (i) hold, to the extent such Cash Collateral is used, a continuing DIP Lien on DIP Collateral, including Cash Collateral, acquired or generated by the Debtor after entry of this Interim DIP Order, and (ii) receive monthly payments of interest in accordance with the Line of Credit Agreement and Note.

12. The term "Event of Default" shall have the same meaning under this Interim DIP Order as such term has under the DIP Documents, including Section 13 of the Line of Credit Agreement.

13. Upon the occurrence of an Event of Default, all DIP Obligations shall become due and payable in accordance with the DIP Documents. Additionally, the DIP Lender may file a notice of such Event of Default (a "Default Notice") on the docket of the Bankruptcy Case. Unless otherwise ordered by the Court in accordance with the terms hereof, as of 12:00 midnight prevailing Central time on the 5th business day after the date the DIP Lender files a Default Notice (such period, the "Default Notice Period"), the automatic stay under section 362 of the Bankruptcy Code will be automatically lifted without further order of this Court to allow the DIP Lender to take any and all actions permitted by law, as if no case were pending under the Bankruptcy Code. The Debtor may file a response to the Notice of Default during the Default Notice Period and may seek an expedited hearing to contest the existence of an Event of Default or the propriety of any termination of the automatic stay as a result of such alleged Event of Default, but the Debtor's access to advances under the DIP Facility and the Debtor's use of Cash Collateral shall be suspended or stayed during the Default Notice Period and until such time as the Court conducts

the expedited hearing regarding the Default Notice. In the event the automatic stay is lifted in accordance with this paragraph, either automatically or after a hearing before this Court, the Debtor shall be permanently prohibited from (a) using Cash Collateral, including accounts receivable, inventory, and the proceeds thereof, of the Debtor in which the DIP Lender has an interest, unless the DIP Lender receives adequate protection of its interest in the Cash Collateral pursuant to an order of this Court and in accordance with its rights under the Bankruptcy Code, or (b) obtaining credit or incurring indebtedness secured by a lien or security interest that is equal or senior to a DIP Lien or which is entitled to priority administrative status which is equal or superior to that granted to the DIP Lender hereunder, as the case may be, until all DIP Obligations are indefeasibly paid in full. Nothing herein shall be construed to limit or otherwise restrict the availability of the rights and remedies provided for in the DIP Loan Agreement.

14. The Debtor's right to use the DIP Facility and Cash Collateral shall terminate immediately upon the earliest of (i) forty-five (45) days after the Petition Date unless the Final DIP Order, in a form acceptable to the DIP Lender, has been entered by this Court as of such date, (ii) expiration of the Default Notice Period and lifting of the automatic stay in accordance with paragraph 13, above; (iii) conversion of the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, and (iv) the Maturity Date (as defined in the Line of Credit Agreement).

15. The failure of the DIP Lender to file a Default Notice or seek relief or otherwise exercise its rights and remedies under this Interim DIP Order, the DIP Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Lender.

16. The automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby modified to permit (a) the Debtor to grant the DIP Liens and the DIP Superpriority Claims, and to

Case 19-70152-JHH11    Doc 12    Filed 01/28/19    Entered 01/28/19 17:44:52    Desc Main
Document      Page 85 of 93

perform such acts as the DIP Lender may request in its sole discretion to assure the perfection and priority of the DIP Liens, (b) the Debtor to incur all liabilities and obligations to the DIP Lender as contemplated under the DIP Documents, (c) the Debtor to pay all amounts referred to, required under, in accordance with, and subject to this Interim DIP Order and the DIP Documents, (d) the DIP Lender to enforce its rights and remedies under the DIP Documents and this Interim DIP Order and, if and when entered, the Final DIP Order, and to apply payments or proceeds received from the Debtor pursue to the DIP Documents or the Interim DIP Order or Final DIP Order without further leave of this Court; and (e) as may be further required to implement fully the terms of this Interim DIP Order and any subsequent Final DIP Order.

17.     Except as explicitly provided for herein, this Interim DIP Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary. Nothing in this Interim DIP Order vests or confers on any person standing or authority to pursue any cause of action, claim, defense, or other right belonging to the Debtor or its estate.

18.     In determining to make extensions of credit under the DIP Facility, permitting the use of Cash Collateral, taking the DIP Liens, or exercising any rights or remedies as and when permitted pursuant to this Interim DIP Order (or any Final DIP Order), or the DIP Documents, the DIP Lender shall not be deemed to be in control of the operations of the Debtor, or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtor (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability, Act, 29 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal or state statute). Furthermore, nothing in this Interim DIP Order or the DIP Documents shall in any way be construed or interpreted to impose or allow the

imposition upon the DIP Lender of any liability for any claims arising from the prepetition or postpetition activities of the Debtor.

19.     The entry of this Interim DIP Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the DIP Lender's right to seek any other or supplemental relief in respect of the Debtor; (b) any of the rights of the DIP Lender under the Bankruptcy Code or under applicable non-bankruptcy law, including the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code or (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans of reorganization; or (c) any other rights, claims, or privileges (whether legal, equitable or otherwise) of the DIP Lender.

20.     Immediately upon entry by the Court, the terms and provisions of this Interim DIP Order shall become valid and binding upon and inure to the benefit of the Debtor, the DIP Lender, all creditors of the Debtor, and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in the Bankruptcy Case, any Successor Case, or upon dismissal of any of this Bankruptcy Case.

21.     The provisions of this Interim DIP Order and any actions taken pursuant hereto or rights granted hereunder shall survive entry of any order which may be entered (i) confirming any plan of reorganization in this Bankruptcy Case, (ii) converting this Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, (iii) dismissing this Bankruptcy Case or any Successor Case, or (iv) pursuant to which this Court abstains from hearing this Bankruptcy Case or a Successor Case.

22.     The DIP Lender has acted in good faith in connection with this Interim DIP Financing and Interim DIP Order, and its reliance on this Interim DIP Order is in good faith. Based on the findings set forth in this Interim DIP Order and the record made during the Interim Hearing,

Case 19-70152-JHH11    Doc 12    Filed 01/28/19    Entered 01/28/19 17:44:52    Desc Main
Document      Page 87 of 93

and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim DIP Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court, the DIP Lender is entitled to fullest extent to the protections provided in section 364(e) of the Bankruptcy Code. Any such modification, amendment, or vacatur shall not affect the validity and enforceability of any payments hereunder of DIP Obligations, advances made hereunder, or lien, claim or priority authorized or created hereby, including the DIP Liens. Any liens or claims granted to the DIP Lender arising prior to the effective date of any such modification, amendment, or vacatur of this Interim DIP Order shall be governed in all respects by the original provisions of this Interim DIP Order, including entitlement to all rights, remedies, privileges, and benefits granted herein.

23.    To the extent of any conflict between or among the Motion, the DIP Documents, and this Interim DIP Order, the terms and provisions of this Interim DIP Order shall govern.

24.    Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Interim DIP Order.

25.    The Final Hearing to consider entry of the Final DIP Order and final approval of the DIP Financing is scheduled for January 30, 2019, at 10:00 a.m. (Central time) before the Honorable Jennifer Henderson, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Northern District of Alabama, Western Division, 2005 University Blvd, Tuscaloosa, Alabama 35401. Objections to the entry of the proposed Final Order shall be in writing and filed with the Clerk of the Court no later than _____ __, 2019, at 4:00 p.m. (prevailing Eastern time), with copies served upon on counsel for the Debtor, counsel for the DIP Lender, and the Notice Parties by _____.

26.     This Interim DIP Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.

27.     The Court has retained and will retain jurisdiction to interpret, implement, and enforce this Interim DIP Order according to its terms.

Case 19-70152-JHH11    Doc 12    Filed 01/28/19    Entered 01/28/19 17:44:52    Desc Main
                    Document      Page 89 of 93

Dated: _____

_____
UNITED STATES BANKRUPTCY JUDGE

EXHIBIT 1

(Budget)

Exhibit 1
SouthFresh Aquaculture, LLC
13-Week Budget

**SouthFresh Aquaculture, LLC**
**13 Week Cash Flow Forecast**
**January 28, 2019**

| | 2/3/2019 | 2/10/2019 | 2/17/2019 | 2/24/2019 | 3/3/2019 | 3/10/2019 | 3/17/2019 | 3/24/2019 | 3/31/2019 | 4/7/2019 | 4/14/2019 | 4/21/2019 | 4/28/2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts from Customers** | 318,559 | 340,965 | 434,842 | 574,198 | 455,280 | 360,207 | 882,030 | 803,593 | 737,440 | 542,969 | 866,280 | 781,234 | 950,406 |
| **Cash Payments to Supplies** | (246,863) | (359,441) | (373,885) | (260,405) | (365,603) | (317,820) | (291,084) | (304,843) | (310,482) | (360,044) | (252,669) | (268,522) | (303,283) |
| Administrative Fees | 45 | (11) | 95 | 287 | (12) | (619) | 705 | 99 | (11) | 568 | (4) | 320 | 310 |
| Allowances | - | 239 | 3,473 | - | 303 | 282 | 1,561 | - | 787 | - | - | 473 | 463 |
| Automobile | 885 | 1,142 | 1,219 | 841 | 402 | 812 | 1,696 | 78 | 190 | 1,260 | 261 | 756 | 243 |
| Bank Fees | 1,224 | 2,111 | (3) | 125 | 511 | 2,066 | 162 | 215 | 757 | 2,149 | (15) | 77 | 540 |
| Brokerage & Commissions | - | 15,813 | 35,280 | 20,375 | - | 22,117 | 17,875 | - | 10,500 | 19,251 | 15,750 | 14,289 | - |
| Comdata Charges | - | 3,134 | 3,579 | - | - | - | - | (581) | - | - | - | 2,057 | - |
| Contract Labor | 1,077 | (12,039) | 44,486 | 612 | - | - | 43 | 21,263 | 7,902 | 1,043 | 10,964 | 84 | 51,901 |
| Contributions | - | - | - | - | - | 250 | - | - | 200 | - | - | 500 | 1,000 |
| Deviations | 245 | 377 | - | - | 807 | 249 | - | - | - | - | - | 701 | 2,515 |
| Dues & Subscriptions | 1,066 | 506 | 6,676 | 1,124 | 1,553 | (17) | 393 | 1,728 | 6,196 | 1,534 | (57) | 964 | 1,892 |
| Employee Benefits - 401(k) | 1,943 | 955 | 1,004 | 1,922 | 2,954 | 1,913 | 1,919 | 1,223 | 14 | 465 | (83) | 1,891 | 1,776 |
| Employee Benefits - Other | - | - | 1,954 | - | - | - | - | 1,388 | 1,849 | 3,870 | - | - | 1,475 |
| Entertainment | 532 | 151 | 1,792 | 157 | 647 | 261 | 1,355 | 372 | 873 | 387 | 1,034 | 941 | 311 |
| Express Mail & Postage | 892 | 1,670 | 723 | 988 | 289 | 415 | 858 | 340 | 1,577 | 767 | 430 | 965 | 1,032 |
| Fines & Penalties | - | - | 6,234 | - | 4,594 | - | - | - | - | 3 | - | 1,658 | - |
| Flyers | - | - | - | 150 | - | - | 300 | 54 | 1,400 | 1,070 | 155 | 1,500 | 2,400 |
| Food Shows & Booths | 780 | - | - | - | - | 2,000 | 1,287 | - | - | 783 | 5,015 | 3,445 | 1,819 |
| Freight | 6,697 | 10,359 | 5,424 | 6,921 | (3,204) | 26,382 | 1,627 | 12,742 | (4,891) | 22,302 | 4,879 | 16,255 | 8,375 |
| Fuel, Gas & Oil | 2,757 | 3,679 | 16,545 | 2,845 | 4,220 | 2,973 | 7,544 | 11,139 | 2,095 | 4,053 | - | 13,404 | 1,764 |
| Hauling/Seining Expenses | 436 | - | 1,233 | 460 | 872 | 574 | 2,010 | 479 | 823 | 1,942 | 385 | 385 | 438 |
| Inspection | 1,287 | - | 81 | 12,990 | 574 | - | 275 | - | 823 | 2,574 | - | 3,001 | 3,885 |
| Insurance | 59,378 | 29,694 | (2,833) | (5,628) | 52,417 | 694 | 4,386 | (5,839) | 26,021 | 46,892 | (1,572) | (5,224) | (6,073) |
| KPI | 708 | - | 126 | 796 | 750 | 855 | 527 | 770 | 806 | 997 | 397 | 770 | 792 |
| Legal & Accounting Expense | - | 862 | 837 | - | 413 | - | - | 7,406 | 275 | 2,520 | - | 570 | 13,714 |
| Loan Program | - | 2,302 | 2,029 | 408 | - | - | - | - | - | - | - | - | - |
| Lumper | 299 | 1,925 | 283 | 624 | 630 | 269 | 853 | 1,067 | 1,701 | 1,082 | 4,162 | 432 | 878 |
| Marketing Program | 6,068 | 4,653 | 2,236 | 256 | 13,158 | 2,867 | 932 | 5,861 | 11,541 | 11,235 | - | 2,299 | 15,842 |
| Marketing, Promotions & Ads | - | 10,387 | 5,728 | 50 | - | 3,627 | (9,950) | 55 | - | (3,700) | - | (3,693) | - |
| Miscellaneous | 1,377 | (137) | 888 | - | 4 | 51 | 381 | 308 | - | 178 | 83 | 1,007 | 54 |
| Moving Expense | - | - | - | - | - | - | 1,609 | - | - | - | - | - | - |
| Packaging | 23,706 | 39,355 | 20,826 | 14,899 | 5,757 | 7,655 | 19,387 | 16,752 | 28,005 | 23,477 | 16,366 | 14,973 | 23,853 |
| Payroll Taxes | 12,501 | 13,867 | 13,131 | 13,127 | 12,312 | 12,302 | 12,092 | 12,586 | 11,511 | 17,780 | 5,005 | 11,533 | 10,629 |
| Pest Control | 2,635 | 142 | 637 | - | - | 110 | 1,074 | 593 | 290 | 509 | 333 | 393 | 252 |
| Lease Payments | 8,300 | 53,770 | 50,646 | 31,656 | 4,387 | 56,387 | 48,100 | 70,017 | 16,288 | 59,147 | 12,397 | 53,180 | 3,049 |
| Repairs & Maintenance | 88,874 | 18,001 | 60,343 | 485 | 29,315 | 14,285 | 70,017 | 21,651 | 48,297 | 69,843 | 31,161 | 24,839 | 29,784 |
| Safety | 108 | 24 | 378 | - | 212 | - | - | 15 | 2,285 | 927 | 234 | 133 | 188 |
| Salaries & Wages | 143,566 | 147,608 | 163,727 | 168,035 | 157,500 | 140,687 | 198,942 | 168,738 | 137,668 | 239,968 | 89,804 | 142,458 | 163,626 |
| Samples | 318 | 1,490 | 1,771 | 249 | 249 | 3,467 | 471 | 949 | 1,110 | 803 | 13,921 | 4,307 | 451 |
| Sanitation & Waste Disposal | 10,294 | 1,340 | 29,131 | 10,293 | 10,293 | 9,902 | (4,263) | 33,769 | 19,243 | 14,485 | 14,485 | (11,142) | 14,527 |
| Supplies | 13,178 | 6,062 | 16,005 | 13,973 | 20,231 | 9,086 | 6,099 | 12,811 | 16,882 | 14,288 | 14,568 | 23,562 | 25,679 |
| Taxes, Licenses & Permits | 12,115 | 17,288 | 1,518 | 4,549 | 1,435 | 6,099 | (316) | 2,227 | 1,244 | 6,757 | 6,757 | 657 | 1,194 |
| Telephone, Fax & Internet | 2,658 | 685 | 3,095 | 1,425 | 1,291 | 1,089 | 1,597 | 995 | 2,870 | 2,331 | 1,599 | 825 | 688 |
| Testing | 466 | 2,376 | 290 | - | - | 1,044 | 281 | 2,523 | 366 | 8,106 | 209 | 550 | - |
| Training and Education | - | - | - | - | - | - | - | 1,019 | - | - | - | - | - |
| Transportation Expense | 5,743 | 6,345 | 3,105 | 6,797 | 9,410 | 3,400 | 6,307 | 14,266 | 8,164 | 3,912 | 3,220 | 4,565 | 7,001 |
| Travel | 2,532 | (2,383) | 9,073 | 790 | 1,432 | 964 | 5,345 | 2,001 | 1,288 | 691 | 3,296 | 7,543 | 728 |
| Uniforms | 758 | 361 | 1,098 | 725 | 690 | 689 | 1,987 | 1,007 | 1,244 | 1,379 | 573 | 458 | 335 |
| Utilities | 25,683 | 16,884 | 11,579 | 41,646 | 42,076 | (14,002) | 45,790 | 14,154 | 46,231 | 28,255 | 9,522 | 39,207 | 34,791 |
| Emergency Contingency | 200,000 | 200,000 | 200,000 | 200,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 45,000 | 45,000 | 45,000 | 45,000 |
| **Operating Expenses** | (641,170) | (568,828) | (742,566) | (576,898) | (471,466) | (477,236) | (548,723) | (473,607) | (456,826) | (661,770) | (288,992) | (420,684) | (469,292) |

Exhibit 1
SouthFresh Aquaculture, LLC
13-Week Budget

**SouthFresh Aquaculture, LLC**
**13 Week Cash Flow Forecast**
**January 28, 2019**

| | 2/3/2019 | 2/10/2019 | 2/17/2019 | 2/24/2019 | 3/3/2019 | 3/10/2019 | 3/17/2019 | 3/24/2019 | 3/31/2019 | 4/7/2019 | 4/14/2019 | 4/21/2019 | 4/28/2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BA Fees | | | | | | | | | | 81,447 | 85,000.00 | | |
| MCG Legal Expenses* | | | | | | | 40,000 | | | | 10,000 | | |
| M&M Legal Expenses | | | | | | | 10,000 | | | | | | |
| Committee Legal Expenses | | | | | | | | | | | | | |
| Utilities Deposit | | | 55,000 | | | | | | | | | | 5,000 |
| Critical Vendors | 1,007,757 | | | | 11,500 | | | | 5,000 | | | | |
| Interest Expense | | | | | | | | | | 18,700 | | | |
| | | | | | | | | | | | | | |
| **Non Operating Expenses** | (1,007,757) | - | (55,000) | - | (11,500) | - | (50,000) | - | (5,000) | (99,647) | (95,000) | - | (5,000) |
| | | | | | | | | | | | | | |
| **Weekly Cash In(out)flow** | (1,577,232) | (587,304) | (736,609) | (263,106) | (393,290) | (434,851) | (7,776) | 25,143 | (34,869) | (578,492) | 229,680 | 92,028 | 172,831 |
| | | | | | | | | | | | | | |
| Beginning Cash Balance | 1,500,000 | | | | | | | | | | | | |
| Cash Flow Prior to Financing | (1,577,232) | (587,304) | (736,609) | (263,106) | (393,290) | (434,851) | (7,776) | 25,143 | (34,869) | (578,492) | 229,680 | 92,028 | 172,831 |
| DIP Financing | 77,232 | 587,304 | 736,609 | 263,106 | 393,290 | 434,851 | 7,776 | (25,143) | 34,869 | 578,492 | (229,680) | (92,028) | (172,831) |
| Ending Cash Balance | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | | |
| DIP Starting Balance | 3,500,000 | 3,422,768.13 | 2,835,464.56 | 2,098,855.18 | 1,835,749.45 | 1,442,459.50 | 1,007,608.30 | 999,831.92 | 1,024,974.63 | 990,105.57 | 411,613.87 | 641,293.66 | 733,321.30 |
| Drawdown | 77,232 | 587,304 | 736,609 | 263,106 | 393,290 | 434,851 | 7,776 | (25,143) | 34,869 | 578,492 | (229,680) | (92,028) | (172,831) |
| DIP Ending Balance | 3,422,768 | 2,835,465 | 2,098,855 | 1,835,749 | 1,442,460 | 1,007,608 | 999,832 | 1,024,975 | 990,106 | 411,614 | 641,294 | 733,321 | 906,153 |

*After application of approximate $100k retainer