IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | Case No. 19-70152 |
| SOUTHFRESH AQUACULTURE, LLC, ) | |
| ) | Chapter 11 |
| Debtor. ) | |
| ) | |

## DECLARATION OF JUSTIN FUNK, CHIEF FINANCIAL OFFICER OF SOUTHFRESH AQUACULTURE, LLC, IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Justin Funk, Chief Financial Officer of SouthFresh Aquaculture, LLC ("SouthFresh"), the above-captioned debtor in possession, hereby declare under penalty of perjury:

### Qualifications

1. I am the Chief Financial Officer of SouthFresh, an Alabama limited liability company, and as of October 29, 2016, have served as Chief Financial Officer to SouthFresh. In my capacity as Chief Financial Officer, I am familiar with SouthFresh's day-to-day operations, business and financial affairs, and books and records. I am a graduate of the University of Alabama with a degree in Finance. I have over 5 years of experience in the accounting field.

2. To effectuate a restructuring, on the date hereof (the "Commencement Date"), SouthFresh filed its voluntary petition for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Northern District of Alabama (the "Court"). To minimize the adverse effects on their business, SouthFresh has filed motions and pleadings seeking various types of "first day" relief (collectively, the "First Day Pleadings"). The First Day Pleadings seek relief to allow SouthFresh to meet necessary obligations and fulfill its duty as debtor-in-possession. I am familiar with the

contents of each First Day Pleading and believe that the relief sought in each First Day Pleading is necessary to enable SouthFresh to operate in chapter 11 with minimal disruption or loss of productivity and value, constitutes a critical element in achieving a successful chapter 11 process for SouthFresh, and best serves SouthFresh's estate and creditors' interests. The facts set forth in each First Day Pleading are incorporated herein by reference.

3.  Except as otherwise indicated herein, all facts set forth in this declaration are based upon my personal knowledge, my discussions with the SouthFresh's management team and/or advisors, my review of relevant documents and information concerning SouthFresh's operations, financial affairs, and/or restructuring initiatives, and my opinions based upon my experience and knowledge. I am over 18 years of age and authorized to submit this declaration on behalf of SouthFresh. If called upon to testify, I could and would testify competently to the facts set forth in this declaration.

4.  To familiarize the Court with SouthFresh, their business, the circumstances leading to this chapter 11 case, and the relief SouthFresh seeking in the First Day Pleadings, I have organized this declaration as follows:

- **Part I** provides a general overview of SouthFresh's corporate history and operations;

- **Part II** provides an overview of SouthFresh's pre-petition capital structure and other liabilities;

- **Part III** describes the circumstances leading to this chapter 11 case;

- **Part IV** describes the proposed debtor-in-possession financing SouthFresh is seeking to obtain in this chapter 11 case; and

- **Part V** sets forth the evidentiary basis for the relief requested in each of the First Day Pleadings.

# Part I
## Corporate History and Operations

**I. SouthFresh's Corporate History**

5. SouthFresh is an Alabama limited liability company that was organized in 1999. SouthFresh is a wholly-owned subsidiary of Alabama Farmers Cooperative ("<u>AFC</u>"). SouthFresh

6. SouthFresh's principal operations are in catfish processing, livestock/catfish/animal feed manufacturing, and seafood reselling. SouthFresh works with farmers and supplies retail, foodservice, and restaurants with fresh and frozen catfish, as well as oysters, alligator meat, crawfish, tuna, redfish, and custom designed catfish products in more than 150 cities in the United States.

**II. SouthFresh's Business Operations**

    **A. Feed Mill**

7. In 2000, SouthFresh acquired a feed mill (the "<u>Feed Mill</u>") located on approximately 16 acres of land in Demopolis, Alabama, that it leases from the Alabama State Port Authority. The Feed Mill consists of several offices, warehouses, a concrete elevator, and a mill with extruding and pelleting capability that can produce nearly 30 tons of feed product per hour.

8. SouthFresh produces high quality catfish feed, cattle feed, game fish feed, equine feed, and deer feed for sale at the Feed Mill, which was the first catfish feed mill in the United States to become BAP certified.

9. Since its inception, the Feed Mill has generally operated as a profitable division of SouthFresh.

### B. Processing Plant

10. In the early 2000s, SouthFresh built a catfish processing plant (the "<u>Processing Plant</u>") on 62 acres in Eutaw, Alabama, that is owned by SouthFresh. The Processing Plant consists of, among other things, a catfish processing facility, water treatment lagoons, and cold storage.

11. To generate capital and ensure a reliable supply of catfish for its new plant, SouthFresh sold shares of processing rights to farmers primarily in west Alabama at approximately $60-$70 per share through processing rights agreements (the "<u>Processing Rights Agreements</u>"). The Processing Rights Agreements are agreements that, subject to certain conditions, entitle a farmer to process 1,000 pounds of catfish annually per share, give the farmer the right to certain rebates based on distributed earnings if such earnings are ever distributed, and give the farmer the first right to deliver fish as long as the quantity delivered fulfills the plant's needs. Initially, the Processing Rights Agreements generally required farmers to enter into "Live Fish Purchase Agreements" that obligated them to provide a certain amount of fish annually, established that pricing would be "local market price FOB the processing plant", and provided for a liquidated payment amount to SouthFresh if the farmers failed to deliver the required quantity of fish. The live fish agreements generally had five year terms with automatic one-year roll over clauses. Currently, there are approximately 14,757 total shares held by thirty-three (33) separate entities, fourteen (14) of which are out of business or have been sold (collectively, the "<u>Processing Rights Holders</u>").

12. While the company initially processed less than 10,000 pounds of catfish per day, cutting each fillet by hand, SouthFresh grew to process as much as 100,000 pounds of catfish per day.

13. Despite SouthFresh's best efforts to position the Processing Plant as a profitable division, the Processing Plant has regularly recognized significant year-end losses due to the aforementioned regulatory and economic challenges in the catfish industry. Over the last seven years, the Processing Plant has lost nearly $12 million. These losses have been offset on a consolidated basis by profits from the SouthFresh Feed Mill and Seafood divisions.

### C. Seafood Division

14. In addition to SouthFresh's operations at the Feed Mill and the Processing Plant, SouthFresh also operates the Seafood Division, which is committed to the resale of high quality seafood and farm-raised products, including but not limited to oysters, crawfish, alligator, frog legs, tilapia, tuna, snapper, group and red drum.

15. The Seafood division of SouthFresh is primarily operated out of its offices in Tuscaloosa, Alabama, and its products for sale are stored in cold storage facilities in Alabama, Illinois, Louisiana, Massachusetts, and Texas.

16. Like the Feed Mill division, the Seafood division of SouthFresh has consistently been a profitable division of SouthFresh whose profits have been used to offset losses sustained by SouthFresh at the Processing Plant.

### III. SouthFresh's Employees

17. SouthFresh currently employs approximately 230 individuals in various part-time and full-time capacities. Approximately 30 individuals are employed at the Feed Mill,

approximately 175 are employed at the Processing Plant, and the balance are employed with the Seafood division or SouthFresh's corporate offices in Tuscaloosa.

18. Employment positions with SouthFresh are varied and include, without limitation, positions for manual fish processing, seiners, truck drivers, quality control, equipment operation, management and executive positions. Every position at SouthFresh is important to the success of SouthFresh's operations at the Feed Mill, the Processing Plant, and the Seafood division.

**Part II**
**Pre-Petition Capital Structure**

**I.    Capital Structure**

19. On August 1, 2017, SouthFresh and AFC entered into that certain Line of Credit Agreement (as renewed, amended and/or modified, the "<u>Line of Credit Agreement</u>") evidencing a revolving line of credit in the amount of $7,500,000 for the purposes of financing the costs of the operation of SouthFresh. The Line of Credit Agreement was renewed in August 2018 and currently has a balance of approximately $7,139,517.24.

20. On October 31, 2015, SouthFresh and AFC entered into that certain 2016 Restated Term Loan Agreement (the "<u>Term Loan Agreement</u>") evidencing a loan given by AFC to SouthFresh in the principal amount of $5,737,258.53 for the purpose of repaying AFC for a previous loan to SouthFresh comprised of advances made to redeem certain industrial development bonds issued relative to certain real property located in Eutaw, Greene County, Alabama. The current balance of the Term Loan Agreement is $5,440,437.88.

# Part III
# Events Leading to Bankruptcy

## 1. Losses at the Processing Plant

21. Over the past decade, the United States catfish industry has declined due to rising imports and shifting consumer palates. In an attempt to stem a rising tide of catfish imports, legislation was passed causing the United States Department of Agriculture (USDA) to assume inspections of catfish and catfish imports from the Food and Drug Administration (FDA) and implement a stricter inspection process. Unfortunately, the stricter protocols only exacerbated the industry decline by forcing the domestic processors to retool and upgrade their plants to meet USDA guidelines. These issues, coupled with the declining average market price of domestic live catfish that has resulted therefrom, has caused SouthFresh's catfish farming, processing, seining, and hauling operations to suffer substantial net income losses. As a result, SouthFresh has closed down catfish farming operations in both Mississippi and Alabama.

22. As previously noted, despite SouthFresh's hopes that the Processing Plant would be a profitable operation, the Plant has regularly recognized significant year-end losses, which have been offset on a consolidated basis by profits in SouthFresh Feed and Seafood divisions and subsidized by loans from AFC. SouthFresh believes a restructuring of its financial obligations and capital structure through the chapter 11 process will enable it to significantly lessen, if not altogether eliminate, these losses.

## 2. Double Wheel Litigation

23. Additionally, SouthFresh is currently defending a lawsuit brought by, and prosecuting a counterclaim against, Double Wheel Ranch, LLC ("Double Wheel"), a catfish farming operation, and its principals, Thed Spree and Julia Burke Spree (hereinafter collectively referred to as "Double Wheel" for convenience). The style of that lawsuit is Double Wheel

Ranch, LLC, Thed Spree, Julia Burke Spree (Plaintiffs) v. Southfresh Aquaculture, LLC, AL, Demopolis Feed Mill, Defendants, Case No. CV-2017-900047.00.

24. Double Wheel is a catfish producer which sometimes provides catfish to SouthFresh, at varying levels over the past ten to fifteen years. Double Wheel claims to have entered into certain catfish processing rights agreements with SouthFresh, which it purchased from third parties, sometimes at discounted prices. Double Wheel has variously claimed that certain of its processing rights are covered by written agreements, or that those rights may be governed by oral promises that Double Wheel alleges were made in the mid 2000s by SouthFresh or its employees or former employees. Double Wheel also claims irregularities in the weighing or seining of its fish, and a failure to pay certain rebates or dividends it claims to be owed. SouthFresh denies the claims filed and allegations made by Double Wheel and has answered the Complaint and filed a Counterclaim. The case has been pending in the Circuit Court of Greene County since August 2017. The Counterclaim was allowed by the Circuit Court in September of 2018, and relates to Double Wheel's failure or refusal to provide SouthFresh with catfish pursuant to certain of the agreements into which Double Wheel allegedly entered. No discovery has been undertaken since the Counterclaim was filed.

25. The original lawsuit filed by Double Wheel alleges a failure by SouthFresh only, to properly pay for or timely accept or process fish which Double Wheel supplied to SouthFresh. Double Wheel moved to amend its complaint on October 1, 2018, to join additional parties, including the parent company of SouthFresh (Alabama Farmers Co-op ("AFC"), and certain current or former employees, officers, and/or directors of SouthFresh and AFC. Double Wheel's Motion to Amend to join additional parties and claims has not yet been ruled upon. The Counterclaim by SouthFresh, on the other hand, is of record in the Circuit Court matter in

Greene County, though Double Wheel filed a Motion to Dismiss the Counterclaim shortly before the entire lawsuit was stayed by the State Court on October 31, 2018. The Motion to Stay was filed as a joint motion by both Double Wheel and SouthFresh, as the parties attempted mediation in the case. Double Wheel's Motion to Dismiss has not yet been briefed by SouthFresh, and no hearing date has been set on that Motion, or on Double Wheel's Motion to Amend.

26. Although written discovery was exchanged during the summer of 2018 as to the original lawsuit, no party or witness depositions have been taken. No discovery has been undertaken since the filing of the Counterclaim, or since Double Wheel filed its Motion to Amend. A court-ordered mediation was conducted on December 7, 2018. The case was not settled at that mediation.

27. SouthFresh believes that this chapter 11 case will provide a breathing spell from the Double Wheel Litigation, which will, in turn, allow SouthFresh to focus its attention on taking necessary steps to successfully reorganize within these proceedings.

## Part IV
## SouthFresh's Proposed Debtor-in-Possession Financing

28. SouthFresh relies heavily on farmers, specialized vendors, ingredients suppliers, repairmen, transportation and shipping providers, and storage/ice providers for each of its operations. SouthFresh believes some of its vendors may be unfamiliar with the chapter 11 process and unwilling to do business on existing credit terms, assuming such parties will continue to supply SouthFresh at all. Any loss of trade terms, leading to demands for cash in advance, cash on delivery, or otherwise, will negatively impact SouthFresh's liquidity. Additionally, SouthFresh's historical revenues during this time period have fluctuated dramatically. Without immediate and reliable access to cash, SouthFresh's ability to maintain and service its equipment and to purchase any additional equipment required to service its clients would also be jeopardized. SouthFresh requires

ready access to funding if it is to maintain a steady supply of materials and ensure reliable transportation of goods to the market, as well as protect its workers, customers, and overall business reputation.

29. SouthFresh made efforts to obtain critical post-petition financing on an unsecured basis, or a reasonably priced secured basis, without success. SouthFresh approached existing credit providers who were unwilling to finance SouthFresh's operations post-petition.

30. SouthFresh ultimately approached another existing pre-petition lender, AFC. Although AFC is also the parent of SouthFresh, the parties have historically maintained an arm's-length lender/borrower relationship, pursuant to which AFC has loaned SouthFresh approximately $12 million under standard loan documentation for both term loan and line of credit facilities. Although these pre-petition facilities were entered into some years ago on an unsecured basis, they have not been repaid, and their repayment is now jeopardized by SouthFresh's current cash constraints. Accordingly, although AFC has agreed to extend SouthFresh credit post-petition as the debtor-in-possession lender (the "DIP Lender"), it has required that such post-petition facility (the "DIP Facility") be fully secured and has increased the rate it charged for the existing loan facilities to account for the heightened credit risk.

31. SouthFresh submits this concise statement listing certain material terms of the DIP Facility and SouthFresh's use of Cash Collateral (together, the "DIP Financing"). SouthFresh believes that the following terms are necessary and justified in the context and circumstances of this chapter 11 case:

    (a)    <u>Borrowing</u>. The maximum principal amount available under the DIP Facility is $3,500,000. From the maximum principal amount, up to $750,000 may be used for DIP Lender to issue, or obtain the issuance for the benefit of SouthFresh, letters of credit, which will result in a commensurate reduction in availability under the DIP Facility.

(b) <u>Liens and Superpriority Claim</u>. The liens and superpriority claims proposed to be granted to the DIP Lender pursuant to Bankruptcy Code Section 364(c) are described in detail in SouthFresh's First Day Pleading concerning debtor-in-possession financing, and shall not include any lien or encumbrance in favor of the DIP Lender on any of SouthFresh's Chapter 5 causes of action, but will permit a carve-out for certain administrative and professional fees of SouthFresh. As adequate protection for the use of cash collateral, SouthFresh proposes to provide continuing liens on newly-acquired or generated post-petition assets, a superpriority claim, and adequate protection payments.

(c) <u>Conditions to Borrowing</u>. The conditions precedent to initial and subsequent advances under the DIP Facility include, among other items, the DIP Lender's receipt of customary closing documentation, an approved budget, entry of the orders in a form acceptable to the DIP Lender providing the liens and other adequate protection required and availability. Moreover, each advance is subject to SouthFresh's compliance with certain affirmative and negative covenants regarding SouthFresh's operations and other conditions, as described in the described in detail in SouthFresh's First Day Pleading concerning debtor-in-possession financing.

(d) <u>Pricing</u>. The DIP Facility contemplates a fixed interest rate of 7.0%, calculated over a 360-day year and payable monthly in arrears, subject to an increase of 2.0% upon the occurrence and continued existence of an event of default.

(e) <u>Term of Facility</u>. The DIP Facility has a maturity date of January 28, 2020.

(f) <u>Use of Proceeds</u>. Proceeds of advances may be used only for (i) working capital purposes of SouthFresh from and after the Commencement Date, (ii) current interest due to the DIP Lender pursuant to the terms of agreements between SouthFresh and DIP Lender, and (iii) SouthFresh's ordinary course operating expenses, in each case of clauses (i) through (iii) solely in accordance with the terms of SouthFresh's First Day Pleading concerning debtor-in-possession financing.

32. SouthFresh believes that the DIP Financing is the only financing available to SouthFresh at this time. SouthFresh has been unable to procure alternative financing (a) in the

form of unsecured credit allowable under section 503(b)(l) of the Bankruptcy Code, or (b) solely as an administrative expense under section 364(a)-(b) of the Bankruptcy Code.

33. In addition, the proposed DIP Financing will allow SouthFresh to maintain much of its existing cash management system and avoid the operational complications that would be associated with setting up new bank accounts with a new lender. Therefore, for the reasons stated herein, SouthFresh submits that it has satisfied the requirements to access post-petition financing on a superpriority, secured basis pursuant to section 364 of the Bankruptcy Code.

34. SouthFresh has not been able to obtain post-petition financing of the type and magnitude required for this chapter 11 case on an unsecured basis. SouthFresh attempted to identify potential post-petition lenders willing to provide funding to SouthFresh on more advantageous terms but was not successful. Accordingly, the DIP Financing is SouthFresh only viable financing option with terms comparable to those offered by the DIP Lender, and the liens granted to secure the DIP Financing are an essential part of the protections provided to the DIP Lender.

### Part V
### Evidentiary Support for First Day Pleadings

35. Contemporaneously, SouthFresh has sought relief through a number of First Day Pleadings that they believe are necessary to enable it to efficiently administer its estate with minimal disruption and loss of value during this chapter 11 case.

36. These First Day Pleadings seek authority to, among other things, honor employee-related wages and benefit obligations, pay pre-petition taxes, and ensure the continuation of SouthFresh's cash management systems and other business operations without interruption. I believe that the relief requested in the First Day Pleadings is necessary to give SouthFresh an

opportunity to work toward a successful chapter 11 case that will benefit all of SouthFresh's stakeholders.

37. Several of these pleadings request authority to pay certain pre-petition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay pre-petition claims during the first 20 days following the filing of a chapter 11 petition, "except to the extent that relief is necessary to avoid immediate and irreparable harm . . ." In light of this requirement, SouthFresh has narrowly tailored its request for immediate authority to pay certain pre-petition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to SouthFresh and its estate. Other relief will be deferred for consideration at a later hearing.

38. I am familiar with the contents and substance of each First Day Pleadings (including the exhibits thereto), and the statements and facts set forth in each of the First Day Pleadings are true and correct to the best of my knowledge. I believe that the relief sought in each First Day Pleadings: (a) is necessary to enable SouthFresh to operate in chapter 11 with minimal disruption or loss of value; (b) is necessary to provide SouthFresh with a reasonable opportunity to maximize value in this chapter 11 case; and (c) best serves the interests of SouthFresh's stakeholders.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Dated: January 28, 2019
_Birmingham_, Alabama

/s/ *[signature]*
Name: Justin Funk
Title: Chief Financial Officer