|  |  |  |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. 19-70152 |
| SOUTHFRESH AQUACULTURE, LLC, | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |

## DEBTOR'S SECOND MOTION FOR ENTRY OF ORDER (I) AUTHORIZING THE PAYMENT OF CRITICAL VENDOR CLAIMS, AND (II) GRANTING RELATED RELIEF

SouthFresh Aquaculture, LLC, as debtor and debtor in possession in the above-captioned chapter 11 case (the "Debtor"), respectfully states the following in support of this motion (the "Second Critical Vendors Motion"):

### Jurisdiction and Venue

1.      The United States Bankruptcy Court for the Northern District of Alabama (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the General Order of Reference from the United States District Court for the Northern District of Alabama, dated January 12, 1995. The Debtor confirms its consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Second Critical Vendors Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief requested herein are sections 105(a), 362, 363, and 503(b) of the Bankruptcy Code and Bankruptcy Rule 6003.

04748848.1

4.      On January 28, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is operating its business and managing its properties as Debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in this chapter 11 case, and no committee has been appointed or designated.

5.      On the same day, the Debtor filed its *Motion for Entry of Order (I) Authorizing the Payment of Critical Vendor Claims, and (II) Granting Related Relief* [Doc. No. 10] (the "Critical Vendors Motion"),[1] pursuant to which the Debtor requested Court authorization to pay Critical Vendor Claims (as that term is defined in the Critical Vendors Motion) in an amount not to exceed $1,090,000.00 in the aggregate (the "Critical Vendors Cap").   As set forth therein and in the Affidavit of Justin R. Funk, the Chief Financial Officer of the Debtor (the "Funk Affidavit"), attached hereto as **Exhibit "A"**, the Debtor requested authority to pay Critical Vendor Claims[2] up to the Critical Vendors Cap, which amount was based upon vendor records and other historical data available to the Debtor at the time it filed the Critical Vendors Motion. (*See* Funk Aff., ¶ 3.)

6.      On January 31, 2019, the Court entered that certain *Order (I) Authorizing the Payment of Critical Vendor Claims, and (II) Granting Related Relief* [Doc. No. 29] (the "Critical Vendors Order"), pursuant to which the Court authorized, on an interim basis, payment of Critical Vendor Claims in an aggregate amount not to exceed the Critical Vendors Cap.   The Debtor has paid approximately $1,040,000 on account of Critical Vendor Claims owing primarily to farmers, ingredient suppliers, and seafood suppliers, leaving a balance of approximately $50,000 in funds

---

[1] The facts and arguments in the Critical Vendors Motion are fully incorporated herein.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Critical Vendors Motion.

available to be paid to Critical Vendors before reaching the Critical Vendors Cap. (*See* Funk Aff., ¶¶ 3, 4.)

7.     Subsequent to the entry of the Critical Vendors Order, the Debtor identified additional pre-petition deliveries of goods and received numerous invoices for pre-petition services/goods that it was unable to account for when preparing the Critical Vendors Motion. Several of these deliveries and invoices were made or issued by vendors whose continued provision of services/goods are absolutely critical to the Debtor's continued operations. In order to pay for these additional deliveries and invoices, the Debtor will need $380,000 of funding beyond the Critical Vendors Cap. If these additional amounts are not authorized to be paid, the Debtor's operations will experience substantial disruption and lasting, irreparable harm. (*See* Funk Aff., ¶ 5.)

8.     Accordingly, by this Second Critical Vendors Motion, the Debtor is seeking Court authority to pay an additional $380,000 for outstanding Critical Vendor Claims.

**Critical Vendors**

9.     As set forth in the Critical Vendors Motion, the Debtor's ordinary course operations can be separated into three general divisions: (1) catfish processing; (2) feed manufacturing; and (3) seafood reselling. For the catfish processing operation, Debtor purchases catfish from farmers, processes the catfish at the Processing Plant, and sells the processed catfish to customers. For the feed manufacturing operation, Debtor purchases feed ingredients, manufactures the feed, and sells the manufactured feed to customers. For the seafood reselling operation, Debtor purchases seafood from a variety of sources, which it then resells to customers. For each of these operations, Debtor relies heavily on farmers, specialized vendors, ingredients suppliers, repairmen, transportation and shipping providers, and storage/ice providers (collectively, the "Critical Vendors"), each of which

provide the Debtor with the materials, supplies, and/or services necessary for the Debtor to operate its three divisions on a daily basis. (*See* Funk Aff., ¶ 6.)

10. In many cases, given the relatively small industry size, there are a limited number of Critical Vendors that can service the Debtor's operational needs. In addition to the processing and manufacturing processes, the Debtor is usually responsible for arranging the shipping of ingredients and products through the supply chain. The materials, supplies, and services provided by the Debtor's Critical Vendors are essential to the day-to-day operations of the Debtor's business. Any disruption to the Debtor's supply network would have an immediate negative impact on the Debtor's business. For example, fast and efficient transportation is necessary for the Debtors' successful operations, not only to avoid a backup of excess inventory, but also to ensure the preservation of ingredients and product and maximization of revenue shipments. (*See* Funk Aff., ¶ 7.)

11. The Debtor obtains materials, supplies, and services from the Critical Vendors, often on an order-by-order basis and without long-term contracts—replacement of which likely would be impossible or would result in substantially higher costs for the Debtor. The Debtor relies on timely and frequent delivery of these goods, equipment, supplies, and services, and any interruption in this supply—however brief—would disrupt the Debtor's operations and impact its revenue, likely causing irreparable harm to its business, reputation, goodwill, employees, customer base, and market share. Such harm would far outweigh the cost of payment of the Critical Vendors Claims. (*See* Funk Aff., ¶ 8.)

12. The Debtor believes some of their vendors may be unfamiliar with the chapter 11 process and unwilling to do business on existing terms—assuming such parties will continue to supply the Debtor at all. Any loss of trade terms, whether on account of demands for cash in

advance, cash on delivery, or otherwise, will negatively impact the Debtor's liquidity and jeopardize its ability to maintain and service its equipment and to purchase any additional equipment required to service their clients. In addition, certain of the Critical Vendors may be able to assert mechanics' liens under applicable state law. (*See* Funk Aff., ¶ 9.)

13.     After a thorough review of its operations and potential alternatives, the Debtor determined, in the exercise of its business judgment, that payment of certain pre-petition Critical Vendor claims (the "Critical Vendor Claims") is essential to avoid costly disruptions to its operations. (*See* Funk Aff., ¶ 10.)

14.     The Critical Vendors which have not been paid thus far generally fall into the following categories:

- Ingredient Suppliers. Debtor purchases feed ingredients from a core group of ingredient suppliers for its feed manufacturing operation. Similar to the significant role farmers play in the catfish processing operation, feed ingredient suppliers are necessary for the Debtor's feed manufacturing operation. These ongoing relationships are necessary for the Debtor's ability to maintain the functionality of its business operations.

- Seafood Suppliers. Debtor purchases seafood from a variety of sources, including importers and fishermen for its seafood reselling operation. Without a steady stream of seafood products, Debtor will not be able to keep its business operations functional.

- Shippers and Packagers. Debtor utilizes shipping and packaging vendors in all three of its major business operations. For the catfish processing operation, Debtor may have to pay to ship the catfish from the farmer to its cold storage facilities and/or Processing Plant. After the catfish is processed, the Debtor has to package and ship the processed fish to its cold storage facilities and/or customers across the country. For the feed manufacturing operation, Debtor must ship the feed ingredients from the ingredient suppliers to the Feed Mill and, after the manufacturing process, package and ship the feed to its customers across the country. For the seafood reselling operation, Debtor must ship the seafood from the suppliers to its cold storage facilities and then package and ship the seafood to other cold storage facilities and/or customers across the country. It is vital for Debtor's operations for it to ship and package goods and materials throughout the supply chain. In many cases, the shippers and packaging supplies vendors

are irreplaceable and represent the only means to transport and package the Debtor's goods. Without the vendors who provide these services, Debtor's business operations would not be functional.

- <u>Cold Storage and Ice Providers</u>. The Debtor uses cold storage and ice providers to preserve the catfish and other seafood throughout the supply chain. Without ice, the catfish would perish during the shipping process. Likewise, the catfish and other seafood must be stored in the proper facilities before ultimately reaching the Debtor's customers across the county. For these reasons, cold storage and ice providers are vital to the Debtor's business operations. Without these vendors, the Debtor would be unable to continue operating.

- <u>Repair, Maintenance, and Sanitation Service Providers</u>. Although the Debtor performs its own routine maintenance and repair work on the Processing Plant and the Feed Mill, the Debtor also relies heavily on other essential vendors for more extensive, complex repair, maintenance, and sanitation services that the Debtor is unable to perform in a cost-efficient manner or does not have the technical expertise to administer. These providers are critical to the safety and sanitation of the Debtor's personnel and its catfish, seafood, and feed products. From time to time, these also supply the Debtor with a limited quantity of replacement parts largely related to their repair services. Further, it is necessary for the Debtor's processing and manufacturing to meeting regulatory standards for sanitation. As a result, the Debtor continually requires specialized chemicals from specific providers to sanitize its equipment and premises to ensure its compliance with health and safety regulations. Without these providers, the Debtor will not be able to keep some of their most highly sought-after equipment sanitary and in good working order.

- <u>Rebate Program Counterparty</u>. One of Debtor's most significant customers is Sysco Corporation, which is one of the largest sellers, marketers, and distributors of food products to restaurants, healthcare and educational facilities, and lodging establishments around the world. Sysco purchases catfish and other seafood products from Debtor. As part of this transaction, Sysco regularly provides certain services, including marketing and advertising, to Debtor and is able to charge back certain costs to Debtor in the form of a rebate. Sysco accounts for approximately 40% of Debtor's manufactured catfish sales and approximately 80% of Debtor's other seafood sales. Not only is Sysco a vital customer of Debtor's goods, the marketing and advertising services it provides to Debtor are instrumental to Debtor's ongoing business operations. Without the ability to charge back certain costs to Debtor as part of its business relationship, Sysco would likely choose to purchase its manufactured catfish and other seafood from another company. Debtor consequently would lose Sysco's business and the marketing and

advertising services it provides. Accordingly, this rebate program is vital to Debtor's continuing operations.

(*See* Funk Aff., ¶ 11.)

15.     By this Second Critical Vendors Motion, the Debtor seeks authority to pay up to an additional $380,000 on account of pre-petition Critical Vendor Claims.

16.     Subject to the Court's approval, the Debtor intends to pay the Critical Vendor Claims only to the extent necessary to preserve its business. In return for paying the Critical Vendor Claims, the Debtor will obtain agreements from any party receiving payment to provide goods and/or services to the Debtor on Customary Trade Terms between the Debtor and the claimant. (*See* Funk Aff., ¶ 12.)

17.     In addition, the Debtor requests that if any party accepts payment pursuant to the relief requested by this Second Critical Vendors Motion and thereafter does not continue to provide goods or services on Customary Trade Terms, then: (a) such payment may be deemed to be an improper post-petition transfer on account of a pre-petition claim, and, therefore, immediately recoverable by the Debtor in cash upon written request; (b) upon recovery by the Debtor, any pre-petition claim of such party shall be reinstated as if the payment had not been made; and (c) if there exists an outstanding post-petition balance due from the Debtor to such party, the Debtor may elect to re-characterize and apply any payment made pursuant to the relief requested by this Second Critical Vendors Motion to such outstanding post-petition balance and such supplier or vendor will be required to repay to the Debtor such paid amounts that exceed the post-petition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

## Basis for Relief Requested

**I.     The Debtor Should Be Authorized to Pay the Critical Vendor Claims In the Aggregate Amount of Up to an Additional $380,000.00.**

**A.** **Payment of the Critical Vendor Claims In the Aggregate Amount of Up to an Additional $380,000.00 Is Necessary to Protect and Preserve the Estate.**

18.     The relief requested herein with respect to payment of the Critical Vendor Claims may be granted by the Court under the Court's general equitable powers as codified in section 105(a) of the Bankruptcy Code. This section empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *In re Ionoshpere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (citing *Miltenberger v. Logansport, C. & S.W.R. Co.*, 106 U.S. 286 (1882)). Under section 105(a), a court "can permit pre-plan payment of a prepetition obligation when essential to the continued operation of the debtor." *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) ("To invoke the necessity of payment doctrine, a debtor must show that payment of the prepetition claims is critical to the debtor's reorganization.") (internal quotation omitted).

19.     Courts regularly have recognized that it is appropriate to authorize the payment of pre-petition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *In re CoServe, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing the payment of certain prepetition claims pursuant to the "doctrine of necessity"); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369–70 (Bankr. S.D. Tex. 2000) (business transactions critical to the survival of the business of the debtor is exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation).

Case 19-70152-JHH11    Doc 63    Filed 02/15/19    Entered 02/15/19 12:56:21    Desc Main
                        Document        Page 8 of 30

20.     Courts in this district and others have routinely authorized payments of pre-petition obligations in similar circumstances. *See, e.g.*, *In re Walter Energy, Inc.*, Case No. 15-02741 (TOM) (Bankr. N.D. Ala. Sept. 4, 2015) (authorizing debtors to pay certain pre-petition obligations pursuant to authority granted under section 105); *see also In re Westmoreland Coal Company*, Case No. 18-35672 (MI) (Bankr. S.D. Tex. Oct. 9, 2018) (same); *In re Armstrong Energy, Inc.*, Case No. 17-47541-659 (KSS) (Bankr. E.D. Mo. Dec. 1, 2017) (same); *In re Peabody Energy Corp.*, Case No. 16-42529-399 (BSS) (Bankr. E.D. Mo. Apr. 15, 2016 (same).[3]

**B.     Payment of the Critical Vendors Claims as Provided Herein Is Warranted Under Section 363(b)(1) of the Bankruptcy Code and the Doctrine of Necessity.**

21.     Courts frequently authorize the payment of pre-petition obligations under section 363(b)(1) of the Bankruptcy Code, which provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under this section, a court may authorize a debtor to pay certain pre-petition claims if the debtor is able to "show that a sound business purpose justifies such actions." *See In re Allied Holdings, Inc.*, 337 B.R. 716, 721 (Bankr. N.D. Ga. 2005); *In re Georgetown Steel Co., LLC*, 306 B.R. 549, 555 (Bankr. D.S.C. 2004); *see also In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (Bankr. D. Del. 1999) (citations omitted); *In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987). Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

---

[3] Based on the voluminous nature of the orders cited herein, such orders have not been attached to this Second Critical Vendors Motion. Copies of these orders are available upon request to the Debtor's proposed counsel.

22.     Further, as discussed above, the Court may authorize payment of pre-petition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code. Under section 105(a), courts may permit pre-plan payments of pre-petition obligations when essential to the continued operation of a debtor's business. Specifically, the Court may use its power under section 105(a) to authorize payment of pre-petition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity").

23.     Federal courts have consistently used the "doctrine of necessity" or the "necessity of payment" rule to permit post-petition payment of pre-petition obligations where necessary to preserve the value of a debtor's estate. *See In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981). Today, the rationale for the necessity of payment rule—the rehabilitation of a debtor in reorganization cases—is "the paramount policy and goal of Chapter 11." *Id.*; *see also In re Just For Feet*, 242 B.R. 821, 824–25 (D. Del. 1999) (finding that payment of pre-petition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); 2 COLLIER ON BANKRUPTCY, 105.02[4][a] (16th ed. rev. 2015) (discussing cases in which courts have relied on the "doctrine of necessity" or the "necessity of payment" rule to pay pr-epetition claims immediately).

24.     Granting the Debtor the narrowly tailored relief sought herein is consistent with the "two recognized policies" of chapter 11 of the Bankruptcy Code—preserving going concern value

Case 19-70152-JHH11    Doc 63    Filed 02/15/19    Entered 02/15/19 12:56:21    Desc Main
Document        Page 10 of 30

and maximizing the value of property available to satisfy creditors. *See Bank of Am. Nat'l Trust & Savs. Ass'n v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 453 (1999). As described above, the Debtor requires a steady stream of supplies and related services to ensure it has inventory to meet customer demand, as well as other goods and services critical to the value of the Debtor's business. As the Critical Vendors do not have long-term contractual obligations to the Debtor, the Debtor must maintain the ability to continue to pay the Critical Vendors on an ongoing basis to ensure uninterrupted goods and services. Without the supplies and services described in this Second Critical Vendors Motion, the Debtor would experience a significant disruption of its supply chain while it searches, likely in vain, for substitute vendors, suppliers, and shippers, which would in turn jeopardize customer goodwill and significantly impair the value of the Debtor's business. Ensuring these Critical Vendors continue to supply and serve is therefore vital to the success of these chapter 11 cases and the ability of the Debtor to remain a going-concern.

25.      Courts in this jurisdiction and others have authorized payment of pre-petition claims for critical vendors under sections 363(b) and 105(a) of the Bankruptcy Code. *See, e.g.*, *In re Walter Energy, Inc.*, Case No. 15-02741 (TOM) (Bankr. N.D. Ala. Sept. 4, 2015) (authorizing up to $8.2 million in payments to critical vendors); *see also In re EXCO Res., Inc.*, Case No. 18-30155 (MI) (Bankr. S.D. Tex. Jan. 10, 2018) (authorizing up to $28.8 million in payments to critical vendors); *In re Avaya Inc.*, Case No. 17-10089 (SMB) (Bankr. S.D.N.Y. Feb. 10, 2017) (authorizing up to $39.5 million in payments to critical vendors); *In re Armstrong Energy, Inc.*, Case No. 17-47541-659 (KSS) (Bankr. E.D. Mo. Dec. 1, 2017) (authorizing up to $6.45 million in payments to shippers, lien claimants, and 503(b)(9) claimants); *In re Peabody Energy Corp.*, Case No. 16-42529-399 (BSS) (Bankr. E.D. Mo. Apr. 15, 2016) (authorizing up to $6.5 million in payments to lien claimants).

Case 19-70152-JHH11    Doc 63    Filed 02/15/19    Entered 02/15/19 12:56:21    Desc Main
Document      Page 11 of 30

26.    Moreover, the failure to make timely payment of certain Critical Vendor Claims would threaten the Debtor's ability to operate and may subject the Debtor's assets to the perfection of liens. Under certain state laws, to the extent the Debtor has not paid for shipping, storage, or repair services, these vendors may have a lien on the goods in its possession, which secures the charges or expenses incurred in connection with repair of the equipment or the transportation or storage of the goods.[4] In addition, pursuant to section 363(e) of the Bankruptcy Code, some of these Critical Vendors, as bailees, may be entitled to adequate protection for any valid possessory lien. In light of these circumstances, certain Critical Vendors may assert that they have possessory liens on goods currently in their possession for transportation, storage, or repair costs and may refuse to deliver or release those goods or equipment in their possession until their invoices are paid and their liens redeemed. Some claimants may be unwilling to release the goods in their possession on which they may be entitled to assert liens for fear of releasing security for their pre-petition claims. Moreover, shippers simply refusing to deliver the Debtor's goods if they are not paid could severely disrupt the Debtor's operations and cause the Debtor to lose a substantial amount of revenue and future business. Accordingly, because the Debtor is dependent on these claimants, it is essential that the commencement of these cases not give any Critical Vendors reason or excuse to cease performing their obligations.

27.    Courts in this district and other jurisdictions have authorized payments to such vendors under similar circumstances. *See, e.g., In re Walter Energy, Inc.*, Case No. 15-02741 (TOM) (Bankr. N.D. Ala. Sept. 4, 2015) (authorizing debtors to pay shippers, storage providers, and other lien claimants up to $12.5 million); *see also In re Westmoreland Coal Company*, Case No. 18-

---

[4] For example, section 7-307 of the Uniform Commercial Code provides, in pertinent part, that a "carrier has a lien on goods covered by a bill of lading or on the proceeds thereof in its possession for charges after the date of the carrier's receipt of the goods for storage or transportation, including demurrage and terminal charges, and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to state law." U.C.C. § 7-307(a) (2003).

35672 (MI) (Bankr. S.D. Tex. Oct. 9, 2018) (authorizing debtors to pay pre-petition expenses of shipping claims and lien claims, among others); *In re Armstrong Energy, Inc.*, Case No. 17-47541-659 (KSS) (Bankr. E.D. Mo. Dec. 1, 2017) (authorizing debtors to pay shippers and lien claimants up to $2.2 million); *In re Peabody Energy Corp.*, Case No. 16-42529-399 (BSS) (Bankr. E.D. Mo. Apr. 15, 2016 (authorizing debtors to pay lien claimants up to $6.5 million).[5]

28.    Contemporaneous with this Second Critical Vendors Motion, the Debtor has filed the *Debtor's Emergency Motion to Set Expedited Hearing on Debtor's Second Motion for Entry of Order (I) Authorizing the Payment of Critical Vendor Claims, and (II) Granting Related Relief* requesting the Court to schedule an expedited hearing on this Second Critical Vendors Motion. Expedited relief is necessary with respect to this Second Critical Vendors Motion because it is urgent to immediately pay several Critical Vendor Claims in excess of the Critical Vendors Cap. For example, the Debtor risks substantial disruption to the flow of ingredients to its operations at the Feed Mill if certain ingredient suppliers are not paid in the immediate future, which will in turn damage the profitability of the Feed Mill and the Debtor's business operations generally.

**Processing of Checks and Electronic Fund Transfers Should Be Authorized**

29.    The Debtor believes it has sufficient funds to pay the amounts described in this Second Critical Vendors Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and debtor-in-possession financing. In addition, under the Debtor's existing cash management system, the Debtor can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the Critical Vendor Claims. Therefore, the Debtor respectfully requests that the Court authorize and direct all applicable financial institutions, when requested by the Debtor, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Second Critical Vendors Motion.

---

[5] Copies of these orders are available upon request to the Debtors' proposed counsel.

## The Requirements of Bankruptcy Rule 6003 Are Satisfied

30.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Commencement Date "to the extent that relief is necessary to avoid immediate and irreparable harm." For the reasons discussed above, authorizing the Debtor to pay the Obligations, and granting the other relief requested herein is integral to the Debtor's ability to transition their operations into this chapter 11 case. Failure to receive such authorization and other relief during the first 21 days of this chapter 11 case would severely disrupt the Debtor's operations at this critical juncture. For the reasons discussed herein, the relief requested is necessary in order for the Debtor to operate its business in the ordinary course and preserve the ongoing value of the Debtor's operations and maximize the value of their estates for the benefit of all stakeholders. Accordingly, the Debtor submits that it has satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## Reservation of Rights

31.     Nothing contained in this Second Critical Vendors Motion or any actions taken by the Debtor pursuant to relief granted in the Order is intended or should be construed as: (a) an admission as to the validity of any particular claim against the Debtor; (b) a waiver of the Debtor's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Second Critical Vendors Motion; (e) a request or authorization to assume or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtor's rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtor that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Second Critical Vendors Motion are valid, and the Debtor expressly reserves its

04748848.1

14

rights to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtor's rights to subsequently dispute such claim.

## **Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

32.     To implement the foregoing successfully, the Debtor requests that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtor has established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## **Notice**

33.     The Debtor will provide notice of this Second Critical Vendors Motion on all entities listed on the creditor matrix via First Class United States Mail.  The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

34.     No prior request for the relief sought in this Second Critical Vendors Motion has been made to this or any other court.

*[Remainder of page intentionally blank]*

04748848.1

15

WHEREFORE, the Debtor respectfully requests that the Court enter the Order, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Respectfully submitted this the 15th day of February, 2019.

/s/ Ryan D. Thompson
J. Leland Murphree
Jayna P. Lamar
Ryan D. Thompson
Evan N. Parrott
Wes Bulgarella

*Proposed Counsel to the Debtor*

**OF COUNSEL:**

**MAYNARD, COOPER & GALE, P.C.**
1901 Sixth Avenue North,
2400 Regions/Harbert Plaza
Birmingham, AL 35203
(205) 254-1000
lmurphree@maynardcooper.com
jlamar@maynardcooper.com
rthompson@maynardcooper.com
eparrott@maynardcooper.com
wbulgarella@maynardcooper.com

# Exhibit "A"

## Affidavit of Justin R. Funk

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | Case No. 19-70152 |
| SOUTHFRESH AQUACULTURE, LLC, ) | |
| ) | Chapter 11 |
| Debtor. ) | |

## AFFIDAVIT OF JUSTIN R. FUNK

STATE OF ALABAMA            )

COUNTY OF JEFFERSON            )

Before me, the undersigned notary public, personally appeared Justin R. Funk and who, being duly sworn under oath, stated as follows:

1. My name is Justin R. Funk. I am over the age of majority and have personal knowledge of the information contained herein.

2. I serve as the Chief Financial Officer of SouthFresh Aquaculture, Inc. (the "Debtor").

3. On January 31, 2019, the Debtor received authority from the Court to pay Critical Vendor Claims[1] in an amount not to exceed $1,090,000.00 (the "Critical Vendors Cap"). The Debtor requested such amount based upon vendor records and other historical data available to the Debtor at the time it filed the Critical Vendors Motion.

4. Since that date the Debtor has paid approximately $1,040,000 on account of Critical Vendor Claims owing primarily to farmers, ingredient supplies, and seafood suppliers, leaving a balance of approximately $50,000 in funds available to be paid to Critical Vendors before reaching the Critical Vendors Cap.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Second Critical Vendors Motion.

04747214.2

5. Subsequent to the entry of the Critical Vendors Order, the Debtor identified additional pre-petition deliveries of goods and received numerous invoices for pre-petition services/goods that it was unable to account for when preparing the Critical Vendors Motion. Several of these deliveries and invoices were made or issued by vendors whose continued provision of services/goods are absolutely critical to the Debtor's continued operations. In order to pay for these additional deliveries and invoices, the Debtor will need $380,000 of funding beyond the Critical Vendors Cap. If these additional amounts are not authorized to be paid, the Debtor's operations will experience substantial disruption and lasting, irreparable harm.

6. The Debtor's ordinary course operations can be separated into three general divisions: (1) catfish processing; (2) feed manufacturing; and (3) seafood reselling. For the catfish processing operation, the Debtor purchases catfish from farmers, processes the catfish at the Processing Plant, and sells the processed catfish to customers. For the feed manufacturing operation, the Debtor purchases feed ingredients, manufactures the feed, and sells the manufactured feed to customers. For the seafood reselling operation, the Debtor purchases seafood from a variety of sources, which it the resells to customers. For each of these operations, the Debtor relies heavily on farmers, specialized vendors, ingredients suppliers, repairmen, transportation and shipping providers, and storage/ice providers (collectively, the "Critical Vendors"), each of which provide the Debtor with the materials, supplies, and/or services necessary for the Debtor to operate its three divisions on a daily basis.

7. In many cases, given the small industry size, there are a limited number of Critical Vendors that can service the Debtor's operational needs. In addition to the processing and manufacturing processes, the Debtor is usually responsible for arranging the shipping of ingredients and products through the supply chain. The materials, supplies, and services provided

04747214.2

2

by the Debtor's Critical Vendors are essential to the day-to-day operations of the Debtor's business. Any disruption to the Debtor's supply network would have an immediate negative impact on the Debtor's business. For example, fast and efficient transportation is necessary for the Debtor's successful operations, not only to avoid a backup of excess inventory, but also to ensure preservation of ingredients and product and maximization of revenue shipments.

8. The Debtor obtains materials, supplies, and services from the Critical Vendors, often on an order-by-order basis and without long-term contracts – replacement of which likely would be impossible or would result in substantially higher costs for the Debtor. The Debtor relies on timely and frequent delivery of these goods, equipment, supplies, and services, and any interruption in this supply—however brief—would disrupt the Debtor's operations and impact its revenue, likely causing irreparable harm to its business, reputation, goodwill, employees, customer base, and market share. Such harm would far outweigh the cost of payment of the Critical Vendors Claims.

9. The Debtor believes some of their vendors may be unfamiliar with the chapter 11 process and unwilling to do business on existing terms—assuming such parties will continue to supply the Debtor at all. Any loss of trade terms, whether on account of demands for cash in advance, cash on delivery, or otherwise, will negatively impact the Debtor's liquidity and jeopardize its ability to maintain and service its equipment and to purchase any additional equipment required to service their clients.

10. The Debtor has determined, in the exercise of its business judgment, that payment of certain pre-petition Critical Vendor claims (the "Critical Vendor Claims") is essential to avoid costly disruptions to its operations.

Case 19-70152-JHH11    Doc 63    Filed 02/15/19    Entered 02/15/19 12:56:21    Desc Main
Document    Page 20 of 30

11.     The Critical Vendors which have not been paid thus far generally fall into the following categories:

- Ingredient Suppliers. The Debtor purchases feed ingredients from a core group of ingredient suppliers for its feed manufacturing operation. Similar to the significant role farmers play in the catfish processing operation, feed ingredient suppliers are necessary for the Debtor's feed manufacturing operation. These ongoing relationships are necessary for the Debtor's ability to maintain the functionality of its business operations.

- Seafood Suppliers. The Debtor purchases seafood from a variety of sources, including importers and fishermen for its seafood reselling operation. Without a steady stream of seafood products, the Debtor will not be able to keep its business operations functional.

- Shippers and Packagers. The Debtor utilizes shipping and packaging vendors in all three of its major business operations. For the catfish processing operation, the Debtor may have to pay to ship the catfish from the farmer to its cold storage facilities and/or Processing Plant. After the catfish is processed, the Debtor has to package and ship the processed fish to its cold storage facilities and/or customers across the country. For the feed manufacturing operation, the Debtor must ship the feed ingredients from the ingredient suppliers to the Feed Mill and, after the manufacturing process, package and ship the feed to its customers across the country. For the seafood reselling operation, the Debtor must ship the seafood from the suppliers to its cold storage facilities and then package and ship the seafood to other cold storage facilities and/or customers across the country. It is vital for the Debtor's operations for it to ship and package goods and materials throughout the supply chain. In many cases, the shippers and packaging supplies vendors are irreplaceable and represent the only means to transport and package the Debtor's goods. Without the vendors who provide these services, the Debtor's business operations would not be functional.

- Cold Storage and Ice Providers. The Debtor uses cold storage and ice providers to preserve the catfish and other seafood throughout the supply chain. Without ice, the catfish would perish during the shipping process. Likewise, the catfish and other seafood must be stored in the proper facilities before ultimately reaching the Debtor's customers across the county. For these reasons, cold storage and ice providers are vital to the Debtor's business operations. Without these vendors, the Debtor would be unable to continue operating.

- Repair, Maintenance, and Sanitation Services Providers. Although the Debtor performs its own routine maintenance and repair work on the Processing Plant and the Feed Mill, the Debtor also relies heavily on other essential vendors for more extensive, complex repair, maintenance, and

sanitation services that the Debtor is unable to perform in a cost-efficient manner or does not have the technical expertise to administer. These providers are critical to the safety and sanitation of the Debtor's personnel and its catfish, seafood, and feed products. From time to time, these also supply the Debtor with a limited quantity of replacement parts largely related to their repair services. Further, it is necessary for the Debtor's processing and manufacturing to meeting regulatory standards for sanitation. As a result, the Debtor continually requires specialized chemicals from specific providers to sanitize its equipment and premises to ensure its compliance with health and safety regulations. Without these providers, the Debtor will not be able to keep some of their most highly sought-after equipment sanitary and in good working order.

- <u>Rebate Program Counterparty</u>. One of the Debtor's most significant customers is Sysco Corporation, which is one of the largest sellers, marketers, and distributors of food products to restaurants, healthcare and educational facilities, and lodging establishments around the world. Sysco purchases catfish and other seafood products from the Debtor. As part of this transaction, Sysco regularly provides certain services, including marketing and advertising, to the Debtor and is able to charge back certain costs to the Debtor in the form of a rebate. Sysco accounts for approximately 40% of the Debtor's manufactured catfish sales and approximately 80% of the Debtor's other seafood sales. Not only is Sysco a vital customer of the Debtor's goods, the marketing and advertising services it provides to the Debtor are instrumental to the Debtor's ongoing business operations. Without the ability to charge back certain costs to the Debtor as part of its business relationship, Sysco would likely choose to purchase its manufactured catfish and other seafood from another company. The Debtor consequently would lose Sysco's business and the marketing and advertising services it provides. Accordingly, this rebate program is vital to the Debtor's continuing operations.

12.     The Debtor intends to pay the Critical Vendor claims only to the extent necessary to preserve its business. In return for paying the Critical Vendor Claims, the Debtor will obtain agreements from any party receiving payment to provide goods and/or services to the Debtor on Customary Trade Terms between the Debtor and the claimant.

*[Remainder of page left intentionally blank]*

_____
Justin R. Funk

STATE OF Alabama )
                 )
COUNTY OF Jefferson )

Personally appeared the above-named **JUSTIN R. FUNK**, and made oath that the foregoing statements made by him are true to the best of his knowledge, information or belief, and that so far as upon information and belief, he believes this information to be true.

Given under my hand and official seal this the 15th day of February, 2019.



_____
NOTARY PUBLIC

My Commission Expires:
7/11/21

**Exhibit "B"**

**Proposed Order**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

|  |  |  |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| | ) | Case No. 19-70152 |
| SOUTHFRESH AQUACULTURE, LLC, | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |

---

## <u>NOTICE OF OPPORTUNITY TO OBJECT AND REQUEST HEARING</u>

**PLEASE TAKE NOTICE THAT**, if you object to the below described motion (hereinafter defined as the "<u>Motion</u>") or this order, you must file an objection with the Clerk of Court (an "<u>Objection</u>") by _____ (the "<u>Objection Deadline</u>"), and you must serve the Objection on the movant and all other appropriate persons.

**PLEASE TAKE FURTHER NOTICE THAT** Objections must be filed with the Clerk of Court electronically, by hand delivery, or by mail. The Clerk's office is located at 2005 University Boulevard, Room 2300, Tuscaloosa, Alabama 35401. If you mail your Objection to the Clerk's office, you must send the Objection in time for the Clerk's office to **receive** your Objection by the Objection deadline. The court will not consider untimely Objections.

**PLEASE TAKE FURTHER NOTICE THAT**, if you timely file and serve an Objection, the Court will hold a final hearing on the Motion and your Objection on _____ at __:__ in Room 2600, United States Courthouse, 2005 University Boulevard, Tuscaloosa, Alabama 35401 (the "<u>Final Hearing</u>"); this order shall be treated as an interim order only; and the burden of proof with respect to the appropriateness of the relief requested in the Motion shall remain with the movant. If there are no timely Objections, this order shall be considered a final order on the Motion on _____, 2019, and the Final Hearing will be cancelled.

**PLEASE TAKE FURTHER NOTICE THAT** transfers made pursuant to this order prior to this order becoming a final, non-appealable order may be subject to avoidance under 11 U.S.C. § 549, but financial institutions that receive, process, honor, or pay checks, ACH transfers, or other items payable through, drawn, or directed to a bank account of the above-named debtor in the good faith belief that the court hereby has authorized such check or other item to be honored (either on an interim or final basis) shall not be deemed liable to the debtor or the debtor's estate on account of such check or item.

Case 19-70152-JHH11    Doc 63    Filed 02/15/19    Entered 02/15/19 12:56:21    Desc Main
Document      Page 25 of 30

## ORDER (I) AUTHORIZING THE PAYMENT OF
## CRITICAL VENDOR CLAIMS, AND (II) GRANTING RELATED RELIEF

This matter is before the court on the motion (the "Second Critical Vendors Motion")[6] of the above-captioned debtor and debtor in possession (the "Debtor") for entry of an order (this "Order"), (i) authorizing, but not directing, the payment of critical vendor claims, and (ii) granting related relief, all as more fully set forth in the Second Critical Vendors Motion; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and it appearing that this Court may enter a final order on the Second Critical Vendors Motion consistent with Article III of the United States Constitution; and it appearing that venue of this proceeding and the Second Critical Vendors Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that notice of the expedited hearing on the Second Critical Vendors Motion held _____ __, 2019 (the "Expedited Hearing"), was appropriate under the circumstances and that notice of the opportunity to object to the Second Critical Vendors Motion, and to request a Final Hearing as set forth herein is sufficient; and this Court having reviewed the Second Critical Vendors Motion and having heard and considered the statements and evidence offered in support of the relief requested in the Second Critical Vendors Motion at the Expedited Hearing; and this Court having determined that the legal and factual bases set forth in the Second Critical Vendors Motion and at the Expedited Hearing establish just cause for the relief granted herein; and based upon the filings, evidence, and all other matters before the Court, and for the reasons stated on the record of the Expedited Hearing, it is ORDERED:

1.    The Second Critical Vendors Motion is GRANTED as set forth herein.

---

[6] Capitalized terms used herein but not otherwise defined have the meanings ascribed to them in the Second Critical Vendors Motion.

04748848.1                                      20

2. The Debtor is authorized, but not directed, in the reasonable exercise of their business judgment, to pay all or part of, and discharge, on a case-by-case basis, the Critical Vendor Claims in an amount not to exceed $380,000. For the avoidance of doubt, this amount is in addition to the Critical Vendors Cap set forth in the Critical Vendors Motion.

3. In return for payment of the Critical Vendor Claims, the Debtor, will obtain agreements from any party receiving payment to provide goods and/or services to the Debtor on Customary Trade Terms between the Debtor and the claimant; provided, further, that if any party accepts payment hereunder and does not continue supplying goods and/or services to the Debtor in accordance with the Customary Trade Terms, (a) the Debtor and the agent under the Debtor's debtor-in-possession facility may take any and all appropriate steps to recover from such party any payments made to it on account of its pre-petition claim to the extent that such payments exceed the post-petition amounts then owing to such party; (b) upon recovery by the Debtor, any prepetition claim of such party shall be reinstated as if the payment on account thereof had not been made; (c) if an outstanding post-petition balance is due from the Debtor to such party, (i) the Debtor may elect to re-characterize and apply any payment made pursuant to the relief requested by this Second Critical Vendors Motion to such outstanding post-petition balance and (ii) such party will be required to repay to the Debtor amounts that exceed the post-petition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise; and (d) the Debtor and the agent under the Debtor's debtor-in-possession facility reserve all rights to assert that such payments made were avoidable post-petition transfers under section 549 of the Bankruptcy Code and recoverable by the Debtor. In the event that the Debtor recovers any such funds pursuant to the foregoing, the applicable Obligation shall be reinstated as a pre-petition claim in the amount so recovered.

Case 19-70152-JHH11    Doc 63    Filed 02/15/19    Entered 02/15/19 12:56:21    Desc Main
Document      Page 27 of 30

4.      Any party that accepts or has accepted payment from the Debtor on account of a Critical Vendor Claim and has notice of this Order shall be deemed to agree to continue supplying goods and/or services to the Debtor on Customary Trade Terms if the party does not timely file an Objection.

5.      To the extent a Critical Vendor has already received payment on account of its Critical Vendor Claim prior to entry of this Order, this Order shall be retroactive to authorize such payment; *provided however*, in the event such Critical Vendor does not agree to Customary Trade Terms, (a) the Debtor and the agent under the Debtor's debtor-in-possession facility may take any and all appropriate steps to recover from such party any payments made to it on account of its pre-petition claim to the extent that such payments exceed the post-petition amounts then owing to such party; (b) upon recovery by the Debtor, any prepetition claim of such party shall be reinstated as if the payment on account thereof had not been made; (c) if an outstanding post-petition balance is due from the Debtor to such party, (i) the Debtor may elect to re-characterize and apply any payment made pursuant to the relief requested by this Second Critical Vendors Motion to such outstanding post-petition balance and (ii) such party will be required to repay to the Debtor amounts that exceed the post-petition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise; and (d) the Debtor and the agent under the Debtor's debtor-in-possession facility reserve all rights to assert that such payments made were avoidable post-petition transfers under section 549 of the Bankruptcy Code and recoverable by the Debtor. In the event that the Debtor recovers any such funds pursuant to the foregoing, the applicable Obligation shall be reinstated as a pre-petition claim in the amount so recovered.

6.      The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the pre-petition obligations approved herein are authorized

and directed to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtor's designation of any particular check or electronic payment request as approved by this Order. Financial institutions that receive, process, honor, or pay checks, ACH transfers, or other items payable through, drawn, or directed to a bank account of the Debtor in the good faith belief that the court hereby has authorized such check or other item to be honored on either an interim or final basis shall not be deemed liable to the Debtor or the Debtor's estate on account of such check or item.

7.      The Debtor is authorized to issue post-petition checks, or to effect post-petition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of this chapter 11 case with respect to pre-petition amounts owed in connection with any of the Critical Vendor Claims.

8.      The terms and conditions of this Order are immediately effective and enforceable upon its entry, and the Debtor may immediately authorize the payments described herein; *provided, however*, if an interested party files an Objection by the Objection Deadline, the Order shall be treated as an interim order only, and the burden of proof with respect to the appropriateness of the relief requested in the Second Critical Vendors Motion shall remain with the Debtor at the Final Hearing. If there are no timely Objections, this order shall be considered a final order on the Second Critical Vendors Motion on _____ __, 2019, and the Final Hearing will not be held.

9.      The Debtor is authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Second Critical Vendors Motion.

10.      Notwithstanding anything to the contrary in this Order, any payment made (or to be made) and any authorization contained in this Order shall be subject to the terms, conditions,

Case 19-70152-JHH11    Doc 63    Filed 02/15/19    Entered 02/15/19 12:56:21    Desc Main
Document      Page 29 of 30

limitations, and requirements of any interim order concerning post-petition secured financing and any subsequently issued final order concerning post-petition secured financing entered by the Court.

11.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

12.     Not later than _____, 2019, the Debtor shall serve a copy of this Order on the service parties identified in the list of creditors filed in this case pursuant to 11 U.S.C. § 521(a)(1)(A) by United States First Class Mail, hand delivery, overnight courier, electronic mail, or facsimile, and promptly file proof of such service in the case.

Dated: _____, 2019

_____
UNITED STATES BANKRUPTCY JUDGE

Order Prepared by: Ryan D. Thompson

*/s/ Ryan D. Thompson*_____
J. Leland Murphree
Jayna P. Lamar
Ryan D. Thompson
Evan N. Parrott
Wes Bulgarella

*Proposed Counsel to the Debtor*

**MAYNARD, COOPER & GALE, P.C.**
1901 Sixth Avenue North,
2400 Regions/Harbert Plaza
Birmingham, AL 35203
(205) 254-1000
lmurphree@maynardcooper.com
jlamar@maynardcooper.com
rthompson@maynardcooper.com
eparrott@maynardcooper.com
wbulgarella@maynardcooper.com

04748848.1

24